IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CENTRE DAILY TIMES,            :
SPOTLIGHT PA, and              :
STATECOLLEGE.COM,              :
    Plaintiffs,                :
                               :  CIVIL ACTION NO. 4:26-CV-01442
    v.                         :
                               :  DEMAND FOR JURY TRIAL :
DAVID KLEPPINGER,              :
DANIEL ONORATO, and            :
RICHARD SOKOLOV,               :
*in their official capacities*,
    Defendants.

## COMPLAINT

1.    The First Amendment protects both the right to speak and the press and public's "right to receive information"—including information from public officials and employees. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (citation and internal quotation marks omitted); *see United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995); *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966).

2.    That right is infringed by speech restrictions imposed on trustees of Pennsylvania State University ("Penn State" or "the University"), causing ongoing harm to the trustees themselves and to members of the press and public who wish to hear from them—including Plaintiffs Centre Daily Times, Spotlight PA, and

StateCollege.com, who regularly cover Penn State and look to its trustees as critical sources for their reporting.

3. The Penn State Board of Trustees (the "Board") comprises thirty-eight members and manages all University affairs. Nine members are elected by alumni, while others are variously appointed by the Governor or elected by other groups.

4. Trustees are governed by the Penn State bylaws (the "Bylaws," attached hereto as **Exhibit 1**), including sections titled "Trustee Code of Conduct" (found at Section 2.03 of the Bylaws) (the "Code of Conduct") and "Role and Responsibilities of Trustees" (found at Section 2.04 of the Bylaws).

5. In July 2024, the Board adopted amendments to those Bylaws that effectively eliminated trustees' freedom to communicate with Plaintiffs. In November 2025, the Board adopted additional amendments that further and more severely restrict trustees' speech rights. The amended versions of Sections 2.03(c) and Section 2.04(c) of the Bylaws together form the policy challenged by this lawsuit, collectively referred to herein as the "Gag Policy."

6. Section 2.03(c) sharply restricts the speech of trustees about nearly any topic. It requires trustees to express support for all "majority decisions of the Board," and prohibits trustees from making "[n]egative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders." Ex. 1 § 2.03(c).

2

7.      Section 2.04(c) specifically restricts trustees' speech to the press by requiring trustees to "coordinate all media and press interactions relating to matters that have come before the Board with the Board Office" (an entity that is not defined in the Bylaws), and "respect" any guidance the Board Office may issue.  *Id.* § 2.04(c).  In other words, every trustee must seek and obtain approval of their statements to media in advance, allowing Board leadership to pick and choose what information and opinions the media is allowed to receive from individual trustees.

8.      These speech restrictions come with a concrete threat of discipline. Section 2.05 of the Bylaws makes clear that trustees who fail to follow the terms of Section 2.03(c) or Section 2.04(c) can be subjected to "admonishment," "sanction," and even "removal" from the Board.  *See id.* §§ 2.03(i), 2.05.

9.      In addition, Section Two of the Elections Appendix to the Bylaws (as amended in November 2025) permits the Board to declare ineligible for nomination or election any incumbent or prospective trustee whose "social media and online presence" is deemed by the "Office of the Board" to be "inconsistent with the Code of Conduct and/or Penn State Values."  Ex. 1, Elections App'x § 2.

10.     The Bylaws vest power to enforce the Gag Policy in the Chair of the Board (currently Defendant David Kleppinger), Vice Chair of the Board (currently Defendant Richard Sokolov), and the Chair of the Governance Committee of the Board (currently Defendant Daniel Onorato).  *See* Ex. 1 § 2.05(a).

11.     The Gag Policy, enforced by Defendants, unlawfully infringes trustees' First Amendment rights as speakers, and, in turn, infringes the First Amendment rights of Plaintiffs to receive such information from trustees who are "willing to speak" about Board matters but are "restrained from doing so." *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838–39 (3d Cir. 1996).

12.     There are, indeed, trustees who are willing to speak with Plaintiffs and the public but are prevented from doing so by the Gag Policy.  One example is Emerita Trustee Alice Pope, who was elected by alumni to serve on the Board in 2014 and was an active trustee until 2023.  *See* Decl. of Alice Pope ("Pope Decl.") ¶¶ 2, 14.

13.     Ms. Pope wishes "to speak openly and candidly about [her] experiences on the Board and its governance issues," but has refrained from doing so for fear of discipline pursuant to the Gag Policy.  Pope Decl. ¶¶ 12, 20, 24–25.

