**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CENTRE DAILY TIMES, | : | |
| SPOTLIGHT PA, and | : | |
| STATECOLLEGE.COM, | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 4:26-CV-01442 |
| | : | Chief Judge Matthew W. Brann |
| DAVID KLEPPINGER, | : | |
| DANIEL ONORATO, and | : | DEMAND FOR JURY TRIAL |
| RICHARD SOKOLOV, | : | |
| *in their official capacities*, | : | |
| Defendants. | : | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................3

ARGUMENT ............................................................................................8

    I.       Plaintiffs Have Standing to Challenge the Gag Policy............................9

    II.      Plaintiffs Are Entitled to a Preliminary Injunction Against Enforcement of the Gag Policy. ..........................................................................12

        A.  Plaintiffs Are Likely to Succeed on the Merits Because the Board Cannot Establish that the Gag Policy Is Constitutional. ........................12

          1.  The Gag Policy Is an Unconstitutional Prior Restraint...........................13

          2.  The Gag Policy Is an Unconstitutional, Content-Based Restriction on Speech. ..........................................................................17

        B.  The Board's Violation of Plaintiffs' First Amendment Right to Receive Protected Speech Constitutes Irreparable Harm.......................18

        C.  The Irreparable Harm to Plaintiffs' First Amendment Rights Outweighs Any Harm Defendants Might Claim. ..................................19

        D.  The Public Interest Strongly Favors Granting Preliminary Injunctive Relief. ..................................................................19

CONCLUSION ........................................................................................20

CERTIFICATE OF COMPLIANCE WITH L.R. 7.8 ............................................22

EXHIBIT TABLE OF CONTENTS .................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*,
509 U.S. 544 (1993) ..................................................................................12

*Am. C.L. Union v. Mukasey*,
534 F.3d 181 (3d Cir. 2008)........................................................................16

*Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*,
92 F. Supp. 3d 314 (E.D. Pa. 2015).............................................................19

*Am. Future Sys., Inc. v. Pa. State Univ.*,
752 F.2d 854 (3d Cir. 1984)...........................................................................3

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994).........................................................................19

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
39 F.4th 95 (3d Cir. 2022)............................................................................19

*Benner v. Oswald*,
444 F. Supp. 545 (M.D. Pa. 1978),
*aff'd*, 592 F.2d 174 (3d Cir. 1979).................................................................3

*Bond v. Floyd*,
385 U.S. 116 (1966)............................................................................... 13, 14

*Calvary Chapel Dayton Valley v. Sisolak*,
140 S. Ct. 2603 (2020) ................................................................................16

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ....................................................................................15

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
78 F.3d 920 (5th Cir. 1996)..........................................................................10

*Decker Advert. Inc. v. Del. Cnty.*,
765 F. Supp. 3d 128 (N.D.N.Y. 2025) ........................................................10

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024).......................................................................18

*Elrod v. Burns*,
  427 U.S. 347 (1976) ....................................................................................18

*Fenchak v. Pa. State Univ.*,
  No. 25-CV-6313, 2026 WL 1045065 (E.D. Pa. Apr. 17, 2026) ...........................14

*FOCUS v. Allegheny Cnty. Ct. of Common Pleas*,
  75 F.3d 834 (3d Cir. 1996)..............................................................................2

*Free Speech Coal., Inc. v. Paxton*,
  606 U.S. 461 (2025) ....................................................................................17

*Greater Phila. Chamber of Com. v. City of Phila.*,
  949 F.3d 116 (3d Cir. 2020)...........................................................................12

*Harman v. City of New York*,
  140 F.3d 111 (2d Cir. 1998)...........................................................................16

*Houston Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022) ....................................................................................13

*In re Dow Jones & Co.*,
  842 F.2d 603 (2d Cir. 1988)..................................................................... 9, 10

*Jenevein v. Willing*,
  493 F.3d 551 (5th Cir. 2007)..........................................................................13

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
  710 F.3d 99 (3d Cir. 2013).............................................................................19

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ......................................................................................9

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)...........................................................................11

*Landmark Commc'ns, Inc. v. Virginia*,
  435 U.S. 829 (1978) ............................................................................... 16, 19

*Melrose, Inc. v. City of Pittsburgh*,
  613 F.3d 380 (3d Cir. 2010)...........................................................................15

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ..................................................................................20

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ..................................................................................13

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ............................................................................. 2, 12

*Overbey v. Mayor of Balt.*,
930 F.3d 215 (4th Cir. 2019)................................................................. 9, 10

*Pa. Fam. Inst., Inc. v. Black*,
489 F.3d 156 (3d Cir. 2007)...................................................................9, 11

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
280 F.3d 278 (3d Cir. 2002)....................................................................8, 9

*Pansy v. Borough of Stroudsburg*,
23 F.3d 772 (3d Cir. 1994).........................................................................9

