# Rushton Exhibit A

Home » News » Latest Penn State News »

# Developer Presents Final Plan for New Student Housing Complex on Penn State Campus



Design rendering of a planned new student-housing complex at the corner of Hastings Road and University Drive on Penn State's University Park campus. Image by Greystar

By **Geoff Rushton** – December 9, 2025 – 12:00 am

Latest Penn State News, Local News, State College

State College Planning Commission on Dec. 3 reviewed a final land development plan for a **new student housing complex to be constructed on Penn State's University Park** campus in a public-private partnership.

The university plans to ground-lease 16.8 acres along the southeast corner of Hastings Road and University Drive to Greystar Development for a four-building complex totaling 1,505 beds. The site is currently used for long-term student parking.

A word from our Ad partners

Construction is slated to begin on the project in the spring and be completed in two phases, Chris Nasuti of project engineer HRG said. Two buildings constructed in phase one will have 876 beds and be completed in 2028, while the other two buildings with 629 beds will be completed in 2029.

A total of 753 parking spaces will include 353 on the development parcel and 400 on an adjacent plot leased from Penn State. The leased parking will be dedicated for tenants of the Greystar complex and will not be shared with other university users, Nasuti said.



Design rendering of a planned new student-housing complex at the corner of Hastings Road and University Drive on Penn State's University Park campus. Image by Greystar

Two access points will be on Hastings Road, with traffic flowing to the University Drive intersection. A traffic impact study has been reviewed and accepted by the borough and College Township, where a small portion of the project site is located, and traffic patterns will be reevaluated 15 to 18 months after construction, Nasuti said.

For the building exteriors, the materials will use a “more neutral color palate,” Matt Lamm of WDG Architecture said. Materials will include fiber cement cladding, brick, glazed aluminum storefront for entrances and metal accents.

“We are mostly using fiber cement panel, creating these kind of organic patterns, different kinds of colors addressing the long scale of the building,” Lamm said. “As we get closer to the ends of the building we are proposing to use a darker masonry, and using a lighter white color fiber cement panel on either side of the building and more of a two-story read of a storefront entry canopy and metal panel articulation.”



A design rendering of one of four buildings planned for the Greystar housing complex at Penn State. Image by Greystar

Greystar development director Daniel Nickerson said during a preliminary plan review in the summer that each six-story building will have apartment-style units with their own kitchens, washers and dryers. Among the four buildings, 55% of units will be four-bedrooms, 25% will be three-bedrooms and the remaining 20% will be one-bedroom and studio apartments.

Amenities will reflect a focus on health and wellness, with year-round fitness centers in both phases, pedestrian paths and walkable streetscapes, direct access to bicycle infrastructure
two outdoor amenity terraces and outdoor plantings, green spaces, gathering areas and amenities, Nickerson said on Dec. 3.

A number of legacy and heritage trees will be preserved, most notably in the outdoor gathering spaces created between the buildings “to make it feel very campus-like,” Nickerson said.

Landscaping buffers also will be utilized along University Drive and Hastings Road to reduce the visibility of the complex from the street.

College Township's planned "Path to Campus," a shared-use path running from Puddintown Road to Hastings Road parallel to East College Avenue, will be routed around and have a connection to the housing complex, Nasuti said.

The complex will be served by the State College Borough Water Authority and the borough and University Area Joint Authority for wastewater.



The planned housing complex viewed from College Avenue at University Drive. Image by Greystar

After issuing a request for proposals, Penn State's Board of Trustees in November 2024 **approved a ground-lease** with Greystar to build and operate the complex on the university-owned land. Terms of the lease were not disclosed.

Greystar representatives said during the preliminary review in the summer that rental rates would be "affordable" for "everyday students" in the context of existing market rates, but have not to date said what the rates would be.

The complex is intended for non-first year students, according to a board of trustees presentation in 2024, and will include a mix of different unit types.

University administrators said the complex would provide more on-campus beds to meet demand, as Penn State plans a strategic increase in enrollment at University Park, while focusing on using Housing and Food Services reserves and debt for renovations of existing university-owned residence halls.



Design rendering of one of four buildings planned for a Greystar housing complex on Penn State's University Park campus. Image by Greystar


## StateCollege.com Breaking News

Receive all the latest news and events right to your inbox.

# Rushton Exhibit B

Home » News » Latest Penn State News »

# Penn State Trustees Vote to Remove Barry Fenchak From Board



Old Main at Penn State. Photo by Mikey DeAngelis | Onward State

By **Geoff Rushton** – June 16, 2025 – 5:29 pm

Latest Penn State News, Local News

Penn State's Board of Trustees on Monday voted to remove a frequently outspoken member, citing code of conduct violations related to an interaction with a university staff member last summer.

