2026 WL 1045065
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Barry J. FENCHAK, Plaintiff,
v.
PENNSYLVANIA STATE UNIVERSITY, et al., Defendants.

CIVIL ACTION NO. 25-6313-KSM
|
Filed 04/17/2026

**Attorneys and Law Firms**

Steven F. Marino, Marino Associates, Philadelphia, PA, for Plaintiff.

Susan E. Kessler, Andy Stanton, Jones Day, Pittsburgh, PA, for Defendants.

**MEMORANDUM**

Marston, District Judge

***1** Plaintiff Barry J. Fenchak was a member of the Board of Trustees of The Pennsylvania State University from 2022 to 2025. During his tenure, Fenchak repeatedly (and at times, publicly) sought financial information about administrative fees paid for managing the University's endowment and about the terms and conditions of a contract that the University was negotiating with the sports ticketing company, Elevate Collegiate Ticketing, LLC. In June 2025, the Board of Trustees voted to remove Fenchak from the Board, allegedly because of an inappropriate sexual comment that he made while attending a Board meeting. Following his removal, Fenchak brought this case against the University, former Board Chair Matthew Schuyler, and Board Vice Chair David Kleppinger alleging defamation, false light, breach of fiduciary duties, and violations of the United States and Pennsylvania Constitutions. (Doc. No. 1-3.) Defendants move to dismiss the Complaint in its entirety. (Doc. No. 6.) For the reasons discussed below, that motion is granted in part and denied in part.

## I. BACKGROUND[1]

The Board of Trustees is a nonprofit corporate body established by The Pennsylvania State University's Charter. (Doc. No. 1-3 at ¶ 18.) The Board is composed of 38 members, some of whom are elected by alumni and some of whom are appointed, and it is governed by the University's Amended and Restated Bylaws. (*Id.* at ¶¶ 19–20.) In 2022, Fenchak was elected by the University's alumni to serve a three-year term as a voting member on the Board, and he assumed his position on July 1, 2022. (*Id.* at ¶¶ 24–25.) Fenchak alleges that throughout his tenure, he "engaged in principled, civil, and respectful debate" with other trustees, "[c]onsistent with expectations of membership ... as a Board of Trustees member." (*Id.* at ¶ 34; *accord id.* at ¶¶ 33, 35–42.) In particular, there was significant debate between Fenchak and his fellow trustees about whether he should be given access to: (1) financial information related to administrative fees paid for management of the University's endowment and (2) the terms and conditions of the Elevate contract.

### A. Administrative Fees

The Board is tasked with, among other things, overseeing and managing the University's endowment, which is valued at around $5 billion. (*Id.* at ¶ 48.) As a new trustee, Fenchak sought to familiarize himself with the endowment by reviewing the University's IRS Form 990 filings for the 2008 to 2023 calendar years. (*Id.* at ¶ 50.) During that review, Fenchak noticed that "professional administrative fees paid to manage the ... endowment rose dramatically in 2017, more than tripling the rate within (3) three years." (*Id.* at ¶ 51.) Concerned, Fenchak spent his first two years as trustee repeatedly requesting "access to the specific data and items that totaled the aggregated figures listed on the IRS Form 990s" as "administrative fees reported to have been paid by the University to manage the endowment." (*Id.* at ¶ 53.) His requests, however, were repeatedly denied, first, by the Vice Chair of the Board's Finance Business and Capital Planning Committee and later, by other "controlling Board of Trustees members," including Defendants Schuyler and Kleppinger. (*Id.* at ¶¶ 54–64.)

***2** On July 16, 2024, Fenchak filed an action against the Board and Schuyler in the Pennsylvania Court of Common Pleas for Centre County, seeking an order compelling production of information related to the administrative fees. *See Fenchak v. Pa. State Univ. Bd. of Trs.*, No. 2024-CV-1843-CI (Centre Cnty. Ct. Comm. Pl.) ("*Fenchak I*").