14.     That fear is well-founded.  The Board has already taken action to enforce the Gag Policy's speech restrictions, including by issuing a warning to Ms. Pope for making public statements about Board decisions of direct interest to her constituents and the public at large.  Pope Decl., Ex. A; *id.* ¶¶ 17–19.

15.     The Gag Policy chills trustee speech in violation of the First Amendment, and its chilling effect interferes with Plaintiffs' right to receive trustee speech and impedes the free flow of information to the public.

4

16.    Accordingly, Plaintiffs ask this Court to declare the Gag Policy unconstitutional and enjoin Defendants from enforcing it.

## JURISDICTION AND VENUE

17.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it presents a federal question, as it is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First Amendment to the United States Constitution.

18.    This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 1343; Federal Rules of Civil Procedure 57 and 65; and the general legal and equitable powers of the Court.

19.    Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because multiple Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to this action arose from events occurring in this judicial district.

## PARTIES

**Plaintiffs**

20.    Plaintiff Spotlight PA is an independent 501(c)(3) nonprofit organization with a principal place of business in Harrisburg and a satellite bureau in State College.  Spotlight PA's general mailing address is 312 Market Street,

#11728, Harrisburg, PA 17108, and its State College bureau mailing address is 210 W. Hamilton Avenue, #331, State College, PA 16801.

21.     Spotlight PA is an award-winning news outlet that provides free access to vital public-service and investigative journalism to millions of Pennsylvanians via partnerships with more than 100 news outlets across the Commonwealth.  It seeks to hold powerful institutions accountable by engaging in timely investigative journalism on matters of local concern.

22.     To combat the continuing loss of local journalism in Pennsylvania, Spotlight PA has established regional bureaus in State College and Berks County in recent years and explored expanding into the Lehigh Valley; all three areas are home to Penn State campuses.

23.     Spotlight PA's State College bureau regularly reports on Penn State and the Board's affairs, notwithstanding the Board's resistance to greater transparency in its decision-making.

24.     As one example, Spotlight PA's years of reporting on the Board's longstanding, gratuitous use of closed-door meetings culminated in a lawsuit in December 2023, alleging that the practice violated the Pennsylvania Sunshine Act, 65 Pa.C.S. §§ 701–716.  *See* Compl., *Spotlight PA v. Bd. of Trs. of Pa. State Univ.*, No. 2023-CV-2998-CI (Centre Cnty. Ct. Com. Pl. Dec. 6, 2023).  The parties agreed

to a settlement in June 2025, which included providing trustees with training on the state's open meetings law.[1]

26.    Plaintiff Centre Daily Times ("CDT") is a d/b/a of The McClatchy Company, LLC, a Delaware limited liability company with a principal place of business at 1601 Alhambra Boulevard, Suite 100, Sacramento, CA 95816.  CDT's mailing address is 330 Innovation Boulevard, Suite 211, State College, PA 16803.

25.    Spotlight PA has also covered how often Penn State's governing body acts on controversial matters without public discussion of dissenting viewpoints.[2]

27.    CDT has covered Penn State for more than 120 years.  The newspaper and its associated digital properties serve readers in Centre County and surrounding communities in central Pennsylvania.

28.    CDT regularly reports on Penn State and the Board's affairs, including its removal of a trustee,[3] its scolding of another trustee for expressing his desire to

---

[1]    Filings in *Spotlight PA v. Board of Trustees of Pennsylvania State University* are available at https://www.rcfp.org/litigation/spotlight-pa-v-psu-sunshine-act/.

[2]    *See, e.g.*, Wyatt Massey, *Penn State Trustees Rarely Discuss Key Issues Before Voting—Unless They're Related to Athletics or Rules for Members*, Spotlight PA (Nov. 21, 2024), https://www.spotlightpa.org/statecollege/2024/11/penn-state-university-trustees-deliberation-governance-football-beaver-stadium-athletics-budget; Wyatt Massey, *Penn State Trustees Pass Almost 85% of Measures without a Single Dissenting Vote*, Spotlight PA (Dec. 5, 2024), https://www.spotlightpa.org/statecollege/2024/12/penn-state-trustees-votes-budget-administration-tuition-increase-fenchak-lubrano.