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*,
235 F.3d 1243 (10th Cir. 2000)........................................................... 13, 14

*Phila. Inquirer v. Wetzel*,
906 F. Supp. 2d 362 (M.D. Pa. 2012)........................................................19

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................................. 2, 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ..................................................................................17

*Schrader v. Dist. Att'y of York Cnty.*,
74 F.4th 120 (3d Cir. 2023)........................................................................12

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979) ....................................................................................13

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) ........................................................................... 13, 14

iv

*United States v. Wecht*,
    484 F.3d 194 (3d Cir. 2007)......................................................................9

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ........................................................................ 1, 8, 9

*Werkheiser v. Pocono Twp.*,
    780 F.3d 172 (3d Cir. 2015)......................................................... 13, 15

*Wood v. Georgia*,
    370 U.S. 375 (1962) ..............................................................................14

**Statutes**

24 P.S. § 2532.............................................................................................3

42 U.S.C. § 1983 ........................................................................................3

**Other Authorities**

Tom Dougherty, *Saquon Barkley Responds to Criticism over Golfing with Trump
    before Eagles' White House Visit*, CBS News (Apr. 28, 2025),
    https://www.cbsnews.com/philadelphia/news/saquon-barkley-trump-tweet-
    eagles-white-house-visit .......................................................................17

## INTRODUCTION

Plaintiffs Centre Daily Times, Spotlight PA, and StateCollege.com seek a preliminary injunction to stop the Pennsylvania State University ("Penn State") Board of Trustees ("Board") from barring its members from making public statements "critical" of Penn State or the Board, or speaking with the press absent advance approval.  The Board's policy stifles the free flow of information from "willing speaker" trustees to Plaintiffs and the public, infringing their First Amendment "right to receive information."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (cleaned up).

The Board, which is the governing body of Penn State, amended its bylaws in July 2024 and November 2025 to add provisions (collectively, the "Gag Policy") requiring trustees to "coordinate all media and press interactions" with Board leadership in advance and prohibiting trustees from expressing "[n]egative or critical" viewpoints about any Penn State "stakeholders."  Compl. Ex. 1 §§ 2.03(c), 2.04(c).  These amendments significantly curtailed trustees' ability to communicate freely with the press on matters of obvious public concern.  Trustees who fail to comply with these new measures face significant penalties for non-compliance, including removal from the Board and disqualification from nomination to a future term.  *See* Compl. Ex. 1 § 2.05.

1

The Gag Policy's restriction on trustee speech violates the First Amendment, as it is a quintessential "prior restraint" on speech, which the Supreme Court has called "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The fact that the Gag Policy discriminates against speech based on its content and viewpoint (blocking "[n]egative" statements about Penn State stakeholders, but not positive ones) forms an independent basis for finding it unconstitutional. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("[A] government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (cleaned up)).

It is not only the trustees' First Amendment rights that are infringed by the restrictions on speech. The Gag Policy also prevents Plaintiffs from speaking with and getting information from trustees on matters of public concern, causing ongoing harm to their reporting. At least some trustees are "willing to speak" with Plaintiffs but are "being restrained from doing so" under the Gag Policy, providing Plaintiffs with standing to challenge the policy. *See FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 839 (3d Cir. 1996).

The Gag Policy jeopardizes Plaintiffs' ability to report on matters of public concern related to Penn State by depriving them of important information from trustees, and does so every day that the policy remains in effect. To halt this ongoing and irreparable injury to their First Amendment rights, Plaintiffs respectfully ask this

2

Court to declare the Gag Policy unconstitutional and enter a preliminary injunction to prevent Defendants from enforcing it.

## BACKGROUND

Plaintiffs are three Pennsylvania news outlets that extensively cover Penn State and the Board's activities, among other things. *See* McAllister Decl. ¶¶ 4, 6; Rafacz Decl. ¶¶ 4–6; Rushton Decl. ¶¶ 6–7. Each Plaintiff's reporting on Penn State relies in part on information from those with knowledge about Penn State's operations. McAllister Decl. ¶ 5; Rafacz Decl. ¶ 7; Rushton Decl. ¶¶ 8–10.

Defendants are the Chair, Vice Chair, and Chair of the Governance Committee of Penn State's Board of Trustees, which manages Penn State's affairs and serves as its governing body. *See* 24 P.S. § 2532; Compl. Ex. 1 § 2.01.[1] As discussed below, Defendants are responsible for enforcing the Gag Policy.