The board voted 30-4 to oust alumni-elected trustee **Barry Fenchak**, just two weeks before his term was set to expire. Joining Fenchak in voting against removal were fellow alumni elected trustees Ted Brown,

Anthony Lubrano and Jay Paterno. Trustees Ali Krieger and Dan Onorato were absent.

A word from our Ad partners

The two-thirds vote in favor of removing Fenchak means he is prohibited from serving as a trustee in the future.

The incident at the heart of Monday's vote occurred on July 19, 2024 following a board meeting at the Altoona campus. Fenchak told a junior female staffer that when he wears a ball cap he "looks like a penis with a little hat on," a remark he later said was a quote from the 1992 movie "A League of Their Own."

Penn State's Office of Ethics and Compliance investigated after the staff member filed a complaint, saying the interaction made her uncomfortable and that she felt she could not exit the conversation because of Fenchak's position. Two witnesses confirmed her account and described the remarks as inappropriate. Fenchak said he intended it as self-deprecating joke and regretted if he made anyone feel uncomfortable.

The interaction happened days after **Fenchak filed a lawsuit against the board** after he said his requests for information about the management of the university's $4.6 billion endowment and its rising administrative fees, and later about the athletic department's 10-year agreement with ticketing and fan engagement firm Elevate, were repeatedly denied.

Fenchak and board leadership have had a contentious relationship throughout his three-year term, resulting in multiple lawsuits over the last year. He said on Tuesday that the incident with a staff member was being used as a pretext to remove him because of his demands for financial information, questioning of decisions and criticisms of how the board operated.

"The only harm being mitigated here is the harm to the desires of board leadership to operate without transparency, without honesty, without responsibility and without accountability," he said. Chair David

Kleppinger said he did not agree with Fenchak's "characterization of board leadership, but we will not debate that here today."

Those who spoke in favor of his removal said the complaint from the staff member was a serious matter that warranted his expulsion.

"Eyewitness accounts of the interaction verified Mr. Fenchak's lack of respect for women, professionalism and moral judgment," said Tracy Riegel, one of seven women trustees who authored **a letter** denouncing Fenchak's behavior last fall. "Furthermore, he publicly passed the interaction off as a joke. Women represent over 50% of Penn State faculty and staff and 46% of our students. The Penn State Board of Trustees is the governing body of the university and must hold themselves to the highest professional and ethical standards. By taking this action today and removing Mr. Fenchak from the Board of Trustees, we send a clear message to the university community that this unacceptable behavior will not be tolerated."

Fenchak said that board leadership provided him notice of the charges on Aug. 23 against him five days before it received a preliminary report and two weeks before he was interviewed by the ethics office. The notice, he said, "was a titillating charging document laced with very distorted interpretations of the facts, at least the facts that board leadership wanted to be true, and obviously those those distortions remain today."

The board's governance **committee voted in September to recommend his removal** and scheduled a vote for October. That vote, however, was halted when Centre County Judge Brian Marshall granted a request for a **preliminary injunction**, writing that Fenchak "provided uncontradicted evidence of retaliatory behavior" against him by board leadership because of his requests for information the university claimed was protected by confidentiality agreements and not essential to his role as a trustee.

After Fenchak and the board reached an agreement for him to review the documents, Marshall **granted Penn State's request to lift the injunction on May 16**, writing that Fenchak "can no longer maintain that he is subject to removal from the Board in retaliation to these specific requests."

Fenchak **told StateCollege.com** on Saturday that the board resumed looking to schedule a vote on his ouster as early as May 23.

Speaking in favor of his removal, trustee Kelley Lynch said on Monday that Fenchak's remark could not be dismissed "as a boys will be boys exchange or "just locker room talk." She and other women were often told early in their careers to "just get over it" when they were made uncomfortable by such comments or worse, Lynch said.

“But this is now 2025. This isn’t the ’90s, it’s not the ’80s, or even earlier. When someone finds the courage to file a complaint, especially against a person in a significantly more powerful position, it is our duty to take it seriously,” Lynch said. “That means conducting a thorough investigation, gathering facts, and hearing all sides. And that is exactly what happened.”

Lynch added that the employee was so uncomfortable she asked not to be assigned to events where Fenchak would be in attendance.