### B. The Elevate Contract


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

A few months before filing *Fenchak I*, in the spring of 2024, Fenchak learned that the University was entertaining a 10-year expanded ticketing partnership with the sports ticketing company, Elevate, the goal of which would be to maximize revenue needed to support the University's ongoing $700 million renovation of Beaver Stadium, the University's football stadium. (Doc. No. 1-3 at ¶ 66; *see also id.* at ¶ 67 (alleging that the University and Elevate "entered into a Letter of Intent").) In April and May 2024, Fenchak "forwarded requests to various controlling Board of Trustees members for access to information related to the terms of and conditions of [the] contract under negotiation." (*Id.* at ¶ 69.) Defendants Schuyler and Kleppinger denied those requests on May 7, 2024, explaining that additional information about the Elevate contract "would be provided to all trustees in the ordinary course." (*Id.* at ¶ 71.)

Two weeks later, the Board convened a public meeting. (*Id.* at ¶ 73.) The purpose of the meeting was for "voting members of the Board of Trustees to consider and act upon a Resolution for project approval concerning Beaver Stadium renovations." (*Id.* at ¶¶ 80, 81.) The proposed resolution authorized certain trustees to "cause the University to award contracts on behalf of the University in furtherance of the ongoing Beaver Stadium Renovation Project, inclusive of [the Elevate contract]." (*Id.* at ¶ 82.) During that meeting, Fenchak disclosed that he had previously requested "access to information relating to the terms and conditions" of the Elevate contract but his requests had been denied. (*Id.* at ¶ 85.) He also publicly asked Defendant Schuyler when all the members of the Board would be given information about the Elevate contract and why that information was being kept secret. (*Id.* at ¶¶ 88–89.)

On August 16, 2024, Fenchak renewed his request for a copy of the Elevate contract. (*Id.* at ¶ 107.) Defendants Schuyler and Kleppinger once again denied the request, this time by letter dated August 20, 2024:

> We write in response to your August 16, 2024 request for the University's agreement with Elevate.
>
> On multiple occasions, including April 18, 2024 and May 2, 2024, all trustees were provided with detailed information about the confidential financial guarantees and revenue share provision in the proposed arrangement with Elevate. Questions were posed by trustees and answered by University administrators regarding this information, as well as related to the reference checks conducted to confirm Elevate *bona fides.* As you know, the Board has received and will continue to receive regular updates on the Beaver Stadium renovation project, including information on ticket/seat sales.
>
> While we welcome all trustees' efforts to prepare for and meaningfully participate in Board proceedings and fulfill their oversight obligations to the University, your request for this document is unreasonable, beyond that which is objectively necessary for you to discharge your duties as a trustee, and seeks information the University is not able to share due to legal obligations it has with Elevate. Furthermore, your repeated violations of your confidentiality obligations have created risks for the University that inform our decision not to provide the contract to you.
>
> ***3** Under the terms of the University's agreement with Elevate, disclosure of the Agreement within the University is contractually restricted to those individuals who have a need to know such information in connection with the University's duties and obligations under the Agreement. In other words, disclosure of the Agreement within the University is limited to those persons tasked with carrying out the obligations in the Agreement including Penn State Finance operations that support those obligations.
>
> Additionally, and despite your mischaracterization that such claims of confidentiality are "specious," the Elevate Agreement and the framework of the Agreement itself, contains commercially sensitive information that Elevate has sought to protect. Your prior confidentiality breach related to Elevate—your disclosure of the existence of a confidential letter of intent between the University and Elevate in a public meeting of the Board in May 2024—was raised by Elevate as a significant concern. Further sharing of confidential information by you could damage the University's relationship with Elevate.
>
> We are available to discuss further should you wish to do so.

(*Id.* at ¶ 108; *id.* at 68.)