[3]    *See* Bret Pallotto, *Centre County Judge Halts Penn State Board of Trustees from Removing Outspoken Trustee*, Centre Daily Times (Apr. 11, 2025),

see the University's football field named after late head coach Joe Paterno,[4] and faculty concerns about the University's 2021 presidential search.[5]

29.     StateCollege.com is a Pennsylvania corporation with a principal place of business at 2929 Stewart Drive, Suite 301, State College, PA 16801.

30.     StateCollege.com is an online news outlet that routinely reports on the actions of Penn State and its Board, including the removal of former Trustee Barry Fenchak from the Board.[6]   StateCollege.com also publishes commentary and opinion pieces related to the Board.[7]

---

https://www.centredaily.com/news/local/education/penn-state/board-of-trustees/article293709264.html.

[4]     *See* Wyatt Massey, *Penn State Trustee Scolded for Making 'Spectacle' in Push to Name Field after Joe Paterno*, Centre Daily Times (Apr. 6, 2024), https://www.centredaily.com/news/local/education/penn-state/article287444900.html.

[5]     *See* Josh Moyer, *Penn State Faculty Express Concerns over Search for New President, Want Greater Role in Selection*, Centre Daily Times (May 30, 2021), https://www.centredaily.com/news/local/education/penn-state/article251414673.html.

[6]     *See* Geoff Rushton, *Penn State Trustees Vote to Remove Barry Fenchak from Board*, StateCollege.com (June 16, 2025), https://www.statecollege.com/articles/psu-news/penn-state-trustees-vote-to-remove-barry-fenchak-from-board.

[7]     *See* Bill Horlacher, *Column: 'They've Lost Their Way,' Former Trustee Says of Penn State Board*, StateCollege.com (Oct. 29, 2024), https://www.statecollege.com/articles/columns/theyve-lost-their-way-former-trustee-says-of-penn-state-board.

**Defendants**

31.    David Kleppinger joined the Board in 2017, served as the Vice Chair from 2021 until 2024, and currently serves as the Chair of the Board.  He is sued in his official capacity.

32.    Richard Sokolov joined the Board in 2022 and currently serves as Vice Chair of the Board.  He is sued in his official capacity.

33.    Daniel Onorato joined the Board in 2022 and currently serves as Chair of the Governance Committee.  He is sued in his official capacity.

34.    Each of the foregoing Defendants voted in favor of the Bylaw amendments adopted in July 2024 and November 2025, including the Gag Policy provisions.

35.    Each of the foregoing Defendants has authority to enforce the Gag Policy under Section 2.05 of the Bylaws, as explained herein.  Specifically, Defendant Kleppinger must act "in consultation with" Defendant Sokolov and Defendant Onorato to initiate an inquiry into a trustee's conduct, *see* Ex. 1 § 2.05(a), and Defendants Kleppinger and Onorato are responsible for making a "joint proposal" that a trustee be removed for violating the Gag Policy, *see id.* § 2.05(c).

36.    Pennsylvania State University, chartered by the Pennsylvania legislature in 1855, *see* 24 P.S. §§ 2531 *et seq.*, is a state actor for purposes of this

action.  *See Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 & n.24 (3d Cir. 1984); *Am. Future Sys., Inc. v. Pa. State Univ*., 618 F.2d 252, 255 (3d Cir. 1980).

37.    Pennsylvania State University's main campus is located in Centre County, PA, and the Board's mailing address is 201 Old Main, University Park, PA 16802.

38.    Because each Defendant participates in governance of Penn State through their membership on the Board as a voting trustee, *see* 24 P.S. § 2532, each Defendant is a "person" acting "under color of any statute, ordinance, regulation, custom, or usage, of" the Commonwealth of Pennsylvania, 42 U.S.C. § 1983.  *See Benner v. Oswald*, 444 F. Supp. 545, 558 (M.D. Pa. 1978), *aff'd*, 592 F.2d 174 (3d Cir. 1979).