The Board is composed of thirty-eight trustees. Compl. Ex. 1 § 2.01(a). Nine are elected by Penn State alumni, while others are appointed by the Governor or elected by other groups. *Id.* The trustees are governed by the Penn State Bylaws,

---

[1]  As participants in the governance of Penn State, a state-run university, Defendants are state actors acting "under color of any statute, ordinance, regulation, custom, or usage, of" the Commonwealth of Pennsylvania, 42 U.S.C. § 1983. *See Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 & n.24 (3d Cir. 1984) (finding Penn State's "close relationship with the state government" renders it a state actor for constitutional purposes); *Benner v. Oswald*, 444 F. Supp. 545, 558 (M.D. Pa. 1978), *aff'd*, 592 F.2d 174 (3d Cir. 1979) (allowing Section 1983 suit against Penn State trustees to proceed).

3

including specifically the subsections of Article II entitled "Trustee Code of Conduct" (Section 2.03), "Role and Responsibilities of Trustees" (Section 2.04), and "Trustee Sanction or Removal" (Section 2.05).  For decades, the Bylaws did not formally limit what trustees could say to the press or public, beyond the general requirement that trustees carry out their fiduciary duty to Penn State by "act[ing] in good faith, with due regard to the interests of the University."  *Id.* § 8.07.

In the past two years, however, the Board amended the Bylaws to substantially restrict trustee speech.  On July 30, 2024, the Board amended Section 2.03(c) of the Bylaws to provide that trustees "shall support majority decisions of the Board," and that "[n]egative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders do not serve the University's interests" and as such "are inconsistent with a Trustee's fiduciary obligation."  Compl. Ex. 2 § 2.03(c).  The Board also amended Section 2.04(c) to require that trustees "coordinate all media and press statements, interviews and/or background discussions done in a Trustee capacity with the Board Office, who will engage Strategic Communications as needed."  *Id.* § 2.04(c).

On November 7, 2025, the Board further amended Section 2.04(c).  That subsection now requires trustees to "coordinate all media and press interactions relating to matters that have come before the Board with the Board Office in advance," and mandates that trustees "shall respect guidance regarding such

4

interactions that might be conveyed by that Office or the Office of Strategic Communications." Compl. Ex. 1 § 2.04(c). The November 2025 amendments also removed the language limiting the pre-approval restriction to speech done "in a Trustee capacity." Instead, Section 2.04(c) now applies to "*any* interaction[]" a trustee might have with a reporter related to any matter before the Board, and makes clear that any instructions from the Board Office about those interactions must be followed. *Id.* (emphasis added). The Board also modified the election and nomination criteria for trustees to include review of a candidate's "social media and online presence to ensure there is no conduct inconsistent with the Code of Conduct and/or Penn State Values." Compl. Ex. 1, Elections App'x §§ 2(2)(b), 9(3). This, in effect, allows candidates to be excluded from consideration if they have made "[n]egative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders." Compl. Ex. 1 § 2.03(c).

Sections 2.03(c) and 2.04(c) of the Bylaws, as amended in July 2024 and November 2025, comprise the Gag Policy challenged in this suit. Section 2.05 provides that violation of the Gag Policy may be grounds for sanction and even removal from the Board. *See id.* § 2.05(c)(i)–(ii). This enforcement process is overseen by Defendants in their respective capacities as Chair, Vice Chair, and Chair of the Governance Committee of the Board. Specifically, Defendant Kleppinger

must act "in consultation with" Defendant Sokolov and Defendant Onorato to initiate an inquiry into a trustee's conduct, *see id.* § 2.05(a), and Defendants Kleppinger and Onorato are responsible for making a "joint proposal" that a trustee be removed for violating the Gag Policy, *see id.* § 2.05(c).

In the wake of the Gag Policy's enactment, Plaintiffs have been unable to obtain vital information from trustees about Board decisions impacting thousands of Pennsylvanians. For example, the Centre Daily Times tried to, but could not, speak with any trustee about the Big Ten's prospective 20-year, $2.4 billion deal to sell a percentage of its television rights for reporting published on November 13, 2025, McAllister Ex. B. Recent articles by Spotlight PA and StateCollege.com similarly lack trustee comment concerning Board actions with significant implications for University governance and spending. *See, e.g.*, Rafacz Ex. F (noting Spotlight PA "requested an interview with board leadership," who "did not respond"); Rushton Ex. A (lacking trustee comment about new housing complex). Further, because the public portions of Board meetings often lack *any* discussion of issues to be voted on, *see* Rafacz Ex. E, the inability of trustees to speak freely with the press means that sometimes no information about trustees' views on key issues ever becomes public. The Gag Policy thus leaves the greater Penn State community in the dark about decisions of momentous importance.