“In his response, the textbook non-apology, he said he felt bad if someone was off-put or felt uncomfortable,” she said. “The fact that he was not mortified by the impact his actions and words had on her just amazed me. His lack of genuine remorse and unwillingness to take responsibility along with his complete failure to recognize the power dynamic at play is what concerns me.”

Each of the trustees who spoke against Fenchak’s removal said they did not condone his comment, but that it warranted sanctions, not expulsion.

Lubrano and Fenchak both referenced alleged code of conduct violations by other board members who they did not name, including personal insults, defamatory statements and threats of violence against other trustees that they said were ignored by board leadership.

“Why is this behavior – of actual malice and threats regarding fellow trustees – condoned, and yet I am the target for removal?” Fenchak asked.

Lubrano called voting to remove Fenchak “hypocritical and intellectually dishonest.”

“Trustee Fenchak’s informed, direct, though sometimes brash and tenacious approach to some of our university’s most important and hotly contested issues offends you,” Lubrano said. “But his conduct does not rise to the level of a fiduciary breach suggested here today, or justify his removal.”

Brown said Fenchak’s comment to the staffer was “awful” but that removing a trustee is “a slippery slope.”

Paterno, who noted he did not endorse Fenchak’s election to the board and called his comment “offensive,” said removing Fenchak with his term nearly expired and virtually no chance he could be elected again “borders on petty.”

“”This is a sad day for Penn State,” Paterno said. “Anybody that thinks this is a good thing is really not tuned into what’s happening here. We are setting a precedent right now.”

Fenchak did not win reelection this spring after running a write-in campaign when he was barred from appearing on the ballot. In February, he garnered the necessary 50 nominations to be eligible for the ballot as he sought a second three-year term as an alumni trustee. But a new nominating subcommittee with the power to deem candidates "unqualified" and ineligible to be listed on the ballot, created among several bylaw changes last year, **voted to disqualify Fenchak**.

At the nominating subcommittee's meeting on Feb. 26, where Fenchak was the only candidate disqualified, trustee Daniel Delligatti cited the incident with the staff member, noting that Fenchak had been advised of seven other "failures to abide by board standards of conduct."

Fenchak **sought an emergency order to be placed on the ballot**, arguing that the board had used the nominating subcommittee to circumvent the injunction and that the bylaw changes violated state laws governing nonprofits and freedom of speech.

Penn State countered that the July 2024 incident was part of a "pattern of inappropriate behavior." Attorneys for the board wrote in a filing that Fenchak has a "bottomless desire for attention" and a "predilection for misogynistic conduct," citing social media posts that denigrated the board as a whole and specific members.

Marshall **ruled in the board's favor** in April.

"Him being on this board is not going to happen future. We all know that but what we want to do today is make sure he can never run again," Paterno said on Monday. "That sends a very chilling message to future boards and future people…"

Lubrano said he expects Fenchak's removal will "lead to costly litigation and distract from our important work."

"Mark my words, your decision to remove Trustee Fenchak will come back to haunt this university," Lubrano said.

Lynch, though, said trustees have a duty to ensure an incident like the July interaction with the staffer "won't happen again."

"This situation was not just locker room talk to her," Lynch said. "This happened while she was doing her job. We have a responsibility to the penn state community to ensure a safe and respectful environment for all of our employees."

# Rushton Exhibit C

# Penn State Board of Trustees Alters Election, Conduct Codes



Photo by Geoff Rushton | StateCollege.com

By **Joe Lister, Geoff Rushton** – July 31, 2024 – 1:50 pm

Latest Penn State News, Local News

Penn State's Board of Trustees on Tuesday voted to alter several sections of its own bylaws regarding elections and code of conduct. With the vote, the board will be able to decide which candidates running for alumni trustees positions are qualified for election and punish any trustees who speak out against board decisions.

The 27-6 vote at the end of a 90-minute meeting came after months of discussion by the board's Committee on Governance and Long-Range Planning and a working group tasked with developing revisions to the bylaws. Alumni-elected trustees Ted Brown, Barry Fenchak, Christa Hasenkopf, Ali Krieger, Anthony Lubrano and Jay Paterno voted no. Trustee Matt McGloin was absent.

A word from our Ad partners



getyourguide.com - Sponsored

Unforgettable experiences

Book now

The board was given the ability to vote between two options on election matters. The board voted against option one, which would have allowed a subcommittee to decide whether or not candidates for alumni seats are "qualified" to serve on the board and mark their decisions on the ballot. With option one, alumni running for office would be able to run regardless of the board's decision.

With option two, the same subcommittee, which does not yet have any members or have standards by which to judge candidates, can remove alumni candidates at will. The board passed option two with

eight trustees voting against the change.