One week later, on August 27, 2024, Fenchak amended his complaint in *Fenchak I* to also seek an order compelling production of "information informing upon the terms and conditions" of the Elevate contract. (*Id.* at ¶ 100.) The amended complaint quoted the August 20 letter verbatim and, except for the salutation, in its entirety. (*See* Doc. No. 6-3 at ¶ 103.) Defendants answered the amended complaint in *Fenchak I* by filing preliminary objections, which included a

copy of the August 20 letter attached as an exhibit. (Doc. No. 1-3 at ¶ 109.)

### C. Fenchak's Investigation and Removal from the Board

On July 19, 2024—just a few days after he filed *Fenchak I*—Fenchak attended a Board meeting at the University's Altoona campus. (Doc. No. 1-3 at ¶ 91.) While there, he spoke to three IT employees, and during the conversation, commented that "his wife says he cannot wear baseball hats because it makes him look like 'a penis with a hat on.' " (*Id.* at ¶¶92–93.) A sexual harassment investigation was launched against Fenchak in connection with this comment, and it was ultimately recommended that Fenchak be removed from the Board for violating the Trustee Code of Conduct. (*Id.* at ¶ 97.) A meeting was scheduled for October 2024 to rule on this recommendation. (*Id.*)

Meanwhile, on July 30, 2024, the Board amended the University's bylaws in two crucial ways. First, the amended bylaws empowered "the Chair of the Board to restrict a member Trustee's access to University information." (*Id.* at ¶ 105(f).) Second, the amended bylaws "vested the Chair of the Board and the Chair of the Governance Committee with ultimate power to sanction and remove member Trustees from their position on the Board." (*Id.* at ¶ 105(g).) After learning of the amended bylaws, Fenchak brought a second lawsuit, challenging the amendments as facially unconstitutional under the Pennsylvania Constitution and state law. *See Fenchak v. The Pa. State Univ. Bd. of Trs.*, No. 2025-CV-0882-CI (Centre Cnty. Ct. Comm. Pl.) ("*Fenchak II*"). The court rejected these arguments and dismissed the action on the pleadings. (Doc. No. 6-2.)

Fenchak was ultimately removed as a trustee by a vote of 30 to 4 on June 16, 2025. (*Id.* at ¶ 112.)[2] He was also voted ineligible to be listed on the ballot in the 2025 alumni trustee election. (*Id.* at ¶ 113.)

### D. Procedural History

***4** On October 30, 2025, Fenchak filed this action in the Court of Common Pleas of Philadelphia County. (Doc. No. 1 at ¶ 1.) He brings claims for defamation, false light, breach of fiduciary duties, and violations of the United States and Pennsylvania Constitutions against the University, Schuyler, and Kleppinger. (Doc. No. 1-3.) Defendants removed the matter to this Court on November 6, 2025. (*See generally* Doc. No. 1.) And two weeks later, they moved to dismiss the Complaint in its entirety. (Doc. No. 6.) Fenchak opposes that motion. (Doc. No. 9.)

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quotation marks omitted). In reviewing a motion to dismiss, the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations. *Id.* However, the court is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted). And "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint ... and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *accord Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011).

## III. DISCUSSION

Fenchak brings three types of claims: (1) invasion of privacy (defamation and false light), (2) breach of fiduciary duties, and (3) constitutional violations under the United States and Pennsylvania Constitutions. All claims are asserted against all Defendants. Defendants have moved under Rule 12(b)(6) to dismiss the Complaint in its entirety. (Doc. No. 9.) The Court considers Fenchak's invasion of privacy claims (Counts I and II), his fiduciary claims (Count III), and his constitutional claims (Counts IV through IX) in turn.

### A. Invasion of Privacy Claims

In Counts I and II, Fenchak brings state law claims for defamation and false light, both of which are premised on Defendants' publication of the August 20, 2024 letter from Schuyler and Kleppinger to Fenchak on the public docket in

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Fenchak I.* (*See* Doc. No. 1-3 at ¶ 159 ("Defendants published or otherwise disseminated the defamatory communication contained in the correspondence dated August 20, 2024, to the public at large September 17, 2024 at 3:16 p.m., by filing the correspondence of public record in the Office of the Centre County Prothonotary ...."); *id.* at ¶ 176 ("The correspondence dated August 20, 2024, contains statements which placed the plaintiff in a false light.").) Defendants argue that these claims must be dismissed because they are entitled to immunity under Pennsylvania's doctrine of judicial privilege. (Doc. No. 6-1 at 10–13.) The Court agrees.