## **FACTS**

**The Gag Policy**

39.    Penn State has often faced criticism for a lack of transparency in its operations.[8]  Through its recent enactment of the Gag Policy, the Board escalated

---

[8]    *See, e.g.*, Pa. Dep't of the Auditor Gen., Performance Audit Report: The Pennsylvania State University (June 2017), https://paauditor.b-cdn.net/wp-content/uploads/PSU-Audit-Report.pdf; Alvin de Levie, *What is the Penn State Administration Afraid of?*, Centre Daily Times (Dec. 12, 2017), https://www.centredaily.com/opinion/article189466914.html; Press Release, Am. Council of Trs. & Alumni, *ACTA Raises Concern Over Restricting Trustee Speech and Debate* (Sept. 16, 2016), https://www.goacta.org/2016/09/acta_raises_concern_over_restricting_trustee_speech_and_debate/; Wyatt Massey, *Penn State Trustees Undergo Transparency Training as Part of Settlement*

that pattern by unconstitutionally restricting the speech of trustees to the press and public.

40.    On July 30, 2024, the Board's Committee on Governance and Long-Range Planning convened a special meeting and adopted amendments to certain provisions of the Bylaws, including the Code of Conduct and Role and Responsibilities of Trustees sections, by a 27-6 vote (hereinafter the "July 2024 Amendments").  A copy of the Bylaws adopted in July 2024 is attached hereto as **Exhibit 2**.

41.    Following adoption of the July 2024 Amendments, Section 2.03(c) of the Bylaws' Code of Conduct provided in relevant part:

> While Trustees think independently and make informed individual decisions about what they feel is in the best interests of the University, they shall support majority decisions of the Board and work cooperatively with fellow Board members and the Administration to advance the University's goals.  Negative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders do not serve the University's interests and are inconsistent with a Trustee's fiduciary obligation to act always in the best interests of the University.

Ex. 2 § 2.03(c).

---

*with Spotlight PA*, Spotlight PA (Sept. 19, 2025), https://www.spotlightpa.org/statecollege/2025/09/penn-state-university-trustees-sunshine-act-pennsylvania-penn-state/.

42.     Section 2.04(c) as amended in July 2024 imposed new limitations on trustee statements made "in a Trustee capacity," providing in relevant part:

> Trustees shall recognize that communication of an individual Trustee's views can be assumed to be an expression of the Board's position as a whole and should make diligent efforts to avoid such misunderstandings. Trustees shall coordinate all media and press statements, interviews and/or background discussions done in a Trustee capacity with the Board Office, who will engage Strategic Communications as needed.

*Id.* § 2.04(c).

43.     On November 7, 2025, the Board made further amendments to the Bylaws.  Section 2.03(c) remained unchanged from the version adopted in July 2024, but Section 2.04(c) of the Bylaws, as well as its criteria for trustee election and nomination, was revised (hereinafter the "November 2025 Amendments").

44.     Pursuant to the November 2025 Amendments, Section 2.04(c) was updated to provide in relevant part:

> Trustees shall coordinate all media and press interactions relating to matters that have come before the Board with the Board Office in advance and shall respect guidance regarding such interactions that might be conveyed by that Office or the Office of Strategic Communications. Further, in any interactions with the press or media, students, faculty, staff, and university-affiliated groups, Trustees shall be cognizant of their special role and fiduciary responsibilities.  Trustees shall recognize that while vigorous debate of Trustee views is fully embraced in the context of Board meetings, external communication of an individual Trustee's views can be misconstrued to be an expression of the Board's position as a whole and

12

Trustees should make diligent efforts to avoid such misunderstandings.

Ex. 1 § 2.04(c).

45. The November 2025 Amendments removed language from Section 2.04(c) that had previously limited its restrictions to trustee statements made "in a Trustee capacity." *Compare* Ex. 1 § 2.04(c), *with* Ex. 2 § 2.04(c).

46. The November 2025 Amendments also altered the "Candidate Requirements" provision of the Elections Appendix to the Bylaws, which applies to the election of new candidates and incumbent trustees. Under the amended criteria, candidates must submit to a background check that includes review of their "social media and online presence." Ex. 1, Elections App'x § 2. An individual will be foreclosed from candidacy and election if the Board leadership finds that their social media or online presence reflects "conduct inconsistent with the Code of Conduct and/or Penn State Values." *Id.*

47. The Gag Policy is enforced against trustees pursuant to the provisions set forth in Section 2.05 of the Bylaws. Ex. 1 § 2.05.

48. As another means of enforcement, Section Two of the Elections Appendix empowers Board leadership to bar a trustee from re-election if that trustee has violated the "Code of Conduct," including Section 2.03(c).

49. Section 2.03(c) eliminates trustees' right to dissent publicly by requiring them to "support majority decisions of the Board." *See* Ex. 1 § 2.03(c).