Emerita Trustee Alice Pope's experience demonstrates the Gag Policy's effect of chilling trustee speech.[2]  Dr. Pope, a Penn State alumna, served as an alumni-elected trustee from 2014 until 2023, when her status changed to emerita trustee. Pope Decl. ¶ 2.  She is "passionate about improving and maintaining the quality of Penn State," and so at times has "spoken out about specific Board actions affecting the Penn State community," *id.* ¶¶ 2, 5.  As a recent example, in May 2025, Dr. Pope and several alumni-elected trustees convened a press conference to discuss their views on the Board's controversial vote to close seven of Penn State's twenty campuses.  *Id.* ¶¶ 14–16.  Eight days later, Dr. Pope received a letter from Board leadership advising that she had violated the Gag Policy by speaking to the media without prior coordination with the Board Office and making "[n]egative or critical public statements" about the Board.  Pope Ex. A.  Dr. Pope understood the letter "to be a formal reprimand," and "a direct warning that further public statements could result in" consequences including ineligibility for re-election.  Pope Decl. ¶ 19.  Dr. Pope was not alone in this experience.  Alumni trustee Anthony Lubrano also joined that May 2025 press conference, and received a similar letter admonishing him for it—as did two other trustees.  *See* Rushton Ex. E.

---

[2]    The Gag Policy explicitly applies to emeriti trustees.  Compl. Ex. 1 § 2.03(a) ("When representing the University, Emeriti Trustees must also adhere to the requirements outlined in this Code of Conduct.").

As a result of the Gag Policy and the risk of disciplinary action for violating it, Dr. Pope has "become more cautious and selective about what [she] say[s] publicly, even when [she] believe[s] speaking would benefit the University and its community." Pope Decl. ¶ 20. But for the Gag Policy, Dr. Pope "would speak fully and without limitation." *Id.* ¶ 24. Mr. Lubrano reported the same hesitation to speak publicly "[a]s a result of the recent Bylaws changes and receipt of the . . . letter." Rushton Ex. E.

The Gag Policy is in effect today, and applies to future speech by any trustee.

## ARGUMENT

The Gag Policy violates Plaintiffs' First Amendment "right to receive information," because it prevents trustees who are "willing speaker[s]" from sharing what they know and think about practically anything Penn State-related at all. *See Va. State Bd. of Pharmacy*, 425 U.S. at 756–57 (cleaned up). At least one trustee has already attested that she would be willing to speak to Plaintiffs but for the Board's Gag Policy. Accordingly, Plaintiffs have standing to challenge the Gag Policy and are likely to succeed on the merits of their claim. Each day the Gag Policy remains in effect chills trustees from speaking and causes irreparable harm to Plaintiffs' constitutional right to receive and report information of profound public interest. Consequently, the Court should enter a preliminary injunction precluding Defendants from enforcing the Gag Policy as soon as possible to avert further harm.

8

## I. Plaintiffs Have Standing to Challenge the Gag Policy.

As an initial matter, Plaintiffs have standing to challenge the Gag Policy's constitutionality because it injures their right to receive information, which is "(1) a cognizable injury that is (2) causally connected to the alleged conduct and is (3) capable of being redressed by a favorable judicial decision." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 287 n.8 (3d Cir. 2002). The Supreme Court has held that "recipients" of speech have standing to assert a First Amendment violation where the government restricts communications by "willing speaker[s]." *See Va. State Bd. of Pharmacy*, 425 U.S. at 756; *accord Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (recognizing First Amendment right to "receive information and ideas" (citation omitted)). To maintain this type of claim, a plaintiff must establish that a "willing speaker" exists and that speaker's right to speak was infringed upon. *Pa. Fam. Inst., Inc. v. Black*, 489 F.3d 156, 166 (3d Cir. 2007).[3] As explained herein, Plaintiffs have established the existence of at least one willing speaker whose speech is restrained by the Gag Policy.

News organizations, as "potential receivers of otherwise restrained speech" from "willing speakers," have standing to challenge government policies that, by way of their restraint on the speech of sources, restrain newsgathering. *See, e.g.*, *In*

---

[3] The purpose of this requirement is "not to tie the third party's interests to those of the speaker, but to ensure that there is an injury in fact that would be redressed by a favorable decision." *United States v. Wecht*, 484 F.3d 194, 203 (3d Cir. 2007).

*re Dow Jones & Co.*, 842 F.2d 603, 607–08 (2d Cir. 1988); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777 (3d Cir. 1994).  A speaker is considered "willing" if they would have spoken but for the restrictions on their speech, *Black*, 489 F.3d at 166, or if they decline to release information because they believe themselves legally precluded from doing so, *see Overbey v. Mayor of Balt.*, 930 F.3d 215, 228–29 (4th Cir. 2019).  Courts have routinely found the "willing speaker" standard satisfied in challenges brought by the press to speech restrictions such as trial court gag orders, *see Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 927 (5th Cir. 1996); *Dow Jones*, 842 F.2d at 607–08; non-disparagement clauses in settlement agreements with the government, *see Overbey*, 930 F.3d at 227–28; and similar "gag policy" prior restraints imposed on public employees, *see Decker Advert. Inc. v. Del. Cnty.*, 765 F. Supp. 3d 128, 153 (N.D.N.Y. 2025).