During the vote, trustees could vote in favor of option one and option two, one at a time. Several trustees asked what would happen if a majority voted no on both options, and chairman Matthew Schuyler told them they would cross that bridge when they got there. Given that option two passed, Schuyler never told trustees what would happen if both options were struck down.

The board also voted to lower the number of nominations needed to run from alumni seats from 250 to 50, which had been the threshold until it was raised in 2015.

Several other bylaws were added to the trustees' code of conduct, including requirements of professionalism, meeting attendance and how trustees publically address board decisions. Most notably, the board can remove a trustee for speaking out against a board decision they disagree with.

“While Trustees think independently and make informed individual decisions about what they feel is in the best interests of the University, they shall support majority decisions of the Board and work cooperatively with fellow Board members and the Administration to advance the University's goals,” the bylaws read.

“Negative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders do not serve the University's interests and are inconsistent with a Trustee's fiduciary obligation to act always in the best interests of the University.”

Fenchak, **who is suing the Board of Trustees** for access information about Penn State's finances, expressed doubts about the decision to Onward State.

“The actions today by the board will undoubtedly move us to where Penn State alumni will no longer have a voice in electing their representation to the board. The actions will concentrate the power and authority of the board into the hands of a small number of trustees with little accountability, not only to Penn State stakeholders but to other members of the board themselves,” Fenchak said. “It will move to suppress dissenting voices, as well as to impose severe sanctions on any trustees who choose to express viewpoints that may not be congruent to board leadership.”

Fenchak requested access to Penn State's financial documents through both the Board of Trustees and the university, though he was repeatedly denied. Under the new bylaws, the board would have complete control over Fenchak's request and whether or not he can access the financial documents he asked to see.

Brown, who complimented the efforts of the working group, and Paterno, who was part of the working group, both said they voted no because of the establishment of the nominating subcommittee.

“Everything else in there I think I’m good with but that to me is a bridge too far,” Paterno said.

Brandon Short was one of two alumni-elected trustees, along with Carl Nassib, who voted in favor of the new bylaws. Short did not vote in favor of either of the two nominating committees. Short told Onward State that while he didn’t agree with everything in the new bylaws, he found the package as a whole too appealing to turn down.

Short said the bylaws improved the board’s work with technology, academic affairs, and the lowered nomination requirement for alumni candidates were positive additions to the new bylaws. He also said that with the lower vote counts, more alumni will be able to run for office and that it would be necessary for a subcommittee to lower the number of eligible candidates out of consideration for those filling out a ballot.

“Just because you don’t agree with one line doesn’t mean you vote no on the whole package,” Short said. “I think it’s a step forward overall for the whole university.”

Nassib did not respond to a request for comment from Onward State.

After the board meeting, trustee emerita Alice Pope spoke out against the decision on **Facebook**.

“This move, which puts even more power than ever before into the hands of board leadership, takes us a step further towards a fully self-selected board,” Pope wrote about the creation of the nominating subcommittee that will determine alumni candidates’ eligibility.

“Other bylaws changes will discourage dissent and disagreement. My writing of this post is contrary to the new bylaws which state that trustees (including emeriti) must not publicly disagree with actions taken by the board majority. Free speech is now denied to trustees of our public university — a place where the open exchange of ideas should be welcome,” Pope continued.

“One-hundred-and-fifty years ago, the founders of our university had the foresight and wisdom to allow the alumni to elect our own trustees,” Pope concluded. “I have always believed that the special relationship between the alumni and the university was nurtured by this and yielded the intense loyalty that has benefited Penn State over the years. Today’s actions by the board majority will forever change that.”

One trustee told Onward State they felt many trustees fell in line with board rank because they felt more loyalty to the board than to those who the board serves. This trustee was granted anonymity by Onward State due to the new board rules regarding trustees who publicly dissent against board decisions.

The trustee added that with a lack of elections for many board positions, there was a go-along-to-get-along attitude that influences board actions.

Penn State's board, the trustee said, is dysfunctional.

*Geoff Rushton contributed to this report.*


## StateCollege.com Breaking News

Receive all the latest news and events right to your inbox.