In Pennsylvania, "[a]ll communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege which cannot be destroyed by abuse." *Binder v. Triangle Pubs., Inc.*, 275 A.2d 53, 56 (Pa. 1971); *see also Post v. Mendel*, 507 A.2d 351, 354–55 (Pa. 1986) ("[T]here has long been recognized a realm of protected communications in judicial proceedings. In this Commonwealth, protection for such communications is firmly established."). Under this doctrine, "statements by a party, a witness, counsel, or a judge cannot be the basis of a [tort] action whether they occur in the pleadings or in open court," *Binder*, 275 A.2d at 56, so long as the communication is "issued in the regular course of judicial proceedings" and is "pertinent and material to the redress or relief sought," *Post*, 507 A.2d at 355 (emphases omitted). Both conditions are satisfied here.

***5** First, Defendants published the August 20, 2024 letter as an exhibit to their preliminary objections in *Fenchak I*, so the communication was made "in the regular course of judicial proceedings." *Post*, 507 A.2d at 355. Fenchak disputes this conclusion on the grounds that Defendants "did not prepare" the August 20, 2024 letter "for purpose of initiating a judicial proceedings [sic], nor did the defendants prepare the ... letter in the regular course of judicial proceedings." (Doc. No. 9-1 at 18 (referring to the letter as "an extra-judicial act").) But that fact is immaterial to the analysis here. It is true that an extra-judicial communication is not protected merely because it is filed in a judicial proceeding. *See Post*, 507 A.2d at 355–56 (holding privilege did not extend to "extra-judicial communications" like the defendant's letter because although the letter "made reference to matters which occurred in an ongoing trial, the letter was not directly relevant to the court proceedings .... The letter was clearly not a part of the judicial proceedings to which it made reference, and merely forwarding a copy of the letter to the court did not make it a part of those proceedings"); *Barto v. Felix*, 378 A.2d 927, 930 (Pa. Super. Ct. 1977) ("[J]udicial immunity does not protect the public defender in this case, for the remarks made by him at the press conference were not made at a judicial proceeding. They did not fall within the sphere of activities which judicial privilege was designed to protect."). But here, Fenchak is challenging the fact that the August 20, 2024 letter was *published on the docket* in *Fenchak I.* (*See, e.g.*, Doc. No. 1 at ¶ 159 ("Defendants published or otherwise disseminated the defamatory communication contained in the correspondence dated August 20, 2024, *to the public at large* September 17, 2024 ... by *filing the correspondence of public record* in the Office of the Centre County Prothonotary ...." (emphases added))). Accordingly, the Court finds the communication at issue was made "in the regular course of judicial proceedings." *Post*, 507 A.2d at 355; *see also Handy v. Del. River Surgical Suites, LLC*, No. 19cv1028, 2023 WL 11884784, at *7 (E.D. Pa. Jan. 19, 2023) (finding the judicial privilege applied because "[a]ttempting to admit evidence or attaching documents to pleadings is a communication with the court attempting to seek relief").[3]

Second, the letter's contents were also "pertinent and material" to the proceeding. *Post*, 507 A.2d at 355. *Fenchak I* was about whether the Board wrongfully denied Fenchak access to financial information about administrative fees and the Elevate contract. *See generally Fenchak I*, Doc. No. 9 (Aug. 27, 2024). Defendants filed preliminary objections seeking dismissal of the complaint and argued in part that Fenchak was not entitled to information related to the Elevate contract under Pennsylvania law because—as explained to him in the August 20, 2024 letter—his request sought "information the University is not able to share due to legal obligations it has to Elevate" and his repeated violations of confidentiality had "created risks for the University" that inform Defendants' decision not to provide him with a copy of the proposed contract. *Id.*, Doc. No. 10 at ¶ 47 (Sept. 16, 2024); *see also id.* at ¶ 54 (arguing that the complaint should be dismissed at least in part because Fenchak did not "allege that he has not violated his confidentiality obligations as a trustee"). Indeed, Fenchak can hardly dispute the letter's materiality given that his amended complaint in *Fenchak I*, which was filed on the public docket weeks before Defendants' preliminary objections, quoted the body of the letter *verbatim* and *in full. Id.*, Doc. No. 9 at ¶ 103.