13

50.    Section 2.03(c) prohibits trustees from making public statements that would be deemed "[n]egative" or "critical" of the Board, the University, its students, alumni, community, faculty, staff and anyone else who could potentially be considered a "stakeholder" in the University's affairs—an opaque term that the Bylaws do not define. *See id.*

51.    Section 2.04(c) imposes a prior restraint upon trustees by requiring pre-approval of "all media and press interactions relating to matters that have come before the Board." Ex. 1 § 2.04(c). That provision provides the Board Office, including at least Defendants Kleppinger and Sokolov, with unlimited discretion to censor dissenting trustees and suppress communication of viewpoints with which its members do not agree. This restriction on speech applies even to statements made by trustees in their individual capacities (whereas prior to November 2025, it only reached statements made "in a Trustee capacity").

52.    Section 2.03(c) and Section 2.04(c) are enforced through the provisions of Section 2.05, which sets forth the grounds and procedures for sanctioning and removing trustees. Under Section 2.05, a trustee may be "counseled, admonished, sanctioned, or removed from their position as a Trustee" based on a determination that the trustee:

> (i) breached their fiduciary duties to the University, (ii) failed to adhere to the Code of Conduct; (iii) committed a serious violation of any policy of the University; (iv) been convicted of any felony; or (v) engaged in other conduct

14

that materially impairs the Trustee's ability to fulfill their assigned duties or reflects adversely and materially on the Trustee's fitness to serve on the Board[.]

*Id.* § 2.05(a).

53.     While any Board member can report a violation of the Gag Policy, Section 2.05 vests initial enforcement power in the Board's Chair, Vice Chair, and Chair of the Governance Committee (Defendants Kleppinger, Sokolov and Onorato, respectively), in that "[t]he Chair of the Board, in consultation with the Board's Vice Chair and Chair of the Governance Committee, will determine if [an alleged violation] should be referred for inquiry and investigation by the Governance Committee," which would then investigate and make recommendations about potential consequences.  *Id.*  To remove a trustee for violating the Gag Policy, the Chair of the Board (Defendant Kleppinger) and the Chair of the Governance Committee (Defendant Onorato) must submit a "joint proposal" to the Board for a vote by all trustees.  *Id.* § 2.05(c).

54.     A trustee removed pursuant to Section 2.05 is ineligible to stand for election or serve again on the Board.

**The Gag Policy's Chilling Effect on Trustee Speech**

55.     Because of the Gag Policy, trustees who would be "willing to speak" with Plaintiffs or other members of the public about Board matters are "restrained

15

from doing so." *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838–39 (3d Cir. 1996).

56.     Prior to the adoption of the Gag Policy provisions, the Bylaws did not clearly provide for enforcing limitations on trustee speech.  For example, in February 2024—before the July 2024 Amendments were implemented—Trustee Anthony Lubrano stated in a television interview that Beaver Stadium should be renamed for longtime Penn State football coach Joe Paterno, and that Penn State President Neeli Bendapudi was "just wrong" to not so honor him.[9]  It was later reported that Mr. Lubrano "was admonished by trustee leadership for not clearing his comments with the university strategic communications office."[10]  But the Board could not subject Mr. Lubrano to formal punishment under Section 2.05 for those statements, because the Gag Policy was not then part of the Bylaws.  Today, those statements would subject him to potential punishment for violating the Gag Policy.

---

[9]     Gary Sinderson, *Resolution to Rename Football Field in Honor of Paterno Pauses at Trustee Meeting*, WJAC (Feb. 17, 2024), https://wjactv.com/news/local/resolution-to-rename-football-field-in-honor-of-paterno-pauses-at-trustee-meeting.

[10]     Gary Sinderson, *PSU Board of Trustees Revises Code of Conduct, Alumni Election Process*, WJAC (July 31, 2024), https://wjactv.com/news/local/psu-board-of-trustees-revises-code-of-conduct-alumni-election-process; *see also* Wyatt Massey, *Penn State Trustee Scolded for Making 'Spectacle' in Push to Name Field after Joe Paterno*, Centre Daily Times (Apr. 6, 2024), https://www.centredaily.com/news/local/education/penn-state/article287444900.html.