Emerita Trustee Alice Pope is a willing speaker to Plaintiffs under this standard.  She has provided information to them before, including during her active tenure as trustee when she published an op-ed with Plaintiff Centre Daily Times in 2015 criticizing the Penn State Alumni Association.  *See* Pope Decl. ¶ 9; McAllister Ex. F.  And in May 2025, Dr. Pope provided a statement to Plaintiff Spotlight PA expressing opposition to the potential closure of Penn State campuses.  Pope Decl. ¶ 15; Rafacz Ex. B.  Shortly thereafter, Dr. Pope also spoke without pre-approval from Board leadership at a press conference with other trustees, and received a letter

10

from Defendants admonishing her for violating the Gag Policy.  Pope Decl. ¶¶ 16–19; Pope Ex. A.  Though she has spoken publicly on rare occasions since July 2024, Dr. Pope has not done so since Defendants' letter or since the November 2025 amendments to the Gag Policy.  Indeed, she declares that the Gag Policy has made her "more cautious and selective about what [she] say[s] publicly, even when [she] believe[s] speaking would benefit the University and its community—particularly the alumni community that elected [her] to serve on the Board."  Pope Decl. ¶ 20.  "But for" the Gag Policy, Dr. Pope would "speak fully and without limitation." *Id.* ¶ 24.  Mr. Lubrano reported the same after receiving the same letter, *see* Rushton Ex. E & attachment.

In other words, Dr. Pope and Mr. Lubrano's hesitation to speak freely with Plaintiffs now is directly traceable and causally connected to the Gag Policy, and an injunction to halt enforcement of the Gag Policy would redress that harm.  Because, at a minimum, Dr. Pope and Mr. Lubrano are willing speakers,[4] Plaintiffs have standing to bring this challenge to the Gag Policy.  *See Black*, 489 F.3d at 167.

---

[4]    To the extent standing is disputed on this basis, Plaintiffs reserve the right to conduct discovery to establish that additional trustees are willing to speak with them absent the Gag Policy.

11

## II.   Plaintiffs Are Entitled to a Preliminary Injunction Against Enforcement of the Gag Policy.

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). In the First Amendment context, however, the government bears the initial burden of proving that the challenged regulation is constitutional. *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023). "If the government cannot establish that the law is constitutional, the [plaintiff] must still demonstrate irreparable harm, though that is generally presumed where the moving party's freedom of speech right is being infringed." *Greater Phila. Chamber of Com.*, 949 F.3d at 133. Here, Defendants cannot prove the constitutionality of the Gag Policy, while Plaintiffs have established irreparable harm warranting a preliminary injunction.

### A.   Plaintiffs Are Likely to Succeed on the Merits Because the Board Cannot Establish that the Gag Policy Is Constitutional.

The Gag Policy is unconstitutional for two principal reasons: (1) it is a prior restraint on protected speech, and (2) it restricts speech based on its content and viewpoint.

12

### 1.    The Gag Policy Is an Unconstitutional Prior Restraint.

The Gag Policy is, on its face, a prior restraint. It "forbid[s] certain communications . . . in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted). Prior restraints "are the most serious and the least tolerable infringement on First Amendment rights," because they impose the "immediate and irreversible sanction" of "freez[ing]" speech. *Neb. Press Ass'n*, 427 U.S. at 559. Consequently, prior restraints are presumptively unconstitutional and subject to strict scrutiny. *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971).

Prior restraints blocking the speech of elected officials like Penn State's trustees are particularly problematic, as elected representatives must be given "the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 136–37 (1966); *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) ("The First Amendment surely promises an elected representative . . . the right to speak freely on questions of government policy."); *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 178 (3d Cir. 2015) (similar); *Jenevein v. Willing*, 493 F.3d 551,

13

557–58 (5th Cir. 2007) (applying strict scrutiny to "regulation of the elected official's speech to his constituency").[5]

Trustees elected by Penn State alumni (if not all Penn State trustees) are elected officials in both form and function, and their speech is thus entitled to robust protection. *See Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (finding college trustees "occupy the same positions as elected public officials"); *Fenchak v. Pa. State Univ.*, No. 25-CV-6313, 2026 WL 1045065, at *7 (E.D. Pa. Apr. 17, 2026) (noting that alumni-elected Penn State trustee "may be more appropriately considered an elected public official" than a public employee). Nine trustees are elected by Penn State's many thousands of alumni, *see* Compl. Ex. 1 § 2.01(a)(iv). Dr. Pope viewed the role as a "noble responsibility," allowing her to help "improv[e] and maintain[] the quality of Penn State." Pope Decl. ¶¶ 2–3. Like any elected official, these alumni-elected trustees "have an obligation to take positions on controversial political questions so that their

---

[5]  In the related, though not identical, context of a government's restrictions on the speech of its own public employees, "the Government's burden [is] heavy" in order to justify any such restriction by "show[ing] that the interests of both potential audiences and a vast group of present and future employees . . . are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 468 (1995) (cleaned up); *see also Werkheiser*, 780 F.3d at 178–79 (noting that standard for public-employee speech cases "appears . . . inapplicable to elected officials"). Even if trustees were public employees, the Gag Policy would fail that test for reasons similar to those explained herein.