**Email**

SIGN UP

**Select List**

- [x] Weekly Events
- [x] Daily Top Stories
- [x] Weekly PSU Sports

**CAPTCHA**

I'm not a robot

reCAPTCHA

A word from our Ad partners

# Rushton Exhibit D

# Column: 'They've Lost Their Way,' Former Trustee Says of Penn State Board



Alvin de Levie offered his perspective on the controversial issues and multiple lawsuits that are now being faced by Penn State's Board of Trustees. Photo by Bill Horlacher

By **Bill Horlacher** – October 29, 2024 – 5:04 am

Columns, Latest Penn State News, Local News, Opinion

*Updated 5:53 p.m. Oct. 30 with corrected attribution of a quote by a trustee.*

I've tried my best this fall to focus on Happy Valley news that really matters. Like the exploits of the Penn State football team or the pre-season rankings of the Nittany Lion wrestlers.

A word from our Ad partners



getyourguide.com - Sponsored

**Top Things to Do**

Book now

But doggone it, even sports fans like me must focus on courtroom dramas that affect our lives. So yes, I've paid attention when Penn State, my alma mater and our region's chief employer, has been taken to court. More than once.

For example, a lawsuit and a request for **injunction** was filed in Centre County by PSU Board of Trustees member Barry Fenchak who alleges that the board and its chairman, Matthew Schuyler, withheld financial data from him—data needed for him to perform his fiduciary role.

Or a lawsuit was filed last month in Lackawanna County by another trustee, **Anthony Lubrano**, who claims that the board launched a retaliatory investigation against him for giving media interviews wherein he “expressed his opinions on matters of public concern affecting the university.”

Or an earlier but still pending lawsuit was filed in December of 2023 by **Spotlight PA** against the Board of Trustees. Spotlight alleges that the board was violating Pennsylvania’s Sunshine Law by regularly meeting in secret.

So here I am, the guy who cares about such cases but who responds to terms like “aforementioned,” “pursuant,” and “prima facie” with “Huh?” Needing a little help to understand these matters, I reached out to my friend, Alvin de Levie, Esquire.

Like me, Alvin is a townie who graduated from State College High School and from Penn State. Unlike me, he’s an attorney and he’s also a former member of PSU’s Board of Trustees. We spent more than an hour discussing the controversies swirling around the board, and the following are portions of that conversation. But for starters, let’s just say that Alvin’s term on the board (July 1, 2021 to July 1, 2024) left him disappointed and sometimes shocked about Penn State’s governance.



*A 1973 graduate of Penn State, de Levie is concerned over what he describes as a "failure to communicate" by the Board of Trustees. Photo by Bill Horlacher*

**I know you have concerns regarding the controversies that have surrounded Penn State's Board of Trustees. What is the most serious matter?**

**de Levie:** It's going to be hard for me to say one concern is the most serious because you have to look at the whole picture. You can't look at one small piece of the puzzle in trying to understand what's happening on Penn State's Board of Trustees. But I think I have an excellent perspective since I'm now on the outside after serving on the board for three years and being its chair of the legal and compliance committee and a member of its executive committee. In my opinion, the board's leadership is going down the wrong path and not serving all the constituents of Penn State. They've lost their way.

What concerns me is the overall contentiousness on the board that has necessitated two lawsuits being brought by trustees. As the judge in one of those cases found, "There was uncontradicted evidence of a broad pattern of retaliatory behavior (by the board) that he (Fenchak) has faced at the hands of the defendants (Chair Matthew Schuyler and the Penn State Board of Trustees)."

As for specific issues, let me first refer to the matter involving Barry Fenchak. Trustee Fenchak had asked board leadership to supply information on several financial issues so that he could fulfill his fiduciary responsibilities as a trustee. He was denied this information despite repeated requests. Therefore, in accordance with Pennsylvania law, he sued Schuyler and the board on July 16 to get this information.

Just three days later, as has been reported in various media, Fenchak made an off-color remark to several IT staff members after a July 19 Board of Trustees meeting. This remark was inappropriate and uncalled for. He should not have said it. He admitted that and apologized several times. But it should be noted that he was repeating a line from Tom Hanks in the 1992 movie, "A League of Our Own," a PG film that was seen by everyone back in the day. I'll just leave it at that.

**So board leadership sought to remove Fenchak as a member after he made that comment?**

**de Levie:** Yes, they announced their intent to vote on Fenchak's removal at a Board of Trustees meeting on October 10. Fenchak then filed a motion requesting an injunction to block this vote. The court found that Matthew Schuyler and the Board of Trustees "repeatedly denied the requests (for financial information) and (the board and Schuyler) sought an opportunity like (Fenchak's inappropriate comment) to remove (Fenchak) and permanently end his probing inquiries into the health of the (Penn State) endowment and other university business for which he (Fenchak) has a responsibility."