Because the communication that serves as the basis for Fenchak's defamation and false light claims was "issued in the regular course of judicial proceedings" and is "pertinent and material to the redress or relief sought," *Post*, 507 A.2d at 355 (emphases omitted), Defendants are protected from suit

on Fenchak's defamation and false light claims by the judicial privilege, *see Handy*, 2023 WL 11884784, at *7 ("Although the judicial privilege had its origin in defamation actions, 'it has now been extended to include all tort actions based on statements made during judicial proceedings.' " (quoting *Panitz v. Behrend*, 632 A.2d 562, 564 (Pa. Super. Ct. 1993))).[4] Counts I and II are dismissed with prejudice.

**B. Fiduciary Duty Claims**

In Count III, Fenchak contends that Defendants "breached the duties of care owed" to Fenchak when they (1) "[p]ublish[ed] or otherwise disseminat[ed] the defamatory communication contained in the correspondence dated August 20, 2024 ... by filing the correspondence of public record in the Office of the Centre County Prothonotary" and (2) "[r]etaliat[ed] against [Fenchak] for voicing his opinions, beliefs, or disagreements that differ from the prevailing views maintained by defendants" and for otherwise engaging in "protected speech." (Doc. No. 1-3 at ¶ 198(a).) Defendants argue that Fenchak's claims fail because none of the Defendants owed a fiduciary duty to Fenchak. The Court agrees.[5]

***6** Directors of a nonprofit corporation owe a fiduciary duty *to the corporation*; they do not owe fiduciary duties to their fellow directors, nor are they owed fiduciary duties by the corporation. *See* 15 Pa. Stat. & Cons. Stat. § 5717 (stating that the fiduciary duty owed by individual directors is owed "*solely* to the nonprofit corporation and not to any member or creditor or any other person or group, and may be enforced directly by the corporation or may be enforced by an action in the right of the corporation, and may not be enforced directly by a member or creditor or by any other person or group" (emphasis added)); *Carlson v. Fawn Ridge Estates Homeowners' Ass'n, Inc.*, No. 1256 C.D. 2011, 2012 WL 1358573, at *3–5 (Pa. Commw. Ct. Apr. 17, 2012) (affirming grant of summary judgment in favor of nonprofit corporation and the corporation's director because § 5717 "permits members of the nonprofit corporation to bring an action for breach of fiduciary duty only as a derivative action on behalf of the nonprofit corporation" and not for "breach of fiduciary duty or damages ... against the corporation or against directors or officers on their own behalf").[6] Contrary to Fenchak's suggestion (*see* Doc. No. 9-1 at 23), nothing in the statute establishing the University and the Board of Trustees renders § 5717 inapplicable, authorizes trustees to bring suit on their own behalf as board members, or alters the fiduciary relationship between trustees and the University they represent. *See* 24 Pa. Stat. & Cons. Stat. § 2533 (establishing a board of trustees for what would become the University and mandating that "*said corporation* shall by the same name have power to sue and be sued" (emphasis added)).

Accordingly, Count III is also dismissed with prejudice.

**C. Constitutional Claims for Deprivation of Free Speech**

Last, Fenchak brings claims for unlawful retaliation in violation of the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. The state constitutional claims (Counts VII through IX) are quickly dismissed, however, as "[n]o Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011); *see also, e.g., Dooley v. City of Philadelphia*, 153 F. Supp. 2d 628, 663 (E.D. Pa. 2001) ("Courts of this circuit that have considered the question have concluded that Article I, Section 7 does not establish a private cause of action for damages.") (collecting cases).