57.    Mr. Lubrano voted against the November 2025 Amendments to the Bylaws.  He explained that he "do[es]n't think what [the Board is] suggesting here is best practice[], particularly around the notion that [trustee] speech be limited any more than it already has been limited."[11]

58.    At a more recent board meeting, Mr. Lubrano suggested on the record that the changes the Board recently made to the Bylaws were "disenfranchis[ing]" alumni-elected trustees.[12]  Mr. Lubrano's term as a trustee ends on June 30, 2026.

59.    Mr. Lubrano's willingness to speak to the media prior to the enactment of the Gag Policy, along with his statements during Board meetings criticizing the Board's limitations on speech, indicates he is a willing speaker whose speech on matters of public concern is chilled by the Gag Policy.

60.    Emerita Trustee Alice Pope is another example of a willing speaker whose speech is now being chilled by the Gag Policy.

61.    In 2013 and 2014, Ms. Pope co-authored opinion pieces in publications including Plaintiff Centre Daily Times.  Pope Decl. ¶ 9.  And more recently, in April

---

[11]    *See* Halie Kines, *Penn State Trustees Approve Bylaw Changes that Further Limit Media Interactions*, Centre Daily Times (Nov. 7, 2025), https://www.centredaily.com/news/local/education/penn-state/article312814864.html.

[12]    Paloma Pimentel, *Penn State Alumni Elect Two New Trustees, Return Incumbent to Board*, Centre Daily Times (May 8, 2026), https://www.centredaily.com/news/local/education/penn-state/article315658138.html.

and May 2025, she repeatedly spoke publicly and without Board approval about the Board's decision to close seven of the University's twenty campuses. *Id.* ¶¶ 14–16. Those public statements included an op-ed published by Plaintiff StateCollege.com, an on-the-record comment published in an article by Plaintiff Spotlight PA, and a Zoom press conference on May 22, 2025, where she was joined by other alumni-elected trustees. *Id.*

62.    Eight days after she participated in the press conference, Ms. Pope received a letter from Board leadership advising her that she had violated the Gag Policy provisions of Sections 2.03(c) and 2.04(c) (both of which the letter referred to as being part of the "Code of Conduct") by speaking to the media without prior "coordinat[ion]" with the Board Office and by engaging in "[n]egative or critical public statements." Pope Decl., Ex. A; *id.* ¶¶ 17–18.

63.    Ms. Pope understood the letter "to be a formal reprimand for violating the Code of Conduct" and "a direct warning that further public statements could result in harm to my standing within the Board and could affect whether the Board would allow me to serve on key committees or appear on the ballot were I to run for an additional term." *Id.* ¶ 19.

64.    As a result of the Gag Policy and disciplinary actions taken against dissenting voices, Ms. Pope has "become more cautious and selective about what I

18

say publicly, even when I believe speaking would benefit the University and its community." *Id.* ¶ 20.

65.    Enforcement of the Gag Policy's provisions conveyed to Ms. Pope "that public speech outside Board-approved internal channels could carry professional and reputational consequences." *Id.*

66.    But for the Gag Policy and its threat of discipline for public expression of dissent, Emerita Trustee Pope "would speak fully and without limitation." *Id.* ¶ 24.  In other words, Ms. Pope is a willing speaker whose speech on matters of public concern is chilled by the Gag Policy.

67.    But for the Gag Policy, trustees such as Mr. Lubrano and Ms. Pope would be free to provide Plaintiffs with non-confidential information about Board activities and provide their views about Board decisions, which have significant implications for Penn State community members and readers of Plaintiffs' publications.

68.    On information and belief, additional trustees would be willing to speak to Plaintiffs and to the media generally, but for the Gag Policy.

69.    The Gag Policy thus deprives Plaintiffs of that information and harms their ability to report the news.

70.    To redress the injuries to the Plaintiffs' First Amendment rights described herein, Plaintiffs bring this suit.

## CLAIM FOR RELIEF

### COUNT ONE
### 42 U.S.C. § 1983 – Violation of the First Amendment

71.     All prior paragraphs are incorporated herein by reference as if fully set forth herein.

72.     The First Amendment protects the right of elected officials to speak on matters of public concern, including to share information about government decisions and express disagreement with those decisions.  *See Bond v. Floyd*, 385 U.S. 116, 135–36 (1966).  Similarly, public employees do not fully relinquish their First Amendment rights by virtue of their employment by the government.  *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995).