14

constituents can be fully informed by them," *Bond*, 385 U.S. at 136, and so they must "be allowed freely to express themselves on matters of current public importance," *Wood v. Georgia*, 370 U.S. 375, 395 (1962).

The Gag Policy is a textbook prior restraint on these trustees because it "chills potential speech before it happens," *NTEU*, 513 U.S. at 468. Specifically, it prohibits "[n]egative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders." Compl. Ex. 1 § 2.03(c). This restriction bans (in advance) any number of statements that fall well within a trustee's rights "to express their views on issues of policy," *Bond*, 385 U.S. at 136–37, or even to speak on matters of public concern not directly related to their role on the Board. For instance, it would prevent Dr. Pope from speaking out against the Board's decision to close multiple campuses, a controversial and highly publicized move. *See* Pope Decl. ¶ 14; Rafacz Ex. B. Taken literally, the Gag Policy would also prohibit "negative" statements by a trustee about hundreds of thousands of Penn State alumni—whether that be Philadelphia Eagles running back Saquon Barkley, any of several Pennsylvania Congressmen, or Plaintiffs' counsel of record Paula Knudsen Burke.

The Gag Policy also specifically targets communications directed to Plaintiffs, essential to their newsgathering: "media and press interactions relating to matters that have come before the Board." Compl. Ex. 1 § 2.04(c). Here, the prior restraint

15

is particularly stark, requiring trustees to "coordinate" with the Board Office "in advance" of any such interaction and "respect guidance" they receive. *Id.* This preclearance requirement prevents Plaintiffs (and by extension, the public) from hearing the "debate and diversity of opinion among elected officials" that the First Amendment is designed to protect, *Werkheiser*, 780 F.3d at 178. It gives the Board Office "unbridled discretion" to decide whether a trustee is allowed to speak, which courts have long held violates the First Amendment. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 392 (3d Cir. 2010). Such discretion creates a grave "risk[] of self-censorship," because trustees "who are critical of the [Board] will naturally hesitate to voice their concerns if they must first ask permission from the very people whose judgments they call into question." *Harman v. City of New York*, 140 F.3d 111, 120 (2d Cir. 1998) (cleaned up).

Accordingly, the Gag Policy is an unconstitutional prior restraint. Defendants cannot demonstrate a "compelling interest" that the Gag Policy alleviates, and its exceedingly broad scope is not "narrowly tailored" to any such interest.[6] *See Am.*

---

[6]    Notably, protecting Penn State's reputation is not a valid basis to restrict protected speech. *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 841–42 (1978) ("[I]njury to official reputation is an insufficient reason for repressing speech that would otherwise be free." (cleaned up)). To the extent Defendants point to trustees' fiduciary duty as a compelling interest, the Gag Policy is not tailored to that interest. Defendants cannot show any statement running afoul of the Gag Policy

16

*C.L. Union v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008) (describing strict scrutiny). To the contrary, the Gag Policy is undeniably overbroad in the statements it reaches—there are no limits to what may be deemed "[n]egative or critical," and nearly anyone could be deemed a Penn State "stakeholder[]," about whom trustees can say very little. Plaintiffs are likely to succeed in showing that the policy violates the First Amendment on this basis.

### 2. The Gag Policy Is an Unconstitutional, Content-Based Restriction on Speech.

In addition to being a prior restraint, the Gag Policy limits speech based on its content and viewpoint, which is "anathema to the First Amendment." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting from denial of application for injunctive relief). Government regulation of speech is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. As written, Section 2.03(c) of the Gag Policy is not only content-based but also viewpoint-discriminatory, as it targets "[n]egative or critical public statements" about various Penn State "stakeholders," Compl. Ex. 1 § 2.03(c). "Positive" statements about those same stakeholders are not so proscribed. For example, a trustee could praise Saquon Barkley for playing golf with the President, but could not criticize him for it without

---

would necessarily violate a trustee's fiduciary duty, as the policy could reach a near-infinite range of statements about Penn State "stakeholders."

risking punishment under the Gag Policy.[7]  As the Supreme Court has long held, viewpoint discrimination is an "egregious" form of content discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

A viewpoint- or content-based regulation of speech, like a prior restraint, is presumptively unconstitutional and warrants strict scrutiny.  *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (citing *Reed*, 576 U.S. at 163).  The Gag Policy cannot survive strict scrutiny, for the same reasons provided above.