And the court went on to say “granting the injunction serves the public interest by preventing the potentially retaliatory termination of a trustee based on that trustee’s inquiries regarding the operation of a public university that it serves.” What I found so interesting was that the court stated that “denying the injunction and allowing Plaintiff’s (Fenchak) removal would re-cast a shadow over the financial operations of Defendants (Schuyler and the Board of Trustees) to the detriment of every PSU stakeholder except those at the very top of the PSU hierarchy.” I agree wholeheartedly with the court’s decision, but it makes me sad that Fenchak had to go to court.

**What were the matters of board business that caused Fenchak to request data?**

**de Levie:** According to an August 27 court filing, Trustee Fenchak “has made repeated requests for financial information related to the administrative fees that PSU pays investment managers to oversee PSU’s endowment, estimated by Plaintiff to be valued at approximately $4.5 billion.” By the way, Fenchak is a trained financial consultant and he noted that Penn State’s IRS forms for the years 2008 to 2018 indicated that the average administrative fee for the endowment was 0.75 percent. But in fiscal year 2018-19, the administrative fee jumped to 2.49 percent, and Fenchak asserted this is well above industry standard. I’ll allow our readers to do the math, but when you compare 0.75 percent to 2.49 percent on something like $4.5 billion the difference is massive. All that Trustee Fenchak wanted was to see the documents and learn why the administrative fees had tripled at one point. Meanwhile, he asserted that the administrative fees in more recent years have still been well above what PSU was paying prior to 2018-19. I am amazed that board leadership did not give him—and all trustees—this information.




*de Levie affirms the effort of Trustee Barry Fenchak to learn why administrative fees for Penn State's $4.5 billion endowment nearly tripled at one point. Photo by Bill Horlacher*

**Not only would such information show dollars, but it would also reveal the identity of the management firm or firms that have been investing the endowment's money. Is that right?**

**de Levie:** Yes, I can only assume but with great certainty that he wants to know not only what the rates were and why they went up but also who has been getting paid. So he asked for the specific data information following his election to the board in 2022. He was denied access to this information and despite repeated requests, he has not received it.

**Does this situation suggest that something serious is being hidden?**

**de Levie:** Well, I can't say that, but what I can say according to the court opinion, is that the information that Trustee Fenchak is likely to be entitled to is being hidden. And what that may ultimately reveal, who knows? I'm not saying that there is any hanky panky, but when information is being withheld, people wonder. I've had people come up to me on College Avenue or in Good Day Café or Rothrock Coffee and say, "What's going on? Why isn't this information being given?" And I can't tell them why.

**So why wasn't this financial information just given to Fenchak?**

**de Levie:** That's a good question. And the court went on to note—and I think this is so important—that "PSU is a public state-related, state-supported, land-grant research university, whose largest financial asset is its endowment that is valued at over $4 billion and consists, in significant part, of contributions from the public to PSU…" The court then wrote, "Plaintiff, as a trustee that was voted into the position by alumni of PSU, is entitled to inquire about the administrative fees, to whom they were being paid and how the cost of those fees impacts the operations of PSU."

**Meanwhile, didn't Fenchak request details on another major financial matter?**

**de Levie:** Yes, in filing for his injunction, Mr. Fenchak noted that he had made three requests this spring for information on a potential contract between Penn State and Elevate, a consulting firm that was purportedly engaged with the goal of "generating a game day engagement, ticketing and premium seating and experiences strategy reflective of the passionate Nittany Lion fanbase." Mr. Fenchak stated that he believes the contract has a 10-year term and is worth approximately $1 billion. Given that this contract was promoted as a "means to ensure the future economic stability of the athletics department," Fenchak asserts that he should have been given access to the contract information so he could vote in accordance with his fiduciary responsibilities as a trustee. And again, Trustee Fenchak still hasn't gotten the information either about Elevate or about the endowment administrative fees because his original lawsuit is still in court. By the way, I am also concerned about the possibility that the contract might allow Elevate to share or sell demographic information about students or other ticket holders.

**And we haven't even talked about the lawsuit brought by Trustee Anthony Lubrano.**

**de Levie:** Yes, thank you for mentioning that. Mr. Lubrano is also an alumni-elected trustee. And the board started a secretive investigation of him with the view, as with Trustee Fenchak, to potentially expel him from the Board of Trustees. But a judge in Lackawanna County granted an injunction on September 30 that halts any further investigation of Mr. Lubrano until the university advances his legal fees. That's because the court held that the Board of Trustee bylaws require Penn State to do so. And in entering that order, the court wrote one sentence that I think was especially significant. It said, "We find that the public has significant interest in this state-created university and how its governing Board of Trustees hews to its own bylaws and treats its own members."