That leaves Fenchak's claims for unlawful retaliation under the First Amendment of the United States Constitution (Counts IV through VI), which are brought pursuant to 42 U.S.C. § 1983.[7] Fenchak contends that Defendants Schuyler and Kleppinger violated his First Amendment rights when they "deliberately retaliated against [him] as a result of the [his] exercise of speech" (Doc. No. 1-3 at ¶¶ 233, 244)[8] and that the University is vicariously liable for their actions (*id.* at ¶¶ 208–27). "[T]o plead a claim for First Amendment retaliation, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Willson v. Yerke*, 604 F. App'x 149, 151 (3d Cir. 2015) (quotation marks omitted); *see also Houston Comm'ty Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (explaining that a plaintiff pursuing a claim for First Amendment retaliation "must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.' " (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019))).

***7** Here, Defendants, relying on the United States Supreme Court's opinion in *Garcetti v. Ceballos*, argue that Fenchak's retaliation claims fail on the first element, because at all relevant times, Fenchak was speaking in his capacity as a trustee, and never as a private citizen. (Doc. No. 6-1 at 14 (citing *Garcetti*, 547 U.S. 410, 421–22 (2006)). In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The problem with Defendants' reliance on this holding is that it assumes Fenchak was a public employee, but the allegations in the Complaint suggest he may be more appropriately considered an elected public official. (Doc. No. 1-3 at ¶ 24 (alleging that Fenchak was "elected by the alumni" of the University); *id.* at ¶¶ 209–10 (alleging that the University is a "state actor")); *see also Phelan v. Laramie Cnty. Comm'ty Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (finding "the Board [of Trustees] members and [the plaintiff, as a trustee,] occupy the same positions as elected officials"). If Fenchak is an elected official, then it is far from clear that *Garcetti* applies. *See Werkheiser v. Pocono Township*, 780 F.3d 172, 177 (3d Cir. 2015) ("We pause here to emphasize that we do not today decide whether *Garcetti* is applicable to elected officials' speech or not."); *Wilson v. Yerke*, 604 F. App'x 149, 152 (3d Cir. 2015) ("*Werkheiser* did not definitively answer the question whether *Garcetti* is applicable to elected officials' speech, but it did hold that the law was not clearly established on this issue."); *Croft v. Donegal Township*, No. 20cv1430, 2021 WL 1146285, at *5 (W.D. Pa. Mar. 25, 2021) ("[T]he scope of [the protection afforded an elected official's speech] —and importantly, the type or degree of retaliatory conduct sufficient to trigger a violation of the First Amendment—is not clear.").

Although the Third Circuit in *Werkheiser* declined to address the issue, dicta in that case suggests the rationale underlying *Garcetti* does *not* apply in the case of an elected public official. *See* 780 F.3d at 178 ("Many of the reasons for restrictions on employee speech appear to apply with much less force in the context of elected officials. Werkheiser's speech as an elected official is not subject to prior review or approval. To use *Garcetti*'s language, his speech is neither 'controlled' nor 'created' in the same way that an employer controls the speech of a typical public employee.... [And], there is no truly comparable analog to 'managerial discipline' when discussing retaliation between elected officials." (quoting *Garcetti*, 547 U.S. at 424)); *see also Jenevein v. Willing*, 493 F.3d 551, 557–58 (5th Cir. 2007) ("[T]he preferable course ought not draw directly upon the *Pickering-Garcetti* line of cases for sorting the free speech rights of employees elected to state office."); *Phelan*, 235 F.3d at 1247 (finding, albeit before *Garcetti* was decided, that the *Pickering* line of cases did not apply to the plaintiff's First Amendment retaliation claim because she "is not a governmental employee or contractor," and instead, "occup[ies] the same position[ ] as [an] elected official[ ]").