73.     The First Amendment also protects Plaintiffs' right to *receive* information from willing speakers, such as public employees and elected officials, *see Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976), as well as the right to gather the news, *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

74.     Section 2.03(c) of the Penn State Bylaws prohibits trustees from making "[n]egative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders."  Ex. 1 § 2.03(c).  By allowing positive statements while forbidding "negative" ones, Section 2.03(c) discriminates based on viewpoint, *see Rosenberger v. Rector &*

20

*Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), and unconstitutionally restrains trustees from commenting on matters of public concern, *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

75.     Section 2.03(c) of the Penn State Bylaws is also unconstitutionally vague and overbroad in that it reaches any statement (whether or not it is made in an official capacity) that the Board may deem "[n]egative or critical" about not only the Board or Penn State but also "students, alumni, community, faculty, staff, and other stakeholders."  Ex. 1 § 2.03(c); *see Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (discussing overbreadth doctrine).  The term "stakeholders" is not defined and is ambiguous.

76.     Section 2.04(c) of the Penn State Bylaws is likewise an unconstitutional prior restraint and imposes viewpoint discrimination.  It mandates that all trustees "coordinate" with—and, in effect, obtain pre-approval from—the "Board Office" before any "media and press interactions" regarding any "matters that have come before the Board," which is an unconstitutional prior restraint on trustees' ability to speak.  Ex. 1 § 2.04(c).  This prior restraint reduces and distorts the information available to the public on matters of public concern and facilitates viewpoint discrimination by the Board Office in deciding which trustees can speak and what they can say.

77.    Defendants cannot show that these burdens on First Amendment-protected expression survive strict scrutiny.

78.    Section 2.05 of the Penn State Bylaws sets forth a process for imposing punishments on trustees who violate the Gag Policy (that is, Sections 2.03(c) and 2.04(c) of the Bylaws), including "sanction" and "removal."

79.    It vests responsibility for initiating enforcement of the Gag Policy and proposing removal of any trustee for violating it in Defendant Kleppinger in his capacity as Chair of the Board, Defendant Sokolov in his capacity as Vice Chair of the Board, and Defendant Onorato in his capacity as Chair of the Governance Committee of the Board.  In enforcing the Gag Policy, each Defendant is acting under color of state law.

80.    The Gag Policy injures Plaintiffs by barring, or at a minimum chilling, otherwise willing speakers from freely communicating information to Plaintiffs' reporters.  Trustees including Emerita Trustee Alice Pope would be willing to speak with Plaintiffs absent the Gag Policy.

81.    By preventing trustees from providing their opinions, perspectives, and insights into important matters of public concern, the Gag Policy and Defendants' enforcement thereof deprive Plaintiffs of their right to receive this speech from trustees.  Enjoining enforcement of the Gag Policy by Defendants is necessary to

remove the restriction on trustee speech and allow the public to hear from trustees who wish to share important information about the Penn State community.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that this Court:

A. Declare that Sections 2.03(c) and 2.04(c) of the Penn State Bylaws violate the First Amendment, as incorporated by the Fourteenth Amendment;

B. Enter an order enjoining Defendants and their agents, attorneys, servants, employees, successors in office, and other representatives from enforcing Sections 2.03(c) and 2.04(c) of the Penn State Bylaws, in any manner whatsoever;

C. Award Plaintiffs costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

D. Grant such other and additional relief as the Court deems just or appropriate.

Dated: May 27, 2026                           Respectfully submitted,

*s/Paula Knudsen Burke*
Paula Knudsen Burke
Pa. Bar No. 87607
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
4000 Crums Mill Rd., Ste. 101
Harrisburg, PA 17112
(717) 370-6884
pknudsen@rcfp.org

Renee M. Griffin*

23

REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 800-3247
rgriffin@rcfp.org

Heather E. Murray*
Kyle S. Clauss*
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC[13]
Myron Taylor Hall
Ithaca, NY 14853
(607) 255-8518
hem58@cornell.edu
ksc227@cornell.edu

*pro hac vice* appl. forthcoming

*Counsel for Plaintiffs*

---

[13]    The Cornell Clinic is housed within Cornell Law School and Cornell University.  Clinic students Elise Balelo, Sierra Berry, Sarah Chang, James Cohen, Maren Geiger, Esther In, Hannah Knott, Danny Lempert, Kat Namon, Alex Strohl, and Luke Wyatt contributed to the Complaint. Nothing in this filing should be construed to represent the view of these institutions, if any.