### B.      The Board's Violation of Plaintiffs' First Amendment Right to Receive Protected Speech Constitutes Irreparable Harm.

The irreparable harm analysis in this case is straightforward, as First Amendment harms are presumed irreparable.  *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024).  Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Gag Policy is causing ongoing, irreparable harm to Plaintiffs' First Amendment right to receive information from willing speakers.  Plaintiffs' newsgathering has suffered as a result, as they are deprived of uncensored comments

---

[7]      *See* Tom Dougherty, *Saquon Barkley Responds to Criticism over Golfing with Trump before Eagles' White House Visit*, CBS News (Apr. 28, 2025), https://www.cbsnews.com/philadelphia/news/saquon-barkley-trump-tweet-eagles-white-house-visit.

from trustees, who are sometimes the only source of information about crucial University decisions. *See* Rafacz Decl. ¶¶ 7–9; McAllister Decl. ¶¶ 8–9; Rushton Decl. ¶¶ 9–10. Trustees will continue to deliberate and vote on important issues, but each day the Gag Policy is in effect, Plaintiffs are unconstitutionally blocked from receiving information from them. That is irreparable harm that merits a preliminary injunction.

### C. The Irreparable Harm to Plaintiffs' First Amendment Rights Outweighs Any Harm Defendants Might Claim.

Courts have routinely ruled that protecting First Amendment principles and the free flow of information outweighs any potential harm to those enforcing speech restrictions. *See, e.g.*, *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015); *Phila. Inquirer v. Wetzel*, 906 F. Supp. 2d 362, 374 (M.D. Pa. 2012). Here, the Board cannot claim any harm from an injunction that outweighs the irreparable harm resulting from the deprivation of Plaintiffs' First Amendment rights. Controlling Penn State's public messaging and reputation is not an adequate justification. *See Landmark Commc'ns*, 435 U.S. at 841–42.

### D. The Public Interest Strongly Favors Granting Preliminary Injunctive Relief.

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve*

*Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Granting preliminary injunctive relief is firmly in the public interest here because the enforcement of the Board's unconstitutional Gag Policy "vindicates no public interest." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).

Further, the public interest in the free exchange of ideas far outweighs any harm to the Board. *See Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022) (recognizing "strong public interest in upholding the requirements of the First Amendment"). Plaintiffs' ability to report on Penn State, including by getting information from willing-speaker trustees with knowledge on matters of public concern, fulfills the maxim that "sunlight is the most powerful of all disinfectants." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 305 (1964) (Goldberg, J., concurring) (citation omitted). In view of the Gag Policy's unconstitutionality, as well as the irreparable harm arising from the Board's ongoing violation of Plaintiffs' First Amendment rights, preliminary injunctive relief is in the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to grant their motion for a preliminary injunction and enjoin Defendants from enforcing Sections 2.03(c) and 2.04(c) of the Penn State Bylaws.

20

Dated: June 10, 2026                    Respectfully submitted,

                                        /s/Paula Knudsen Burke
                                        Paula Knudsen Burke
                                        PA Bar No. 87607
                                        REPORTERS COMMITTEE FOR
                                        FREEDOM OF THE PRESS
                                        4000 Crums Mill Rd., Ste. 101
                                        Harrisburg, PA 17112
                                        Tel: (717) 370-6884
                                        Fax: (202) 795-9310
                                        pknudsen@rcfp.org

                                        Renee M. Griffin*
                                        REPORTERS COMMITTEE FOR
                                         FREEDOM OF THE PRESS
                                        1156 15th St. NW, Suite 1020
                                        Washington, D.C. 20005
                                        (202) 800-3247
                                        rgriffin@rcfp.org

                                        Heather E. Murray*
                                        Kyle S. Clauss**
                                        CORNELL LAW SCHOOL
                                        FIRST AMENDMENT CLINIC[8]
                                        Myron Taylor Hall
                                        Ithaca, NY 14853
                                        (607) 255-8518
                                        hem58@cornell.edu
                                        ksc227@cornell.edu

                                          *admitted *pro hac vice*
                                        ***pro hac vice* appl. forthcoming

                                        *Counsel for Plaintiffs*

---

[8]    The Cornell Clinic is housed within Cornell Law School and Cornell University.  Nothing in this brief should be construed to represent the view of these institutions, if any.

21

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.8**

I hereby certify that the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction contains 4,887 words, as calculated by the word-count feature of Microsoft Word, in compliance with the limits of Local Rule 7.8(b)(2).