**So two different courts have granted injunctions against the Penn State board?**

**de Levie**: Yes, sadly.

**Speaking of bylaws, I know that on July 30 the board proposed new amendments to its bylaws, and one of them was especially troubling to you.**

**de Levie:** Correct. In my opinion, the board not only wants to expel trustees who ask tough questions, but now it wants to stack the board with trustees who will tow the "company line." One new bylaw has to do with the nomination and election of alumni trustees. Previously, a would-be candidate for an alumni seat on the Board of Trustees simply had to gather signatures of other alums in order to be listed on the ballot. But now there is a nominating subcommittee of six or seven board members, hand-picked by board leadership, who will select the candidates they want. And this subcommittee will be utilizing an undemocratic process—behind closed doors—that will specify a matrix of prior experiences for board candidates. In my opinion, this approach is both elitist and dangerous.

[Trustee Naren Gursahaney, elected by the board representing business and industry] stated something to the effect that this process "will give us an opportunity to have the right kind of people sit on the Board of Trustees." *(Editor's note: de Levie incorrectly attributed this statement to another trustee during the interview. It has been updated here in brackets to reflect correct attribution.)* After reading the opinions from courts in Centre and Lackawanna counties, I wonder if board leaders themselves are the right kind of people.



*During this conversation in the HUB-Robeson Center, de Levie and current board member Matt McGloin listened to students' concerns, a practice that the State College native urges other board members to begin. Photo by Bill Horlacher*

**You began our conversation by saying that it would require looking at more than one piece of the puzzle to understand the overall problem with Penn State's Board of Trustees. Now, having described several of the pieces, how would you summarize the situation?**

**de Levie:** There was a line in a movie that old timers like me remember. In "Cool Hand Luke," the Paul Newman character famously said, "What we've got here is failure to communicate." Well, it's an old movie but the problem is still with us, and I'd say it's very prevalent on the board.

There used to be a portion of every board meeting called "Public Comment." It was a time-honored tradition where anyone from the public could make a comment or ask a question in person. And then there would be an opportunity for a give and take between board members and whoever was asking the question. Well, that was dismantled. The board no longer permits a question to be asked in person, so there is no more give and take. Today, the board will only answer a question with a written response on its website which really doesn't reach the public.

In my opinion, another disturbing example of the board's failure to communicate took place when Chair Schuyler cut short and then ended public deliberation on the $700 million renovation of Beaver Stadium. Chair Schuyler claimed there had been sufficient deliberations in executive session. But executive sessions are behind closed doors, giving the public no real opportunity to hear why trustees are voting on a $700 million stadium renovation. When I walk around town or go to the supermarket, many people still come up to me and ask why the public deliberation was cut short.

**And how about communication from the board to current students, perhaps the most important segment of the university community?**

**de Levie:** Absolutely. Back in 2021, in preparation for my first meeting with President Neeli Bendapudi, I walked around the campus to talk with students about their concerns. And I did this throughout my years on the board. So because I found this so helpful, I recommended that the entire board should find such an opportunity. Well, the board typically meets on a Thursday and Friday, and on Thursday evening everyone goes out for dinner somewhere like upstairs at The Tavern. I suggested to the board office and to Chair Schuyler personally that during some of our meetings we could have the Thursday dinner in a dormitory dining hall. We'd publicize that the trustees were going to be there from 6 p.m. to 8 p.m., and we'd put a trustee or two at each table. I mentioned this idea several times, and each time I was told no. What was there to lose? Maybe they didn't want to be asked why increases in tuition, room and board always seem to be approved by a nearly unanimous vote of the board. By the way, I usually voted no on those increases. On the room and board increase, I asked for more data on how inflation was affecting

the particular costs at hand, but I was told it would take too much time to get me that data—so I voted no.

**My own attempt to believe the best of these people is to hope that maybe they just want to expedite the important business of the university. Maybe they feel like Mr. Fenchak and Mr. Lubrano are mavericks who slow down the process?**

**de Levie:** I don't know. There's no reason not to have an occasional meal with some students. There's no reason not to have public comment. There's no reason not to provide all the trustees with the kind of information that Mr. Fenchak had to file suit for. Maybe several individuals are mavericks in demanding information, not being the kind of trustee who just votes "yes" every time they're asked to vote. So if asking for information so you can do your job means you're being a maverick, congratulations, that's the type of trustee we need.