And, consistent with *Werkheiser, Jenevein*, and *Phelan*, many recent district courts have declined to apply *Garcetti* in cases involving elected officials. *See, e.g., Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 826 (D.N.J. 2020) ("In short, the *Garcetti* categories do not read very readily onto the situation of an elected councilwoman, like Ms. Greenman. True, she may suffer consequences for political speech—but not because she is in some subordinate role, subject to the authority of her public employer.... Plaintiff spoke as elected official. (As I have held, *Garcetti* does not apply as such. Speech is protected, but 'retaliation,' to be impermissible, must rise to the level of interfering with plaintiff's functioning as an elected official)."); *Warren v. DeSantis*, 631 F. Supp. 3d 1188 (N.D. Fla. 2022) ("*Garcetti* deals with government supervisors, their subordinates, and managerial discipline. The decision includes not a word about the First Amendment rights of elected officials—the issue decided in *Bond*—and the decision's rationale simply does not apply to them.... [T]he weight of circuit authority supports this analysis." (collecting cases)). *But see, e.g., Hartman v. Register*, No. 06cv33, 2007 WL 915193, at *6 (S.D. Ohio Mar. 26, 2007) ("The distinction between the public employee in *Garcetti* and an elected official, in this case Plaintiff, is inconsequential.").

***8** Considering the unsettled nature of the case law and outstanding questions as to whether trustees, like Fenchak, are more appropriately considered public employees or elected officials—issues which no party meaningfully addresses[9]—the Court declines to dismiss Fenchak's federal constitutional claims at this juncture. Defendants may raise this argument again at summary judgment if appropriate.[10]

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is granted in part and denied in part. It is denied as to Fenchak's First Amendment claims (Counts IV through VI). It is granted as to Fenchak's remaining claims, all of which are dismissed with prejudice. An appropriate order follows.

**All Citations**

Slip Copy, 2026 WL 1045065

Footnotes

1 The following facts are taken from the Complaint, and are assumed true for purposes of the instant motion. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) ("The District Court, in deciding a motion under Federal Rule of Civil Procedure 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].").

2 Although not specified in the Complaint, Defendants note in their motion to dismiss that the removal vote initially scheduled for October 9, 2024 was delayed because Fenchak obtained a preliminary injunction in *Fenchak I.* (*See* Doc. No. 6-1 at 9.) The injunction was dissolved on May 16, 2025, and Fenchak was then removed from the Board one month later. (*Id.* at 9–10.)

3 The Court strongly disagrees with Fenchak's contention that the "holding of *Handy* is burdened with infirmities, misconstrues the concept of judicial [privilege], and troubling to understand." (Doc. No. 9-1 at 20.)

4 Because the Court dismisses Counts I and II on this basis, we need not consider Defendants' argument that Fenchak consented to the August 20, 2024 letter's filing on the docket.

5 Defendants also argue, and the Court concludes, that Fenchak's first contention likewise fails for the reasons discussed in Part III.A.—Defendants' publication of the August 20, 2024 letter is covered by the judicial privilege. *See Handy*, 2023 WL 11884784, at *7 (recognizing that the judicial privilege has "been extended to include *all tort actions* based on statements made during judicial proceedings" (quoting *Panitz*, 632 A.2d at 564) (emphasis added)); *see also Panitz*, 632 A.2d at 564 ("Regardless of the tort contained in the complaint, if the communication was made in connection with a judicial proceeding and was material and relevant to it, the privilege applies. The privilege is equally applicable where the cause of action is stated in terms of misrepresentation or a contractual requirement to exercise due care." (citations and quotation marks omitted)).