Date: June 10, 2026                                    */s/ Paula Knudsen Burke*
                                                       Paula Knudsen Burke
                                                       PA Bar No. 87607
                                                       REPORTERS COMMITTEE FOR
                                                       FREEDOM OF THE PRESS

22

## EXHIBIT TABLE OF CONTENTS

| | |
|---|---|
| Declaration of Jessica McAllister | |
| McAllister Ex. A | Halie Kines, *Do Penn State's Bylaws Restrict Trustees' Freedom of Speech? What Experts Said*, Centre Daily Times (Nov. 24, 2025), https://perma.cc/454U-VP2C |
| McAllister Ex. B | Josh Moyer, *Will Penn State, Big Ten OK $2.4B Deal Likened to 'Payday Loan'? PSU, Trustees Mum*, Centre Daily Times (Nov. 13, 2025), https://perma.cc/R2SA-EBUP |
| McAllister Ex. C | Halie Kines, *Penn State Trustees Approve Bylaw Changes that Further Limit Media Interactions*, Centre Daily Times (Nov. 7, 2025), https://perma.cc/LYE5-NM2Y |
| McAllister Ex. D | Halie Kines, *Penn State Trustees Permanently Remove Barry Fenchak from the Board*, Centre Daily Times (June 16, 2025), https://perma.cc/54KG-XXHT |
| McAllister Ex. E | Bret Pallotto, *Centre County Judge Halts Penn State Board of Trustees from Removing Outspoken Trustee*, Centre Daily Times (Apr. 11, 2025), https://perma.cc/NF76-USXV |
| McAllister Ex. F | Alice Pope, *Alumni Association Eschewing Inclusiveness*, Centre Daily Times (Apr. 18, 2015), https://perma.cc/7RF7-245J |
| Declaration of Sarah Rafacz | |
| Rafacz Ex. A | Wyatt Massey, *Penn State Trustees Undergo Transparency Training as Part of Settlement with Spotlight PA*, Spotlight PA (Sept. 19, 2025), https://perma.cc/2ASK-9JWQ |

23

| | |
|---|---|
| Rafacz Ex. B | Wyatt Massey, *How Penn State Trustees Plan to Vote on Campus Closures Could Run Afoul of Transparency Law*, Spotlight PA (May 7, 2025), https://perma.cc/6V5Y-F6ND |
| Rafacz Ex. C | Wyatt Massey, *Penn State Trustee Scolded for Making 'Spectacle' in Push to Name Football Field after Joe Paterno*, Spotlight PA (Apr. 6, 2024), https://perma.cc/Z3VR-YFMW |
| Rafacz Ex. D | Wyatt Massey, *Review of Penn State Contracts Reveals Incorrect Filings, Questions about Trustee Disclosures*, Spotlight PA (Sept. 21, 2023), https://perma.cc/VX3Q-JM2G |
| Rafacz Ex. E | Wyatt Massey, *Penn State Trustees Rarely Discuss Key Issues Before Voting — Unless They're Related to Athletics or Rules for Members*, Spotlight PA (Nov. 21, 2024), https://perma.cc/SZ2Q-XHX8 |
| Rafacz Ex. F | Wyatt Massey, *Penn State Trustees Pass Almost 85% of Measures without a Single Dissenting Vote*, Spotlight PA (Dec. 5, 2024), https://perma.cc/K3RQ-UGCD |
| Declaration of Geoff Rushton | |
| Rushton Ex. A | Geoff Rushton, *Developer Presents Final Plan for New Student Housing Complex on Penn State Campus*, StateCollege.com (Dec. 9, 2025), https://bit.ly/4uMWUBd |
| Rushton Ex. B | Geoff Rushton, *Penn State Trustees Vote to Remove Barry Fenchak from Board*, StateCollege.com (June 16, 2025), https://perma.cc/DFL8-8JUU |
| Rushton Ex. C | Joe Lister & Geoff Rushton, *Penn State Board of Trustees Alters Election, Conduct Codes*, StateCollege.com (July 31, 2024), https://perma.cc/8XV7-ALUF |

24

| Rushton Ex. D | Alvin de Levie, *Column: 'They've Lost Their Way,' Former Trustee Says of Penn State Board*, StateCollege.com (Oct. 29, 2024), https://perma.cc/Q8GZ-EGXG |
| --- | --- |
| Rushton Ex. E | Email from A. Lubrano to G. Rushton, dated June 3, 2026, with attached letter from Defendants D. Kleppinger, R. Sokolov, and D. Onorato to A. Lubrano, dated May 30, 2025 |
| | Declaration of Alice Pope |
| Pope Ex. A | Letter from Defendants D. Kleppinger, R. Sokolov, and D. Onorato to A. Pope, dated May 30, 2025 |

25