**So, in your mind, where do things stand or where should they stand?**

**de Levie:** Well, first of all, I acknowledge that serving in board leadership is difficult. But I'm sure we can do better, and we can learn from our prior mistakes. I hope this interview will start a discussion on how the board can become more transparent in fulfilling its responsibilities to all the stakeholders at Penn State. And then I want to ask this question: Has board leadership failed to fulfill its fiduciary responsibilities and thereby failed to adhere to the board's code of conduct? After all, a court concluded there was a "broad pattern of retaliatory behavior" toward Barry Fenchak. And should there not be an investigation of board leadership, the type of investigation that it seemingly started against Trustee Lubrano?

I suspect I will be roundly criticized for this interview, and I guess if I ever decide to run again for the Board of Trustees, the selection committee will find me to be not the "right kind" of person. But maybe it's better I'm not on the board because I have a free voice to comment upon matters that affect the future of this university that I love with all my heart.




*The State College native acknowledges the challenges of serving in board leadership but says, "We can do better." Photo by Bill Horlacher*


## StateCollege.com Breaking News

Receive all the latest news and events right to your inbox.

**Email**

# Rushton Exhibit E

LAZERPRO DIGITAL MEDIA GROUP

**Geoff Rushton <geoff.rushton@lazerpro.com>**

# Fwd: PSU Litigation

**Anthony Lubrano** <anthony@aplubrano.com> Wed, Jun 3, 2026 at 12:53 PM
To: Geoff Rushton <geoff.rushton@lazerpro.com>

Sent from my iPhone

Begin forwarded message:

**From:** Anthony Lubrano <anthony@aplubrano.com>
**Date:** June 3, 2026 at 11:31:00 AM EDT
**To:** geoff.rushton@statecollege.com
**Subject: PSU Litigation**

I read with great interest the Complaint filed last Wednesday May 27th by Centre Daily Times, Spotlight PA, and StateCollege.com against Penn State Board of Trustees Chair David Kleppinger, Vice Chair Richard Sokolov and Governance Committee Chair Daniel Onorato.

Specifically, pages 17 and 18 of the Complaint refer to Emeritus Trustee Dr. Alice Pope's participation in a May 22, 2025, Zoom press conference to discuss the Penn State Board of Trustees decision to close seven of the University's Commonwealth campuses. Trustee Pope was joined on that call by three other then-current Trustees: Ted Brown, Jay Paterno and me.

Like Dr. Pope, I too received a letter from board leadership. I have provided a copy of the letter here. My understanding is that Trustees Brown and Paterno also received this letter.

As a result of the recent Bylaws changes and receipt of the attached letter, I too have become more cautious and selective about what I say publicly, even when I believe speaking would benefit the University and its community.

Feel free to contact me.

---

**5.30.2025 Press Conference Trustee Lubrano Letter.pdf**
244K

# Rushton Exhibit E - ATTACHMENT

PennState

**Board of Trustees**
The Pennsylvania State University
201 Old Main
University Park, PA 16802-1589

May 30, 2025

Anthony Lubrano
1800 East Lancaster Avenue
Paoli, PA 19301

Dear Anthony,

We are writing to stress to you the importance of your adherence to the Trustee Code of Conduct.

We are aware of your participation in the "press conference" and media statement you provided following the May 22, 2025 Board of Trustees meeting. In participating in this press conference and providing a media statement, it appears that you failed to comply with the Code of Conduct section 2.04 requirement to "*coordinate all media and press statements, interviews and/or background discussions done in a Trustee capacity with the Board Office, who will engage Strategic Communications as needed*." Advance notice of your intentions is the minimum expected of a Trustee.

We also ask that you review Code of Conduct section 2.03(c) which states, in pertinent part: *"While Trustees think independently and make informed individual decisions about what they feel is in the best interests of the University, they shall support majority decisions of the Board and work cooperatively with fellow Board members and the Administration to advance the University's goals. Negative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders do not serve the University's interests and are inconsistent with a Trustee's fiduciary obligation to act always in the best interests of the University."* It is particularly important for you to be explicit that that you are speaking exclusively in your personal capacity expressing your personal view in media statements not made on behalf of the Board.

Finally, we remind you of the language of section 2.03(c) which states: "*Trustees shall extend goodwill to one another and to all members of the University community in board sessions and in public forums, including social media*." We urge you to avoid social media conversations critical of your fellow Trustees.

Please consider this a letter of counseling. Should you wish to discuss this matter further, we are available at your convenience.

David M. Kleppinger

David M. Kleppinger, Board Chair

Richard S. Sokolov

Richard S. Sokolov, Board Vice Chair

Daniel A. Onorato

Daniel A. Onorato, Governance Committee Chair