6 Although Fenchak alleges that the relevant duties of care arose, at least in part, out of the University's bylaws (*see* Doc. No. 1-3 at ¶¶ 191–97), those allegations do not save Count III. Fenchak has not alleged that the bylaws state that the duties of care run from one trustee to another or from the University to a trustee. And the Court's independent review of the bylaws revealed that they state only that "[t]rustees have crucial fiduciary responsibilities *towards the University* under these Bylaws." Bylaws for Bd. of Tr'ees § 2.03(a), https://trustees.psu.edu/files/2025/12/Bylaw-Elections-Appendix-2025-November.pdf (last visited Apr. 16, 2026) (emphasis added). Even if the Court were to ignore this clear language, we still would not be inclined to read the bylaws in the manner Fenchak proposes, because to do so would impermissibly render them at odds with § 5717. *See* 15 Pa. Stat. & Cons. Stat. § 5504(a) ("The bylaws may contain any provisions for managing the business and regulating the affairs of the corporation *not inconsistent with law* or the articles [of incorporation]." (emphasis added)); *see also Fenchak v. The Pa. State Univ. Bd. of Trs.*, No. 25cv0882, 2025 WL 1643951, at *4 (Centre Cnty. Ct. Comm. Pl. Apr. 14, 2025) ("The Board [of Trustees for the University] is further empowered by the Pennsylvania Nonprofit Corporation Law to pass 'any provisions for managing the business and regulating the affairs of the corporation *not inconsistent with laws* or the articles.' " (quoting 15 Pa. Stat. & Cons. Stat. § 5504(a)) (emphasis added)).

7 That section provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

8 The Complaint does not specify *how* Defendants Schuyler and Kleppinger allegedly retaliated against Fenchak. (*See* Doc. No. 1-3 at ¶¶ 233, 244.) But based on Fenchak's allegations against the University, the Court infers that he views the entire course of events leading to his removal—i.e., the sexual harassment investigation, the recommendation of removal, and Fenchak's ultimate removal from the Board of Trustees pursuant to the amended bylaws—as retaliatory. (*See id.* at ¶¶ 208–27.)

9 Fenchak argues that *Garcetti* is inapplicable, but, confusingly, not on the grounds that Fenchak is an elected official. Instead, Fenchak argues that the University is a *private* entity for First Amendment purposes, and thus, Fenchak could not have been speaking as a public employee under *Garcetti.* (*See* Doc. No. 9-1 at 24–25 ("Discovery will reveal in this case plaintiff did not provide services to a government or an instrumentality of the government. Although the University is recognized as a state actor for purposes a [sic] Section 1983 liability, it is not identified as a government or an agency of the Commonwealth by the Pennsylvania Supreme Court. To the contrary, Penn State University is a private corporate identity, not government .... The doctrine which limits the constitutional protections guaranteed by the First Amendment to public employee speech in the context of employment with the government does not apply here." (footnotes omitted))). But Fenchak simultaneously contends that the University *is* a state actor subject to liability under § 1983. (*Id.*) He cannot have it both ways. If the University is a state actor under § 1983, then it is also a public employer for purposes of the First Amendment. Nothing in the cases cited by Fenchak alters that conclusion. Indeed, although the Pennsylvania Supreme Court has found the "board of trustees of PSU is not governmental in nature" for tax purposes, *see Pa. State Univ. v. Derry Twp. Sch. Dist.*, 731 A.2d 1272, 1275 (Pa. 1999), the Third Circuit and district courts in this Circuit have consistently recognized the University's public nature when it comes to § 1983 *and* claims for retaliation under the First Amendment, *see, e.g., Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 n.24 (3d Cir. 1984) ("Of course, the [F]irst [A]mendment would not even be implicated if Penn State were not a 'state actor' for purposes of the [F]irst [A]mendment."); *Nelatury v. Pa. State. Univ.*, 633 F. Supp. 3d 716, 729 (W.D. Pa. Oct. 3, 2022) (finding university professor "works at PSU, so he is a public employee" and applying *Garcetti*). The issue here is whether Fenchak, who was elected by University alumni to serve on the Board, is more appropriately considered an employee or an elected official of the University, which again, is a public entity for purposes of this lawsuit. This is the issue that the parties have yet to meaningfully brief.

10 Any future motion should address the cases discussed by the Court in this Memorandum.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.