# Appendix to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, Pursuant to Local Rule 7.8(a)

2021 WL 5492803
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Chad PARKER; Rebecca Kenwick-Parker; Mark Redman; Donna Redman, Appellants
v.
GOVERNOR OF PENNSYLVANIA; Attorney General Pennsylvania; Secretary Pennsylvania Department of Health

No. 20-3518
|
Argued: September 23, 2021
|
(Opinion filed: November 23, 2021)

On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. Civil No. 1-20-cv-01601), District Judge: Honorable John E. Jones, III

**Attorneys and Law Firms**

Robert J. Muise [ARGUED], American Freedom Law Center, P.O. Box 131098, Ann Arbor, MI 48113, Counsel for Appellants

J. Bart DeLone, Sean A. Kirkpatrick [ARGUED], Office of Attorney General of Pennsylvania, Strawberry Square, Harrisburg, PA 17120, Daniel B. Mullen, Office of Attorney General of Pennsylvania, 1251 Waterfront Place, Mezzanine Level, Pittsburgh, PA 15222, Claudia M. Tesoro, Office of Attorney General of Pennsylvania, 1600 Arch Street, Suite 300, Philadelphia, PA 19103, Counsel for Appellees

Before: CHAGARES, HARDIMAN, and MATEY, Circuit Judges

OPINION[*]

CHAGARES, Circuit Judge.

***1** The Commonwealth of Pennsylvania implemented several public health measures to limit the spread of COVID-19. The plaintiffs in this case argue that two such measures, a contact tracing program and mask mandate, are unconstitutional. They now appeal the District Court's denial of a preliminary injunction that would have prevented the defendants from enforcing both measures. The United States Constitution limits the cases that federal courts can decide and commands that we only decide "cases" or "controversies." This means that we cannot decide cases where an issue has become moot or where the parties lack standing to bring a claim. The plaintiffs here have not made the threshold showing that this case fits within those constitutional constraints. Accordingly, we will affirm the order of the District Court.

I.

We write solely for the parties and so recite only the facts necessary to our disposition. The first public health measure at issue in this case is a contact tracing program, whereby the Commonwealth's Department of Health ("DOH") seeks to identify, notify, and monitor anyone who came in close contact with a person who tested positive for COVID-19 during the period in which that person was infectious. The Commonwealth also sends a letter to potentially infected contacts that directs them to self-quarantine for fourteen days after their last contact with someone who was likely infected. If a recipient fails to cooperate, the DOH may petition a court to isolate that person and call upon law enforcement to effectuate the court's order; the DOH has yet to do so.

The other measure challenged in this case is a mask mandate first implemented by an order of the Secretary of Health on July 1, 2020. The Secretary issued this mandate following the suspension of business closure and stay-at-home orders, citing CDC guidance indicating that wearing masks helps to prevent and control further spread of COVID-19. The mandate required Pennsylvanians aged two and older to wear a face covering in various settings including indoors or outdoors where social distancing cannot be maintained. The mandate expired by its own terms on June 28, 2021. See Department of Health Lifting Universal Masking Order on June 28 (June 25, 2021), https://www.media.pa.gov/pages/health-details.aspx?newsid=1505.

The plaintiffs are Chad Parker and Rebecca Kenwick-Parker, as well as Mark and Donna Redman. They view masks as political symbols expressing that "all people are diseased" and that mask wearers have "surrendered [their] freedom to the government," and they believe the mandate compels them to express this message even though they disagree with it. Appendix ("App.") 80, 265, 282. They also believe

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

that wearing a mask violates their rights to privacy and personal autonomy. Parker tested positive for COVID-19 in July 2020 and was contacted by the DOH, who asked him questions about his contacts from the previous two weeks. The Parker family was then directed to self-quarantine. The Parkers found this experience intrusive and now fear they will be subjected to surveillance and a future quarantine. They claim that they have been forced to take costly measures to avoid contact tracing: they now homeschool their son rather than sending him to public school, "think twice" before seeking medical treatment for minor symptoms, and avoid any businesses or events that may document attendees. App. 269–70. The Redmans likewise avoid establishments that may document attendance and have "curtailed attending religious services" because their church now "requires pre-registration in order to attend in-person services." App. 78.

***2** The plaintiffs filed this lawsuit against the Commonwealth's Governor, Attorney General, and Secretary of Health and moved for a preliminary injunction preventing enforcement of either measure. They alleged that both measures violated their First and Fourteenth Amendment rights, and that the contact tracing program also violated their Fourth Amendment rights. The District Court denied the motion, holding that the plaintiffs lacked standing for an injunction as to either measure. The court further held that even if the plaintiffs had standing, the motion would be denied after considering the likelihood of success on the merits, risk of irreparable harm, and balance of equities. The plaintiffs timely appealed.

II.[1]

We review the District Court's findings of fact for clear error, its legal conclusions de novo, and its decision to grant or deny the injunction for abuse of discretion. See Osorio-Martinez v. Att'y Gen., 893 F.3d 153, 161 (3d Cir. 2018).

Article III limits the federal courts to adjudication of "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. At every stage in litigation, we must determine whether the case-or-controversy requirement is met in order to ensure that we only decide issues within the bounds of the Constitution and do not give "opinions advising what the law would be upon a hypothetical state of facts." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (cleaned up).

One doctrine encompassed by the case-or-controversy requirement is standing. In order to establish standing to sue, plaintiffs bear the burden to show that (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the conduct of the defendant, and (3) the injury is likely redressable by a favorable decision. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

Another doctrine stemming from the case-or-controversy requirement is mootness. An issue becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Chafin, 568 U.S. at 172 (citation omitted).

As discussed more fully below, the District Court correctly concluded that the plaintiffs lack standing to challenge the contact tracing program. And because the mask mandate expired by its own terms in June 2021, the challenge to that mandate is moot.

A.

The plaintiffs allege two injuries stemming from the contact tracing program: (1) the future threat of again being identified as a close contact through contact tracing and ordered to quarantine, and (2) the changes the plaintiffs have made in order to avoid contact tracing, such as avoiding businesses, schools, and church due to this potential future threat. Neither constitutes an injury in fact, however. A "threatened injury must be *certainly impending*" and "[a]llegations of *possible* future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (emphasis in original). Past exposure to conduct "does not in itself show a present case or controversy regarding injunctive relief" unless accompanied "by any continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); see also McNair v. Synapse Grp. Inc., 672 F.3d 213, 223 (3d Cir. 2012). Though they fear government surveillance, the Parkers do not allege that they are presently being monitored or forced to disclose information as a result of Parker's past infection.

***3** The District Court found that an attenuated chain of events is required to expose the plaintiffs to the contact tracing program:

> [F]irst, they must be in sustained "close contact" ... with another person; second, that person must receive a test for COVID-19; third, that test must come back either

> "positive" or "probable"; fourth, that test result is sent to the DOH (which, presumably, might not happen if the individual receives a test in a different state, or if they receive a test from a non-DOH-approved lab, or if the testing lab for some reason is not mandated to report test results through NEDSS); fifth, a DOH contact tracer must call the infected individual; sixth, that individual must actually pick up the phone; and seventh, the individual must tell the contact tracer that he or she was in close contact with one of the Plaintiffs.

App. 24–25. These findings are not clearly erroneous. As the District Court observed, the plaintiffs have limited interpersonal interaction in many ways: their children do not attend school in person, they stopped going to church, they avoid visiting hospitals for minor maladies, and they no longer frequent a number of restaurants and businesses. These actions make the plaintiffs less likely to contract COVID-19 and undergo contact tracing than many Pennsylvanians. The plaintiffs might still experience contact tracing if any close contacts contract the virus, but they have offered no details about their close contacts or any facts reflecting that those contacts will likely become infected.

Courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," and this case is no exception. Clapper, 568 U.S. at 413. Our reluctance is even greater here, as we cannot presume that the plaintiffs' unspecified close contacts will act in ways that expose themselves to a potentially life-threatening virus. See McNair, 672 F.3d at 225 ("[G]enerally, the law accords people the dignity of assuming that they act rationally, in light of the information they possess."). And participation in the contact tracing program is voluntary for individuals, further diminishing the chances that any of the plaintiffs' close contacts will imminently provide their information to the government. The plaintiffs have not established that they or their close contacts face "certainly impending" contact tracing.

Nor can the plaintiffs' self-imposed injuries of making changes in their behavior confer standing. It is well established that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Clapper, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." Id. The plaintiffs' behavioral changes may be burdensome, but the plaintiffs themselves made those changes in response to a fear of contact tracing that is not certainly impending. See Laird v. Tatum, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm" and do not suffice to create standing). Because the plaintiffs have failed to show an injury in fact, the District Court properly held that they lack standing to obtain a preliminary injunction of the Commonwealth's contact tracing program.

B.

***4** An appeal becomes moot if events have transpired "that make it impossible for the court to grant any effectual relief whatsoever." County of Butler v. Governor of Pa., 8 F.4th 226, 230 (3d Cir. 2021). Because the statewide mask mandate expired several months ago, there is no relief the Court could grant the plaintiffs regarding that order. There are two possible exceptions to mootness: the "voluntary cessation" doctrine, and the doctrine of "capable of repetition yet evading review." Neither applies here.

The voluntary cessation exception does not apply because the mandate expired by its own terms and not as a response to litigation. Id. (citing Trump v. Hawaii, 138 S. Ct. 377 (2017)). The mask mandate remained in place for many months after its constitutionality was challenged. It expired by its own terms once vaccines became widely available. The Court "generally presume[s] that government officials act in good faith." Id. Absent any evidence to the contrary, that presumption applies here, and the voluntary cessation exception is inapplicable.

The "capable of repetition yet evading review" exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Hamilton v. Bromley, 862 F.3d 329, 335 (3d Cir. 2017). The plaintiffs bear the burden to show that this exception applies. See Belitskus v. Pizzingrilli, 343 F.3d 632, 648 (3d Cir. 2003). The exception is "narrow" and it "applies only in exceptional situations." County of Butler, 8 F.4th at 231.

The plaintiffs have not shown that there is a reasonable expectation that the statewide mask mandate will be reinstated and so the second prong is not met.[2] The government has represented that the mask mandate was issued in response to

the reopening of businesses after the initial shutdown and that it expired based on the availability of vaccines, and Governor Wolf has stated that he does not plan on issuing another statewide mandate in the future. See Oral Arg. at 20:15–20:30.

The government has not rescinded and then re-issued the order even once, let alone multiple times. That fact distinguishes this case from those relied upon by the plaintiffs, where the Supreme Court held challenges to COVID-19 orders were not moot upon a record of frequent government changes. See Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 68 & n.3 (2020) (citing evidence that "[t]he Governor regularly change[d] the classification of particular areas without prior notice" and that the classification had been changed three times in the previous seven days); see also Tandon v. Newsom, 141 S. Ct. 1294, 1297 (2021) (holding that a case was not moot where there was a "track record" of state officials "moving the goalposts."). Given the evidence in this case, the plaintiffs have not met their burden to show that there is a reasonable expectation that a statewide mask order will be reinstated. The challenge is therefore moot.

IV.

For the foregoing reasons, we will affirm the order of the District Court.

**All Citations**

Not Reported in Fed. Rptr., 2021 WL 5492803

Footnotes

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

1 We have jurisdiction to review the denial of a preliminary injunction under 28 U.S.C. § 1292(a). The plaintiffs invoked the District Court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, though the court held that it lacked jurisdiction to preliminarily enjoin the contact tracing program or mask mandate.

2 As in County of Butler, because the second prong is not satisfied, we decline to decide here "[w]hether, as a general matter" orders satisfy the first prong "when they are of sufficiently short duration that they cannot be addressed through the appellate process." Id. at 231 n.3.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

FILED FOR RECORD
2025 AUG 25 AM10 25
JEREMY S. BREON
PROTHONOTARY
CENTRE COUNTY, PA

**IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA**
**CIVIL ACTION-LAW**

| | | |
|---|---|---|
| BARRY J. FENCHAK,<br>Plaintiff, | ) | |
| v. | ) | No. 2025-CV-0882-CI |
| THE PENNSYLVANIA STATE UNIVERSITY BOARD OF TRUSTEES, and DAVID KLEPPINGER, IN HIS OFFICIAL CAPACITY AS CHAIRMAN<br>Defendants. | ) | |

*Attorney for Plaintiff:* *Terry L. Mutchler, Esq.*
*Erika L. Silverbreit, Esq.*

*Attorney for Defendants:* *Andrew R. Stanton, Esq.*
*Susan E. Kessler, Esq.*

**OPINION AND ORDER**

**Marshall, J.**

Presently before the Court are the Preliminary Objections to Plaintiff's Complaint, filed by the Pennsylvania State University Board of Trustees and David Kleppinger, in his official capacity as Chairman (collectively, "Defendants") on May 1, 2025. In deciding the preliminary objections, this Court considered, *inter alia*, (*i*) the aforementioned Preliminary Objections, (*ii*) Defendants' Brief in Support of Preliminary Objections, filed on July 11, 2025, and (*iii*) the Brief in Opposition to Preliminary Objections, filed by Barry J. Fenchak ("Plaintiff") on August 11, 2025. A hearing on the matter was held on August 14, 2025. Upon consideration of the filings and arguments of the parties, the Court enters the following Opinion and Order:

**BACKGROUND**

Plaintiff is a former member of the Pennsylvania State University Board of Trustees (hereinafter, the "Board"), having served as a Trustee from June 2022 until the expiration of his

☒O ☐RD ☐S

term in June 30, 2025. Plaintiff is one of nine voting members elected by the alumni to serve on the 36-person Board. The Board is the corporate body established by the University's Charter and serves as the governing body of the University. The Board delegates day-to-day management of the University to the President, with certain reserved powers set forth in the bylaws. On or about July 30, 2024, the Board adopted the Amended and Restated Bylaws (the "Amended Bylaws") presently at issue.

Plaintiff filed a Complaint on April 1, 2025, seeking declaratory judgment pursuant to 42 Pa. C.S.A. §7531 *et seq.*[1] Specifically, Plaintiff asks this Court to declare that Sections 2.01, 2.02, 2.03, 2.04, and 2.05 of the Amended Bylaws were adopted in violation of 15 Pa. C.S. §5504, on the basis that those sections of the Amended Bylaws are "inconsistent with law." *See* 15 Pa. C.S. §5504(a) ("The members entitled to vote shall have the power to adopt, amend and repeal the bylaws of a nonprofit corporation...The bylaws may contain any provisions for managing the business and regulating the affairs of the corporation <u>not inconsistent with law</u> or the articles...") (emphasis added).

The parties have stipulated that Plaintiff is a "Director" of the Board, as that term is used by the Pennsylvania Nonprofit Corporations law, 15 Pa. C.S. §§5101–6162. *See* 15 Pa. C.S. §5103 ("**Directors.**" Individuals designated, elected or appointed, by that or any other name or title, to act as members of the board of directors, and their successors. The term does not include a member of an other body, unless the person is also a director. The term, when used in relation to any power or duty requiring collective action, shall be construed to mean "board of directors.").

[1] Plaintiff's Complaint also contains two prayers for relief that have been mooted by Plaintiff's removal from the Board at the expiration of his term on or about June 30, 2025. *See Compl.* (Apr. 1, 2025) ("(b) The Nominating Subcommittee's vote of February 26, 2025, deeming Plaintiff "unqualified" as an alumni candidate and precluding him from election the ballot is hereby overturned; (c) Plaintiff is henceforth deemed "qualified" as an alumni candidate for the Pennsylvania State University Board of Trustees and shall be eligible to be on the ballot as an alumni candidate.")

Defendants bring a single preliminary objection in the nature of a demurrer pursuant to Pa.R.C.P. No. 1028(a)(4). Defendants argue that the Amended Bylaws are lawful and inside the bounds of the Board's inherent authority to govern itself. The parties agree that Plaintiff's instant challenge to the Amended Bylaws is a facial challenge, which requires Plaintiff to show that there are "no circumstances" under which the Amended Bylaws would be valid. *Germantown Cab Co. v. Phila. Parking Auth.*, 206 A.3d 1030, 1041 (Pa. 2019).

**DISCUSSION**

"Preliminary objections may be filed by any party to any pleading." Pa. R.C.P. No. 1028. Answers and preliminary objections are among the pleadings allowed by the Pa. R.C.P. No. 1017. The grounds for a preliminary objection are limited to:

> (1) lack of jurisdiction over the subject matter of the action or the person of the defendant, improper venue or improper form or service of a writ of summons or a complaint;
> (2) failure of a pleading to conform to law or rule of court or inclusion of scandalous or impertinent matter;
> (3) insufficient specificity in a pleading;
> (4) legal insufficiency of a pleading (demurrer);
> (5) lack of capacity to sue, nonjoinder of a necessary party or misjoinder of a cause of action;
> (6) pendency of a prior action or agreement for alternative dispute resolution;
> (7) failure to exercise or exhaust a statutory remedy; and
> (8) full complete and adequate non-statutory remedy at law.
> Pa. R.C.P. No. 1028.

When considering preliminary objections in the nature of a demurrer, all material and relevant facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true. *Hess v. Fox Rothschild, LLP.*, 925 a.2D 798, 805 (Pa. Super. Ct. 2007). The court is to resolve the issues solely on the basis of the pleadings without considering testimony or other evidence outside the complaint. *Cardenas v. Schober*, 783 A.2d 317, 321 (Pa. Super. Ct. 2001). The objection may only be granted when the case is clear and free from doubt. *D'Elia v. Folino*,

933 A.2D 117 (Pa. Super. Ct. 2007). To be free and clear from doubt, the complaint must appear with certainty that the law will not permit recovery by the plaintiff upon the facts averred. *Burgoyne v. Pinecrest Cmty. Ass'n.*, 924 A.2d 675 (Pa. Super. Ct. 2007). Where doubt exists as to whether a demurrer to the complaint should be sustained, it should be resolved in favor of overruling the preliminary objection. *Haun v. Cmty. Health Systems Inc.*, 14 A.3d 120,123 (Pa. Super. Ct. 2011).

The parties agree that Plaintiff's challenge to the Amended Bylaws is a "facial challenge." *See Def. Brief in Support* (Jun. 11, 2025), p. 9; *see also Brief in Opposition* (Aug. 11, 2025); *Compare Clifton v. Allegheny County*, 600 Pa. 662, 969 A.2d 1197, at 1223 n. 37 (Pa. 2009) ("…a statute is facially invalid when its constitutional deficiency is so evident that proof of actual unconstitutional applications is unnecessary.") *with Diop v. Bureau of Professional and Occupational Affairs*, 272 A.3d 548 (Commw. Ct. 2022) ("[h]ere, Henry is asserting that the Law's licensing requirements are unconstitutional <u>as applied</u> to her.") (emphasis added). A statute is facially unconstitutional only where there are "no circumstances under which the statute would be valid." *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *Clifton v. Allegheny Cty.*, 600 Pa. 662 (Pa. 2009).

The Pennsylvania Supreme Court has repeatedly recognized the Pennsylvania Constitution to be an alternative and independent source of individual rights. *See Willing v. Mazzocone*, 393 A.2d 1155 (Pa. 1978); *Commonwealth v. Triplett*, 341 A.2d 62 (Pa. 1975). It is also well settled that a state may guarantee rights and liberties of its citizens independent from those provided by the Federal Constitution, and that the rights so guaranteed may be more expansive than their federal counterparts. *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 80-82 (1980); *Oregon v. Hass*, 420 U.S. 714, 719 (1975).

The Pennsylvania Constitution of 1776 was the first Constitution in the country to protect "freedom of speech and of writing." *Oberholzer v. Galapo*, 322 A.3d 153, 177 (Pa. 2024) (citation omitted). The Constitutional Convention of 1790 rewrote the provision to state: "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty" which is the formulation that remains today. Pa. Const. Art. I, § 7. ("The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty…"). Article I, §7 has been "routinely recognized as providing broader freedom of expression than the federal constitution." *Uniontown Newspapers, Inc. v. Roberts,* 839 A.2d 185, 193 (Pa. 2003).

While the right to freedom of speech and freedom of the press are recognized as fundamental rights in the Pennsylvania Constitution, they are not absolute rights. *Andress v. Zoning Bd. Of Adj.City of Phila.*, 410 Pa. 77 (Pa. 1963). For example, while the state cannot bring a prosecution simply because someone yells "fuck the police" (*Com. v. McCoy*, 69 A.3d 658 (Pa. Super. 2013) (finding the phrase to be neither obscene nor fighting words)), the state can, for example, place reasonable restrictions on the time, place and manner of expression. *S.B. v. S.S.*, 243 A.3d 90, 105 (Pa. 2020) (finding content-neutral speech restrictions to be justified by the important governmental interest of protecting the psychological and emotional well-being of a child.). Further, when a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. See, *e.g., Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) ("[T]he government as employer indeed has far broader

powers than does the government as sovereign"). Like any organization, the University has an interest in its "effective functioning," *Rankin v. McPherson*, 483 U.S. 378, 388 (1987), and may restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at speech that has some potential to affect its operations. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. *Rankin*, 483 U.S. at 390.

Section 2.03(c) of the Amended Bylaws is the crux of this matter, with Plaintiff characterizing it as a "draconian gag order," *Compl.* ¶70, and provides as follows:

> "**Meetings and Other Responsibilities.** Trustees must prepare diligently, attend required meetings of the Board (as set forth in Section 2.04), and assigned committees, and participate constructively in all Board of Trustees meetings and related activities by reading the agenda and supporting materials. Trustees shall speak openly, freely, and candidly within the Board, while being mindful that any public dissent from Board decisions must be done as trusted stewards of a public institution. Because a university is a free marketplace of competing ideas and opinions, its governance mandates open communications as well as principled, civil, and respectful debate. At the same time, Trustees must always protect and act in the best interest of the University, being cognizant that the tone and substance of their words whether in the board room or in public, including on social media platforms, reflect on the University that they are entrusted to serve and can adversely affect its wellbeing. While Trustees think independently and make informed individual decisions about what they feel is in the best interests of the University, they shall support majority decisions of the Board and work cooperatively with fellow Board members and the Administration to advance the University's goals. Negative or critical public statements about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders do not serve the University's interests and are inconsistent with a Trustee's fiduciary obligation to act always in the best interests of the University. Trustees shall extend goodwill to one another and to all members of the University community in board sessions and in public forums, including social media."
>
> *Amended Bylaws*, §2.03(c).

Section 2.03(c) is undoubtedly a restriction on the speech of Trustees, providing, among other things, that "[n]egative or critical public statements about the Board, the University or its

students, alumni, community, faculty, staff, and other stakeholders do not serve the University's interests." This is seemingly inconsistent with the Pennsylvania Constitution's broad guarantee that every citizen may freely speak, write and print on any subject, as the free communication of thoughts and opinions is recognized as one of the "invaluable rights of man." Pa. Const. Art. I, § 7, *supra* (emphasis added). However, the freedom of speech is not absolute; for example, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick v. Myers*, 461 U.S. 138, 151-52 (1983).

The Board is vested with the "power to pass all such by-laws, ordinances and rules as the good government of the institution shall require." 24 P.S. §2541. The business judgment rule statutorily applies to directors of nonprofit corporations and dictates that courts must "presume that [directors] pursue the best interests of their corporations," and should not "second-guess[]" their business decisions. 15 Pa. C.S. §5712(d); *Cuker v. Mikalauskas*, 692 A.2d 1042, 1046 (Pa. 1997). The Board duly enacted the Amended Bylaws in July 2024, passing by a vote of 27-6.

This Court maintains that the challenged Amended Bylaws are "inoffensive and are likely not inconsistent with law." *Opinion and Order* (Apr. 14, 2025). Plaintiff has failed to demonstrate that there are "no circumstances" in which the Amended Bylaws are valid. *Germantown Cab Co. v. Phila. Parking Auth.*, 206 A.3d 1030, 1041 (Pa. 2019). The Amended Bylaws represent the Board's right to self-governance, which the Board determined to be necessary to operate efficiently and effectively. It should be no surprise that "when a citizen enters government service," he necessarily "must accept certain limitations on his … freedom." *Garcetti,* 547 U.S. at 418. The burden of caution employees bear with respect to words they speak will vary with the extent of authority and public accountability the employee's role entails. *Rankin*, 483 U.S. at 390. Logically,

then, a Trustee – holding a position that carries more authority and public accountability than any other – should be held to the highest standard.

Accordingly, the Court enters the following Order:

**ORDER**

AND NOW, this 24th day of August 2025, Defendant's Preliminary Objection in the form of a demurrer is hereby SUSTAINED. Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE.

BY THE COURT:

Brian K. Marshall, Judge

KeyCite Blue-Striped Flag
Appeal Filed by Cheryl Borowski v. Kean University, et al, 3rd Cir., July 11, 2025

2025 WL 1806643
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Cheryl BOROWSKI, Plaintiff,
v.
KEAN UNIVERSITY et al., Defendants.

Civ. No. 2:20-cv-5172 (WJM)
|
Signed July 1, 2025

**Attorneys and Law Firms**

Kevin Haverty, Williams, Cuker & Berezofsky, Esqs., Cherry Hill, NJ, for Plaintiff.

Levi Malcolm Klinger-Christiansen, New Jersey Department of Law and Public Safety, Division of Law, Trenton, NJ, Rimma Razhba, Andrew Keir Hedin, New Jersey Office of the Attorney General, Division of Law, Trenton, NJ, for Defendants Kean University, Dawood Farahi, Charles Williams, Steven Kubow, Kenneth Green, Faraque Chowdhury.

Levi Malcolm Klinger-Christiansen, New Jersey Department of Law and Public Safety, Division of Law, Trenton, NJ, Pamela N. Ullman, Steven Michael Gleeson, Andrew Keir Hedin, New Jersey Office of the Attorney General (Division of Law), Trenton, NJ, for Defendant Christopher Myers.

**OPINION**

WILLIAM J. MARTINI, United States District Judge

***1** Plaintiff Cheryl Borowski ("Plaintiff"), a former adjunct professor at Kean University, brings this action against the university and related defendants seeking redress under 42 U.S.C. § 1983.[1] Plaintiff alleges that she was unlawfully removed from her teaching position after students reported that she made offensive comments in class and challenges the constitutionality of the state policy under which she was terminated. Plaintiff now moves for leave to file a Second Amended Complaint ("SAC"). ECF No. 65. Defendants oppose, arguing that amendment would be futile. ECF No. 66. For the reasons that follow, Plaintiff's motion to amend is **DENIED**.

**I. BACKGROUND**

In May 2016, Plaintiff was named as a respondent in a complaint alleging that she made remarks in class about gender, immigration status, nationality, ethnicity, and religion that were in violation of the New Jersey State Policy Prohibiting Discrimination in the Workplace ("State Workplace Policy"). Kean informed Plaintiff that her teaching contract would not be renewed for the following academic term, and, after an investigation, it sent Plaintiff a final determination letter advising her that it found her remarks to be a violation of the State Workplace Policy. Plaintiff appealed the determination, but the case was ultimately dismissed by an Administrative Law Judge ("ALJ"). On November 23, 2018, a final state agency decision was issued that affirmed the ALJ's ruling and dismissed Plaintiff's appeal for lack of jurisdiction.

The lengthy procedural history of this case is detailed in prior opinions, including the February 15, 2024 Opinion and Order dismissing all of Plaintiff's claims in her original Complaint and the January 23, 2025 Opinion and Order dismissing Plaintiff's First Amended Complaint for lack of Article III standing. *See* ECF Nos. 40-41. After the Court granted limited leave to seek further amendment, *see* ECF No. 62, Plaintiff filed the present motion, attaching her proposed SAC. ECF No. 65-2. Aside from two new paragraphs alleging reputational harm from Kean's final determination, the SAC mirrors the prior pleading. *See* SAC ¶¶ 62–63. Defendants oppose the motion on standing grounds and, in the alternative, argue futility under Rule 15(a)(2), Def. Opp. 5, ECF No. 66.

**II. LEGAL STANDARD**

Leave to amend is generally granted unless there is: (1) undue delay or prejudice; (2) bad faith; (3) dilatory motive; (4) failure to cure deficiencies through previous amendment; or (5) futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The ultimate decision to grant or deny leave is in the court's discretion. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1970). The futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002).

The proposed amended claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The proposed amendment is futile if it is "frivolous or advance[s] a claim or defense that is legally insufficient on its face...." *Rx ReLeaf LLC v. Relief TMS LLC*, No. 23-3551, 2024 WL 4894768, at *6 (D.N.J. Nov. 26, 2024) (citing *Marlowe Patent Holdings LLC v. Dice Electronics, LLC*, 293 F.R.D. 688, 695 (D.N.J. 2013)). The Court accepts well-pleaded factual allegations as true and draws reasonable inferences in Plaintiff's favor, but disregards "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

### A. Standing

***2** In the wake of this Court's prior dismissal for lack of Article III standing, the proposed SAC adds two paragraphs alleging that Kean's termination decision has stigmatized Plaintiff and hampered her future employment prospects. *See* SAC ¶¶ 62–63. Such reputational harm allegations, if coupled with a request for expungement or similar prospective relief, can satisfy injury in fact. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-340 (2016); *Baraka v. McGreevey*, 481 F.3d 187, 208 (3d Cir. 2007). Defendants respond that the records are statutorily confidential and have never been disclosed; any reputational injury, they argue, is conjectural. Def. Opp. 10-12. While the question of Article III standing remains close, the Court will assume *arguendo* that Plaintiff has met the minimal pleading burden and proceeds to the merits.[2] The dispositive question, therefore, is whether the proposed pleading states a plausible claim; if it does not, Plaintiff's request for leave to file the SAC must be denied as futile. *See City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).

### B. Facial First Amendment Challenge

Plaintiff asserts that the State Workplace Policy is facially unconstitutional and therefore cannot be used as a basis for disciplining her. A facial attack is notably "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To prevail, a plaintiff must demonstrate that the policy at issue lacks a "plainly legitimate sweep." *Id.*; *Moody v. NetChoice*, LLC, 603 U.S. 707, 723 (2024). The First Amendment relaxes the facial standard slightly: a plaintiff need show only that "a substantial number" of a statute's applications are unconstitutional "in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (cleaned up). Where, as here, the state acts as employer, courts afford it "broader discretion to restrict speech" in the workplace when it acts in its employer role. *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Plaintiff argues that the State Workplace Policy is facially unconstitutional for three reasons: (1) it is neither content nor viewpoint neutral; (2) many of its provisions are unconstitutionally vague; and (3) many of its provisions are overbroad. SAC ¶ 58. Each of these theories—content/viewpoint discrimination, vagueness, and overbreadth—miss the mark.

1. <u>Content/Viewpoint Neutrality</u>

The State Workplace Policy proscribes treating an individual differently in the workplace based on protected traits, including, *inter alia*, race, creed, color, national origin, ancestry, age, sex/gender, marital status, sexual orientation, disability, or liability for service in the Armed Forces. SAC ¶ 58; State Workplace Policy § II(a), ECF No. 65-4. Plaintiff asserts that various provisions in the State Workplace Policy —including "[u]sing derogatory references with regard to any of the protected categories in any communication"—violate the requirement that speech prohibitions be content and viewpoint neutral. SAC ¶ 58. However, the SAC contains no factual allegations that would permit the Court to reasonably infer that the State Workplace Policy encroaches on any protected speech. The policy regulates only speech by state employees in the course of their duties; when employees speak pursuant to official duties, their speech is generally not protected by the First Amendment. *Garcetti*, 547 U.S. at 421 (2006); *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006).[3] This is especially appropriate in a classroom setting, where the state's interest in preserving a respectful learning environment is paramount. *See Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 172 (3d Cir. 2008); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998). As the State Workplace Policy simply forbids state employees from using discriminatory or harassing language in the workplace and its reasonable extensions—and because that category of speech is not protected by the First Amendment—it does not unlawfully infringe on protected free expression.

2. Vagueness

***3** Plaintiff next contends the State Workplace Policy is impermissibly vague, She specifically alleges that certain undefined terms (e.g., "treat" and "differently") leave state employees without adequate notice of what the policy prohibits. SAC ¶ 58. A statute is unconstitutionally vague only if it " 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' " and " 'authorizes or even encourages arbitrary and discriminatory enforcement.' " *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (quoting *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)). Here, the State Workplace Policy's operative terms—"treat" and "differently" or "derogatory" and "demeaning"—are words of common understanding that give persons of ordinary intelligence fair notice of the proscribed conduct and do not invite arbitrary enforcement. *See id.* Further, various examples in the policy illustrate forbidden conduct, such as calling co-workers derogatory nicknames, displaying demeaning images pertaining to protected categories, and suggesting that failure to accept a request for a date would result in adverse employment consequences. *See* State Workplace Policy § II(a), (b). Because the State Workplace Policy sets forth a discernible standard of conduct and the SAC identifies no concrete instances of arbitrary enforcement, Plaintiff's void-for-vagueness challenge fails on the merits.

3. Overbreadth

Plaintiff's final theory is facial overbreadth. SAC ¶ 58. The doctrine is an extraordinary measure invoked sparingly; a law is void only when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The State Workplace Policy's core purpose—eradicating discriminatory employment practices—is indisputably legitimate. Plaintiff posits hypothetical scenarios in which co-workers might be chilled from political debate, but the Supreme Court has cautioned against going "beyond the statute's facial requirements and [speculating] about 'hypothetical' or 'imaginary' cases." *Haagensen v. Pennsylvania State Police*, 490 F. App'x 447, 450 (3d Cir. 2012) (quoting *Washington State Grange*, 552 U.S. at 450). Absent concrete allegations that the State Workplace Policy has in practice curbed a substantial volume of protected speech, Plaintiff cannot invoke the "strong medicine" of facial overbreadth. *Broadrick*, 413 U.S. at 613.

**IV. CONCLUSION**

For these reasons, Plaintiff's motion to amend (ECF No. 65) is **DENIED** as futile, and the action is **DISMISSED WITH PREJUDICE**. An appropriate Order shall follow.

**All Citations**

Slip Copy, 2025 WL 1806643

Footnotes

1 Defendants are Kean University, Dawood Farahi, Charles Williams, Stephen Kubow, Kenneth Green, Faruque Chowdhury, and Allison Chris Myers.

2 For present purposes, the Court presumes that the proposed SAC fits within the *Ex parte Young* exception.

3 When public employees speak (i) pursuant to their official duties or (ii) on internal personnel grievances rather than matters of public concern, the First Amendment affords that speech little—if any—protection. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1146285
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Kathleen Wright CROFT,
Samuel E. Croft Jr., Plaintiffs,
v.
DONEGAL TOWNSHIP, Richard Fidler, Tammi Iams, Richard Martin, Lane Turturice, Defendants.

2:20-CV-01430-CCW
|
Signed 03/25/2021

**Attorneys and Law Firms**

Gretchen E. Moore, Alexis M. Wheeler, E. J. Strassburger, Strassburger, McKenna, Gutnick & Gefsky, Pittsburgh, PA, for Plaintiffs.

Thomas P. McGinnis, Samuel G. Dunlop, Karin M. Romano, Thomas, Thomas & Hafer, LLP, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION

CHRISTY CRISWELL WIEGAND, United States District Judge

***1** Before the Court is the Motion to Dismiss filed by Defendants Donegal Township, Richard Fidler, Tammi Iams, Richard Martin, and Lane Turturice. ECF No. 70. For the reasons set forth below, Defendants' Motion will be GRANTED and Plaintiffs' Second Amended Complaint will be DISMISSED.

## I. Background

### A. Factual Allegations

Plaintiffs allege in their Second Amended Complaint that Plaintiff Kathleen Wright Croft ("Ms. Croft"), an elected member of Defendant Donegal Township's Board of Supervisors (the "Board"), has been the subject of an ongoing campaign of harassment and retaliation by the majority faction of the Board. *See* ECF No. 51 at ¶¶ 9, 17. Plaintiffs allege that the majority faction—currently comprised of Defendants Tammi Iams ("Ms. Iams"), Richard Fidler ("Mr. Fidler"), and Richard Martin ("Mr. Martin"), *see id.* at ¶¶ 10–13—in coordination with Defendant Township Solicitor Lane Turturice ("Mr. Turturice"), *see id.* at ¶ 14, has worked to marginalize Ms. Croft because of her persistent criticism of Board policies and actions, specifically as they related to issues such as budgeting, employment matters, financial management, and policing. *See id.* at ¶ 51. Plaintiffs claim that Ms. Croft has been (1) the subject of allegedly retaliatory lawsuits, *see id.* at ¶¶ 22, 27, 37; (2) denied access to Township offices and information important to her work as an elected Supervisor through the so-called "chain of command policy" embodied in Resolution 2-2019, *see, e.g., id.* at ¶¶ 18–21, 30–32, 39, 50; (3) made to use Right to Know Law procedures to obtain information, unlike other Supervisors, *see id.* at ¶¶ 33–36; (4) the subject of an allegedly spurious surcharge by the Township's Board of Auditors, *see id.* at ¶¶ 42–48; and (5) rebuked by Defendants Turturice and Martin for her comments on police contract negotiations. *See id.* at ¶¶ 40–41. According to Plaintiffs, the alleged cumulative result of these actions has been to effectively prevent Ms. Croft from fulfilling her elected duties. *See* ECF No. 84 at 1–2.

Relatedly, Plaintiffs allege that Defendants Iams, Fidler, and Martin have violated Pennsylvania's Second Class Township Code and Sunshine Act by deliberating, and taking official action, on Township business outside the scope of public meetings and without requisite notice to Ms. Croft or the public. *See* ECF No. 51 at ¶¶ 18-19, 53–62.

### B. Procedural History

Plaintiffs filed their original, four-count complaint on September 22, 2020, ECF No. 1, and moved for a preliminary injunction on October 12, 2020. ECF No. 4. After the Court held a status conference with the parties regarding Plaintiffs' original motion for preliminary injunction, ECF No. 20, Plaintiffs filed an amended complaint on November 3, 2020, ECF No. 24, and a renewed Motion for Preliminary Injunction, ECF No. 25, on November 6, 2020. On November 17, 2020, Defendants moved to dismiss the amended complaint. ECF No. 31.

On January 14, 2021, before the Court ruled on Defendants' pending motion to dismiss, Plaintiffs filed a consent motion for leave to further amend their complaint, ECF No. 49, which the Court granted. ECF No. 50. Plaintiffs filed the operative Second Amended Complaint that same day, *see* ECF No. 51, rendering Defendants' then-pending motion to dismiss moot.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***2** In their five-count Second Amended Complaint, Plaintiffs make claims against Defendants under 42 U.S.C. § 1983 and state law. Specifically, Plaintiffs allege that Defendants: (1) unlawfully retaliated against Ms. Croft for her outspoken views on local political matters, in violation of the First Amendment (Count I, all Defendants); (2) unlawfully discriminated against her because of her political views, in violation of the Fourteenth Amendment's Equal Protection Clause (Count II, all Defendants); (3) unlawfully "deprived" Plaintiffs of their votes by impeding Ms. Croft's ability to perform her duties as an elected Supervisor, in violation of the Fourteenth Amendment's Due Process Clause (Count III, all Defendants); (4) violated Pennsylvania's Second-Class Township Code (Count IV, Defendants Donegal Township, Iams, Martin, and Fidler); and (5) violated Pennsylvania's Sunshine Act (Count V, Defendants Donegal Township, Iams, Martin, and Fidler).

On February 4, 2021, Defendants filed the present Motion to Dismiss Plaintiffs' Second Amended Complaint. ECF No. 70. Plaintiffs filed their opposition to Defendants' Motion on February 25, 2021; as such, Defendants' Motion is now ripe for disposition.[1]

## II. Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim. In reviewing a motion to dismiss, the court accepts as true a complaint's factual allegations and views them in the light most favorable to the plaintiff. *See* *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008). Although a complaint need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That is, "a formulaic recitation of the elements of a cause of action will not do." *Id.* Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

The United States Court of Appeals for the Third Circuit has established a three-step process for district courts to follow in analyzing a Rule 12(b)(6) motion:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

Finally, if a civil rights claim is dismissed pursuant to Rule 12(b)(6), the Third Circuit has held that the district court must provide leave to amend "unless an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 236; *see also* *Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017) ("In our Circuit, 'district courts must offer amendment [in civil rights cases]— irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile.' ") (citation omitted). Amendment is futile where an amended complaint could not withstand a renewed motion to dismiss. *See* *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

## III. Discussion

### A. Plaintiffs' Claims Under 28 U.S.C. § 1983 are Subject to Dismissal

#### i. Count I – First Amendment Retaliation

***3** With respect to Plaintiffs' First Amendment retaliation claim (Count I), Defendants advance three arguments in favor of dismissal: (1) that Plaintiffs' claim seeks "improper judicial inquiry into political motives;" (2) that the Second Amended Complaint fails to allege the type of conduct "deemed sufficient to deter an elected official from exercising her speech rights;" and (3) that the individual Defendants are entitled to qualified immunity "on the basis that [Ms. Croft] does not have a 'clearly established' right against alleged retaliation for speech made within the scope of her official duties." ECF No. 71 at 9, 27. The Court will first address whether Plaintiffs have plausibly alleged a violation of the First Amendment before turning to consider whether

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the individual Defendants are entitled to qualified immunity because the right that Defendants allegedly violated was not clearly established. *See* *Santini v. Fuentes,* 795 F.3d 410, 418 (3d Cir. 2015) (noting that, following the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), courts have discretion to undertake the two-step qualified immunity analysis "in the order we deem most appropriate for the particular case before us.").

**a. Plaintiffs Plausibly Allege a Claim for First Amendment Retaliation**

To state a First Amendment retaliation claim, a plaintiff must demonstrate "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal nexus between the constitutionally protected conduct and the retaliatory action." *Zimmerlink v. Zapotsky*, 539 Fed.Appx. 45, 48 (3d Cir. 2013) (citing *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).

Because "the alleged retaliatory conduct must have had more than a de minimis impact on the plaintiff's First Amendment rights" to be actionable, "[w]here the alleged misconduct relates to the statements or actions of elected officials, the threshold is particularly high." *Willson v. Yerke*, 604 Fed.Appx. 149, 151 (3d Cir. 2015). Thus, "the First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation interferes with their ability to adequately perform their elected duties." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015).

First, the Court is not persuaded by Defendants' argument that Plaintiffs' First Amendment retaliation claim should be dismissed because it "seeks improper judicial inquiry into political motives." ECF No. 71 at 9. Although Defendants may be correct that a First Amendment retaliation claim by an elected official against her colleagues raises separation of powers concerns, *see* ECF No. 71 at 10 (citing *Tenney v. Branhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) and *Shields v. Charter Twp. of Comstock*, 617 F.Supp.2d 606, 615–16 (W.D. Mich. 2009)), courts have found such claims to be cognizable where the alleged retaliation interferes with the plaintiff-official's ability to perform her elected duties. *See* *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006).

Second, Plaintiffs have adequately pleaded allegations to support the "sufficient to deter a person of ordinary firmness" element of their First Amendment retaliation claim. Plaintiffs allege in the Second Amended Complaint that Defendants denied Ms. Croft access to Township facilities and information allegedly necessary for Ms. Croft to fulfill her duties as an elected supervisor in retaliation for Ms. Croft's public criticism of the individual Defendants' "policies and Township activities, specifically those relating to budgeting, expenditures, police contracts, and employment." ECF No. 51 at ¶ 51. For example, Plaintiffs assert that Ms. Croft has been denied access to the Township offices on at least one occasion and prevented from accessing information provided to other supervisors. *See, e.g., id.* at ¶¶ 20, 30–32, 39. Furthermore, although Plaintiffs do not directly plead a close temporal proximity between Ms. Croft's alleged speech and Defendants' alleged retaliation, causation may be inferred from "a pattern of antagonism or the sum of the allegations," which is the case here. *Michalesko v. Freeland Borough,* 18 F.Supp.3d 609, 622 (M.D. Pa. 2014) (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir. 2000)). Thus, viewing these allegations in the light most favorable to Plaintiffs, as the Court must when deciding a motion under Rule 12(b)(6), Plaintiffs have plausibly alleged that the alleged retaliatory acts were sufficient to interfere with Ms. Croft's ability to perform her elected duties and a pattern of antagonism from which causation can be inferred.

**b. The Individual Defendants Are Entitled to Qualified Immunity**

***4** Having determined that Plaintiffs have alleged a plausible claim for retaliation in violation of the First Amendment, we must next address whether the right allegedly violated by the individual Defendants was clearly established at the time of the alleged violation such that " 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Santini*, 795 F.3d at 417 (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). We conclude that it was not, and, therefore, that the individual defendants are entitled to qualified immunity.

Qualified immunity, "properly applied, ... protects all but the plainly incompetent or those who knowingly violate the law." *Phoenician Mediterranean Villa, LLC v. Swope*, 872 F.3d 138, 143 (3d Cir. 2017) (quoting *Ashcroft v. al-Kidd*,

563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (citation omitted)). Accordingly, government officials sued in their individual capacity are entitled to qualified immunity for alleged violations of a plaintiff's civil rights " 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d. Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

In addressing a claim of qualified immunity, courts analyze "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right was clearly established at the time of the alleged misconduct." *Id.* (citing *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). Further, "district courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.' " *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191–92 (3d Cir. 2009) (quoting *Pearson*, 555 U.S. at 236, 129 S.Ct. 808).

In a recent precedential opinion, the Third Circuit emphasized that, for a right to be "clearly established," it "must be so apparent that 'every reasonable official would understand that what he is doing is unlawful.' " *Hira Educ. Servs. N. Am. v. Augustine*, 991 F.3d 180, 190 (2021) (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020)). Furthermore, "the right must be defined with a 'high "degree of specificity" ' before [courts] consider that right clearly established." *Hira,* 991 F.3d at 190-91 (quoting *D.C. v. Wesby*, ––– U.S. ––––, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018)). Thus, "the legal principle established in a precedential case must 'clearly prohibit the offic[ial's] conduct in the particular circumstances before him.' " *Id.* at 191 (quoting *Wesby,* 138 S.Ct. at 581).

That said, " 'qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint.' " *Thomas*, 463 F.3d at 291 (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001)). Here, Defendants assert that they are entitled to qualified immunity on the sole ground that Ms. Croft "does not have a 'clearly established' right against alleged retaliation for speech made within the scope of her official duties." ECF No. 71 at 27. Defendants assert that following *Garcetti v. Caballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), and more recent Third Circuit cases, *see Werkheiser v. Pocono Twp.*, 780 F.3d 172 (3d Cir. 2015), the law is unsettled as to whether an elected official's speech pursuant to her official duties is constitutionally protected. *See id.* at 28–29.

***5** Plaintiffs' claim in Count I of the Second Amended Complaint rests on the proposition that an elected official has a right to be free from retaliation by her colleagues that is sufficient to interfere with her ability to perform her elected duties, for speech related to her role as a public official.

That an elected official's speech is protected under the First Amendment is not a novel proposition. *See Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (holding that state legislature's refusal to seat an elected representative in retaliation for statements opposing the war in Vietnam violated the First Amendment); *see also Montiero v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006) ("It is clearly established that when a public official excludes a[n] elected representative or a citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment."). However, the scope of that protection —and, importantly, the type or degree of retaliatory conduct sufficient to trigger a violation of the First Amendment—is not clear.

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421, 126 S.Ct. 1951. Following *Garcetti*, the Third Circuit concluded in *Werkheiser* that it was not clearly established that the First Amendment would protect an elected official from retaliation by his peers in a similar context. *See* 780 F.3d at 177. Although the facts in *Werkheiser* are not on all fours with this case—the alleged retaliation in *Werkheiser* took the form of plaintiff's colleagues not reappointing him to serve as the township's road master, *see id.* at 175—the upshot here is that the Third Circuit concluded that (1) it was not clear whether *Garcetti* applied to the speech of elected officials and (2) it was not clear that the type of retaliation at issue in *Werkheiser* would violate the First Amendment. *Id.* at 177, 181.

Thus, while an elected official's speech, broadly speaking, is protected under the First Amendment, it has not been clearly established what type or degree of retaliation is sufficient to trigger a constitutional violation. Certainly, retaliatory acts that actually prevent an elected official from taking office violate the First Amendment, *see Bond*, 385 U.S. at 137,

87 S.Ct. 339, as does retaliation that actually prevents an elected official from speaking once in office. *See Monteiro*, 436 F.3d at 404 (denying qualified immunity where city council president had council member physically removed from public meeting). However, courts in this Circuit have found less severe retaliation—e.g. declining to reappoint an elected official to a non-elected position, *see Werkheiser*, 780 F.3d at 183*,* or not including an official in private meetings and discussions, *see Zimmerlink*, 539 Fed.Appx. at 50—to be insufficient. Indeed, while physical intimidation crosses the line, *see Landis v. Bishop*, 1:13-cv-1119, 2014 WL 12775672, at *8, 2014 U.S. Dist. LEXIS 205905, at *24 (M.D. Pa. Sept. 23, 2014), mere verbal threats and harassment do not. *See Willson,* 604 Fed.Appx. at *151–152.

The allegations in Plaintiffs' Second Amended Complaint do not describe retaliatory conduct that rises to the level where a constitutional violation has been clearly established, such that a reasonable official in the individual Defendants' position would understand his or her actions to be unlawful. *See Hira*, 991 F.3d at 190. Although Plaintiffs argue that Defendants' alleged conduct "has excluded Supervisor Wright Croft from her office," ECF No 84 at 23, stripped of conclusory allegations, the Second Amended Complaint claims that Ms. Croft allegedly was subjected to the kinds of retaliatory acts courts in this Circuit have found, in this context, not to be violations of clearly established law, like being denied access to information and not being included in private discussions and decision-making. *See, e.g.,* ECF No. 51 at ¶¶ 18, 19, 31, 39. That is, there is no allegation in the Second Amended Complaint that Ms. Croft was ever prevented from speaking at public meetings, voting, or otherwise publicizing her criticisms of the Defendants and their policies. Furthermore, Plaintiffs do not point to, nor is the Court aware of, any precedential decisions from the Third Circuit clearly prohibiting Defendants' alleged conduct under the circumstances described in the Second Amended Complaint. *See Hira,* 991 F.3d at 191 (finding that "the legal principle established in a precedential case must 'clearly prohibit the offic[ial's] conduct in the particular circumstances before him.' ") (quoting *Wesby,* 138 S.Ct. at 581). At least one non-precedential decision from the Third Circuit has affirmed dismissal at summary judgment of a claim based on allegations similar to what Plaintiffs allege here. *See Zimmerlink*, 539 Fed.Appx. at 50.

***6** Mindful of the Third Circuit's recent reiteration that "[a]n official will not be charged with [understanding his conduct to be unlawful] unless existing precedent has 'placed the statutory or constitutional question beyond debate,' " *Hira*, 991 F.3d at 190 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)), the Court concludes that it was not clearly established at the time of the alleged retaliatory conduct that individual Defendants' actions would violate the First Amendment. As such, the individual Defendants are entitled to qualified immunity, and Plaintiffs' First Amendment retaliation claim against them will be dismissed.

Furthermore, having found that the individual Defendants are entitled to qualified immunity for Plaintiffs' First Amendment retaliation claim, Plaintiffs' claim in Count I against Defendant Donegal Township will also be dismissed. *See Williams v. W. Chester*, 891 F.2d 458, 467 (3d Cir. 1989) (affirming, under *Monell v. New York Dept. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), dismissal of claims against municipality where no claims against municipal employees remained).

That said, the Third Circuit requires that the district courts "must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 246. Although the individual Defendants are entitled to qualified immunity under the facts as alleged in the Second Amended Complaint, because qualified immunity is an affirmative defense that plaintiffs need not anticipate in their pleadings, *see Thomas,* 463 F.3d at 293, and because the Court is not aware of precedent from the Third Circuit permitting denial of leave to amend where a complaint plausibly states a claim but falls short of alleging a violation of a clearly established right, out of an abundance of caution, the Court will grant Plaintiffs leave to file a third amended complaint to attempt to cure the deficiencies identified above with respect to Count I.

#### ii. Count II – Equal Protection (Class of One)

In Count II, Plaintiffs assert a claim under the Equal Protection Clause, alleging that Defendants unlawfully treated Ms. Croft differently than other elected members of the Board. *See* ECF No. 51 at ¶ 68. Defendants assert that Plaintiffs' class-of-one equal protection claim, asserted against all Defendants, should be dismissed, arguing (1) that Plaintiffs' claim seeks "impermissible judicial inquiry regarding the political motives for interactions between co-legislators" and (2) that "a rational basis exists as a matter of law with respect to the alleged differential treatment of

political adversaries and political allies." ECF No. 71 at 13.[2] The Court finds that Plaintiff's equal protection claim is not cognizable and must be dismissed.

Plaintiffs do not assert that any protected class is in play, here, and so are proceeding on a "class of one" theory. *See* ECF No. 84 at 12 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). To maintain an Equal Protection claim under the "class of one" theory, a plaintiff "must allege that (1) the defendant treated [her] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (discussing *Olech*, 528 U.S. at 564, 120 S.Ct. 1073). The "rational basis" standard is very deferential and is satisfied " 'if there is any reasonably conceivable state of facts that could provide a rational basis' for the differing treatment." *Newark Cab Assoc. v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (quoting *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007)).

***7** In *Enquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008), the Supreme Court held that class of one Equal Protection claims are not cognizable in the public employment context. *Id.* at 607, 128 S.Ct. 2146. Underlying the holding in *Enquist* was the " 'common-sense realization that government offices could not function if every employment decision became a constitutional matter.' " *Id.* at 607, 128 S.Ct. 2146 (quoting *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Although concerned with claims by public employees, the rationale grounding the Supreme Court's holding in *Enquist* applies with equal force in the context of a class of one equal protection claim asserted by an elected official against her colleagues: In the absence of discrimination based on an elected official's membership in a protected class, the "class of one" theory would make democratic government unworkable by recognizing a federal claim every time an elected official is treated differently by her colleagues as a consequence of political differences.

Indeed, this natural extension of the Supreme Court's logic in *Enquist* is consonant with the Third Circuit's holding in *Zimmerlink* that plaintiff's Equal Protection claim was "legally deficient," in part because "the dispute in question is a political one, and [plaintiff] has provided no basis to conclude that it is irrational that a politician would treat a political ally differently than a political opponent." 539 Fed.Appx. at 50 (affirming district court decision, *Zimmerlink v. Fayette Cty.*, Civil Action No. 10-237, 2012 WL 5989198 at *7, 2012 U.S. Dist. Lexis 169349 at *27 (W.D. Pa. Nov. 29, 2012), which granted summary judgment on the ground that "it is axiomatic and expected in the political arena that elected officials treat political allies differently than political foes.").

That is not to say that an elected official may never seek redress in federal court for the allegedly unlawful conduct of their colleagues—as discussed above, the First Amendment provides such recourse, under certain circumstances. However, where, as here, the alleged differential treatment is rooted in admittedly political disputes, *see* ECF No. 84 at 2 (tying Defendants' allegedly unlawful conduct to Ms. Croft "criticizing the Board for a lack of transparency, especially in personnel, policing, and finance matters" and her disputes with the board over "police support and contracting matters"), the remedy is to be had at the ballot-box, not the courthouse. *Zimmerlink*, 2012 WL 5989198, at *7 n.9, 2012 U.S. Dist. LEXIS 169349, at *27, n.9 (collecting cases).

Accordingly, Plaintiffs' claim in Count II of the Second Amended Complaint will be dismissed. Furthermore, because the Court concludes that Plaintiff's class of one equal protection claim is not cognizable in this context—i.e., political disputes between elected officials—amendment would be futile, and such dismissal will be with prejudice. *See Shane*, 213 F.3d at 115 (no leave to amend required where amended complaint could not withstand renewed motion to dismiss).

**iii. Count III – Due Process**

Next, Defendants argue that Count III, asserted against all Defendants, should be dismissed because Plaintiffs have not "alleged facts showing that they were deprived of a constitutionally protected property or liberty interest in their vote." ECF No. 71 at 14. In support, Defendants point to *Smith v. Twp. of Aleppo,* 05cv0071, 2005 WL 5327643, 2005 U.S. Dist. LEXIS 45262 (W.D. Pa. Apr. 12, 2005), in which the district court dismissed at summary judgment "a virtually identical argument." ECF No. 71 at 15. Here again, the Court finds that Plaintiffs' due process claim is not cognizable and must be dismissed.

"The Due Process Clause of the Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.' " *Am. Express*

*Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (quoting U.S. Const. Amend. XIV, § 1). According to the Second Amended Complaint, "Plaintiffs have a property and liberty interest in their votes" of which they were deprived because "Defendants have interfered with Mrs. Wright Croft performing the duties of her elected office[,]" thereby "effectively den[ying] Plaintiffs of their vote." ECF No. 51 ¶¶ 71–72. In opposition to Defendants' Motion, Plaintiffs assert that their claim in Count III is grounded on the Supreme Court's "famous 'one-man, one vote' decision" in *Baker v. Carr,* 396 U.S. 186 (1962), in which the court found " 'a citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution.' " ECF No. 84 at 13 (quoting *Baker*, 396 U.S. at 208, 90 S.Ct. 314).

***8** Fundamentally, the Supreme Court's decision in *Baker* was about voting power, and, specifically, whether plaintiffs who alleged that their votes were diluted relative to other voters could maintain a federal lawsuit challenging an inequitable state apportionment scheme. In holding the federal courts had jurisdiction and that such claims are justiciable, the Court found that "[a] citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution" in situations involving false tallies, refusals to count votes from certain precincts, and ballot-box stuffing. *Baker,* 396 U.S. at 208, 90 S.Ct. 314 (citations omitted). *Baker* added to this list situations where apportionment schemes result in some votes carrying disproportionately less weight than others.

Here, there is no allegation in the Second Amended Complaint that Plaintiffs' *votes* were in any way impaired or diluted. Indeed, Plaintiffs cast their votes and Ms. Croft was elected. ECF No. 51 at ¶¶ 9, 71. Instead, Plaintiffs seek to extend *Baker* to situations where a group of voters' chosen candidate is later marginalized by her elected colleagues. *See id.* at ¶¶ 71–72. Other courts in this Circuit have rejected attempts to similarly expand the scope of *Baker*'s holding. *See Harris v. Corbett*, NO. 1:11-CV-2228, 2012 WL 1565357, 2012 U.S. Dist. LEXIS 61354 (M.D. Pa. May 2, 2012) (rejecting claim challenging state law where law affected voters equally). Plaintiffs' reliance on *Baker* is, therefore, misplaced.

In *Smith v. Aleppo* a court in this District was presented with a virtually identical claim to the one pled here—citing *Baker*, plaintiff-voters asserted a due process/equal protection claim based on allegations that defendant-elected officials had marginalized the official for whom plaintiffs voted. *See Smith*, 2005 WL 5327643 at *1, 2005 U.S. Dist. LEXIS 45262, at *1–2. The *Smith* court rejected the claim, noting that:

> Citizens may elect a member of a legislative body whose voice is ruthlessly muffled by the majority, but that does not mean that the voters' [sic] were denied any equal protection or due process right to "one right [sic] one vote" as with an unconstitutional apportionment. It is not the process of election that is denied its due, in that case, but the political will of the electors whose redress is at the ballot, not in the Courts, *on that issue.*

*Id.* at *1-2, 2005 U.S. Dist. LEXIS 45262 at *4 (emphasis original).[3] The Court finds the opinion in *Smith* to be persuasive and will dismiss Count III for fundamentally the same reasons. That is, assuming Plaintiffs' factual allegations are true and reading the Second Amended Complaint in the light most favorable to Plaintiffs, as the Court must when deciding a Rule 12(b)(6) motion, Plaintiffs have not pleaded any facts to support a claim that any protected interest they have in their *votes* was in any way impaired by the Defendants. Furthermore, as with Plaintiffs' claims in Count II, because amendment would be futile, Count III will be dismissed with prejudice.

### B. Counts IV and V – State Law Claims

***9** Because Plaintiffs' federal claims will be dismissed as to all Defendants, the Court will decline to exercise supplemental jurisdiction over the state law claims alleged in Counts IV and V. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if the district court has dismissed all claims over which it has original jurisdiction."). Because the Court does not address the merits of Plaintiffs' state law claims, Plaintiffs' claims in Counts IV and V will be dismissed without prejudice.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED as follows:

1. Plaintiffs' claim in Count I, for retaliation under the First Amendment, will be DISMISSED WITHOUT PREJUDICE on the ground that the individual Defendants are entitled to qualified immunity;

2. Plaintiffs' claim in Count II, for violation of the Equal Protection Clause of the Fourteenth Amendment, will be DISMISSED WITH PREJUDICE;

3. Plaintiffs' claim in Count III, for violation of the Due Process Clause of the Fourteenth Amendment, will be DISMISSED WITH PREJUDICE;

4. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims; therefore, Plaintiffs' claims in Counts IV and V will be DISMISSED WITHOUT PREJUDICE.

5. On or before **April 8, 2021**, Plaintiffs may file a Third Amended Complaint to attempt to cure the deficiencies identified with respect to Count I, only, and may reassert their state law claims. In light of the fact that Plaintiffs are represented by able counsel and have previously amended their complaint on multiple occasions, this will be the last opportunity for Plaintiffs to amend, and the Court will not afford the opportunity for further amendment. If Plaintiffs do not file a Third Amended Complaint on or before **April 8, 2021**, the dismissal of Plaintiffs' claim in Count I will be converted to a dismissal with prejudice without any further action by the Court.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1146285

Footnotes

1 In light of Plaintiffs' Motion for Preliminary Injunction, ECF No. 26, and the record developed in connection with the hearing held on Plaintiffs' Motion for Preliminary Injunction on January 27, 2021, *see* ECF No. 63, the Court notes that, for the purpose of resolving Defendants' Motion to Dismiss, the Court considers only the operative Second Amended Complaint, Defendants' Motion, and the briefing submitted in connection therewith.

2 Defendants also raise qualified immunity with respect to Plaintiffs' claims in Counts II and III. However, because the Court concludes that Plaintiffs have failed to state viable claims in either Count II or Count III, the Court need not address whether defendants are entitled to qualified immunity for those claims.

3 Plaintiffs correctly point out that *Smith* was decided at summary judgment. *See* ECF No. 84 at 13. However, in reaching its decision, the court specifically noted that

> Neither defendants nor plaintiffs cite any facts or make any record references to any facts learned in discovery, and appear to be content with the 'facts' as alleged in the amended complaint for purposes of this motion for summary judgment. Accordingly, the Court's decision on summary judgment is based upon the facts as set forth in the complaint, and all reasonable inferences.

*Smith,* 2005 WL 5327643 at *1 n.1, 2005 U.S. Dist. LEXIS 45262 at *3 n.1. Thus, while the Court is mindful of the difference in procedural posture between the motion in *Smith* and Defendants' Motion here, the Court finds the reasoning in *Smith* to be sound and applicable.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2779006
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

David OH
v.
PHILADELPHIA COUNTY
BOARD OF ELECTIONS, et al.

Civil Action No. 08-0081.
|
July 16, 2008.

**Attorneys and Law Firms**

Jeremy H. Gonzalez Ibrahim, Law Office of Jeremy H. Gonzalez Ibrahim, Philadelphia, PA, for David Oh.

Mark R. Zecca, City of Philadelphia, Law Department, Philadelphia, PA, for Philadelphia County Board of Elections, Margaret M. Tartaglione, Edgar A. Howard, Joseph J. Duda, and Dennis Kelly.

MEMORANDUM

O'NEILL, District Judge.

***1** On March 25, 2008, plaintiff David Oh filed a complaint alleging that defendant Philadelphia County Board of Elections violated 42 U.S.C. § 1983 and 42 U.S.C. § 1971 by failing to adhere to proper procedures for absentee ballot voting. Specifically plaintiff contends that he was denied equal protection and due process of law as a voter and a candidate. I have jurisdiction pursuant to 42 U.S.C. § 1331.

Presently before me are defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7), plaintiff's response and defendants' reply.

BACKGROUND

Plaintiff David Oh is a resident of Philadelphia and was a Republican Party candidate for the a City Council-at-Large seat in the 2007 election. Defendant Board of Elections is a municipal entity whose mission is to administer voter registration and conduct elections in accordance with state and federal voter registration and election laws. Defendants Judge Margaret Tartaglione, Judge Edgar Howard, Judge Joseph Duda, and Dennis Kelly are residents of Philadelphia and serve on the Board of Elections.

By the Philadelphia City Charter only five of the seven at-large members of the Council may be of the dominant party. Therefore the minority Republican Party was entitled to two at-large seats on the Council in the 2007 election. Plaintiff was one of the top two Republican vote recipients after the count of machine and provisional ballot votes but placed third overall among Republican at-large candidates after the count of absentee ballot votes. After the final tally of votes Mr. Jack Kelly was the second-place vote recipient for the Republican Party. Kelly presently serves on the Council.

Plaintiff alleges that defendants did not follow state election law in handling absentee ballots associated with several nursing homes in the Philadelphia area. Plaintiff claims that: (1) residents of these homes were issued absentee ballots without having submitted the proper applications; (2) the ballots were hand-carried to these locations by an unauthorized individual; (3) the ballots were filled out by an unidentified and unauthorized third party other than the named voter; (4) the ballots were hand-delivered by an individual from the nursing home to the Board of Elections; (5) the ballots were not delivered to their corresponding polling places; and (6) the ballots were neither opened nor counted until after Election Day.

DISCUSSION

Federal Rule of Civil Procedure 12(b)(7) provides a defense based on a failure to join a party under Rule 19. "Under Rule 19(a), the joinder of parties is compulsory or 'necessary' if their joinder is 'feasible.' " *Gen. Refractories Co. v. First State Ins. Co.,* 500 F.3d 306, 312 (3d Cir.2007). Federal Rule of Civil Procedure 19(a) provides:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair

> or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to the substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

***2** If the person is not a necessary party under the provisions of Rule 19(a), "the inquiry need go no further" because the party need not be joined. *Bank of Am. Nat'l Trust & Sav. Assoc. v. Hotel Rittenhouse Assocs.,* 844 F.2d 1050, 1054 (3d Cir.1988).

*I. Rule 19(a)(1)*

The inquiry under Rule 19(a)(1) is limited to "whether the district court can grant complete relief to persons *already named* as parties to the action; what effect a decision may have on absent parties is immaterial." *Gen. Refractories Co.,* 500 F.3d at 313, *citing Angst v. Royal Maccabees Life Ins. Co.,* 77 F.3d 701, 705 (3d Cir.1996) (emphasis in original).

In this case plaintiff seeks that defendants: (1) investigate the validity of the absentee ballots and report such findings to the Court; (2) invalidate any absentee ballots not submitted in accordance with Pennsylvania election law; (3) determine the accuracy of the election results for City Council-at-Large candidates of the minority party; and (4) report their findings to the Court. Plaintiff also seeks compensatory damages, punitive damages, costs and other equitable relief.

Looking to the relief requested by plaintiff I conclude that complete relief can be accorded among those already parties to this case. Though defendants argue that Kelly is necessary because plaintiff is attempting to remove him from office and any ouster would require Kelly to be notified and to participate, these arguments provide insufficient grounds to make Kelly necessary under Rule 19(a)(1). Any ouster of Kelly is merely a potential effect of this litigation, and as the Court of Appeals stated in *General Refractories* the effect a decision may have on third parties is immaterial to the analysis under Rule 19(a)(1).

Because I may grant complete relief among the already named parties, Kelly is not a necessary party under Rule 19(a)(1).

*II. Rule 19(a)(2)*

The Court of Appeals has held that under Rule 19(a)(2) "a party is only 'necessary' if it has a legally protected interest, and not merely a financial interest, in the action." *Liberty Mut. Ins. Co., v. Treesdale, Inc.,* 419 F.3d 216, 230 (3d Cir.2005), *quoting Spring-Ford Area Sch. Dist. v. Genesis Ins. Co.,* 158 F.Supp.2d 476, 483 (E.D.Pa.2001); *see also Special Jet Servs., Inc. v. Fed. Ins. Co.,* 83 F.R.D. 596, 599 (W.D.Pa.1979) ("The 'interest' relating to the subject matter of the action that makes an absent party a party needed for just adjudication must be a legally protected interest, not merely a financial interest or interest of convenience."), *quoting* 3A Moore's Federal Practice ¶ 19.07-1(2).

In the present motion defendants argue that Kelly is necessary based on his interest in his elected position on the Council. For Kelly's interest in his elected position to be legally protected under federal law, he would need a property right in continued employment; if he did the State could not deprive him of this property without due process of law. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (citing cases). Because the Supreme Court has held that "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law,' " *id.* at 538, *quoting Bd. of Regents v. Roth,* 408 U.S. 564,577 (1972), I will turn to Pennsylvania law to determine whether Kelly, as a sitting elected official, has a legally protected interest in his office.

***3** In *In re 1991 Pa. Legislative Reapportionment Commission* the Pennsylvania Supreme Court asserted:

> An elected office is a public trust, not the private domain of the officeholder. A member of the Legislature has a profound responsibility to represent his constituents in the formation of public policy in this state. He holds office for the benefit of his constituents ... [and] is periodically accountable to his constituents through the electoral process.... A member of the Legislature is thus subject to the political process at all times.... This is properly so for the public interest in the office far outweighs any private interest of the officeholder. An elected official can never have tenure in the same sense as an ordinary public employee.
>
> Thus as we have held in the past, elected officials' interest in their offices does not merit constitutional protection.

530 Pa. 335, 609 A.2d 132, 140-41 (Pa.1992), *citing Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698, 713 (Pa.1977).

Also under Pennsylvania law there is no constitutional or statutory right for an elected official to serve out their elected terms. *In re Reapportionment of Sch. Dist. of Pittsburgh,* 507 Pa. 128, 488 A.2d 1106, 1107-08 (Pa.1985) (per curiam) (stating there is no constitutional or statutory basis for the

assumption that incumbent school directors had a legal right to serve out their elective terms, as "[i]t is well settled that the legislature has the power to abolish legislative offices it created").

Because under Pennsylvania law Kelly has no legally protected interest in his position on the Council or in serving a full term on the Council, he may claim no legally protected interest relating to the subject of this action. Therefore Kelly is not necessary under Rule 19(a)(2).[1] The inquiry need go no further because Kelly need not be joined.

An appropriate Order follows.

ORDER

AND NOW, this 16th day of July 2008, upon consideration of defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7), plaintiff's response and defendants' reply, it is ORDERED that defendants' motion is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2779006

Footnotes

1 Requirements for the type of interest a party needs to possess to be necessary under Rule 19(a)(2) vary by jurisdiction. Unlike this jurisdiction, certain other jurisdictions require that an absent party merely express an interest in the subject of the action. Further, certain other jurisdictions recognize that sitting elected officials retain interests in their office or their continued tenure in office. Accordingly some courts have determined that sitting elected officials are necessary or indispensable parties to litigation challenging the election. *See, e.g., Dickinson v. Ind. State Election Bd.,* 933 F.2d 497, 499 (7th Cir.1991) (recognizing the District Court's joinder of elected officials under Rule 19 in Voting Rights Act case challenging legislative apportionment); *Williams v. State Bd. of Elections,* 696 F.Supp. 1563, 1572 (N.D.Ill.1988) (holding that sitting elected judges were indispensable parties to a voting rights discrimination action because their absence likely would impair their ability to protect their continued tenure); *Donohue v. Bd. of Elections of N.Y.,* 435 F.Supp. 957, 965 (E.D.N.Y.1976) (asserting that a successful candidate is a necessary party in a suit to recover his position under New York law); *Walsh v. Peoria,* 222 F.Supp. 516, 520 (S.D.N.Y.1963) (holding that the directors of a company whose elections were being challenged in the action were indispensable parties by virtue of their interest in their positions); *Benavente v. Taitano,* 2006 WL 3060030, at * 14 (Guam Oct. 27, 2006) (determining that absent nominees were necessary where they had an interest, created by statute, to be placed on the general election ballot and their ability to protect that interest might have been impaired by a judgment rendered in their absence).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1045065
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Barry J. FENCHAK, Plaintiff,
v.
PENNSYLVANIA STATE UNIVERSITY, et al., Defendants.

CIVIL ACTION NO. 25-6313-KSM
|
Filed 04/17/2026

**Attorneys and Law Firms**

Steven F. Marino, Marino Associates, Philadelphia, PA, for Plaintiff.

Susan E. Kessler, Andy Stanton, Jones Day, Pittsburgh, PA, for Defendants.

**MEMORANDUM**

Marston, District Judge

***1** Plaintiff Barry J. Fenchak was a member of the Board of Trustees of The Pennsylvania State University from 2022 to 2025. During his tenure, Fenchak repeatedly (and at times, publicly) sought financial information about administrative fees paid for managing the University's endowment and about the terms and conditions of a contract that the University was negotiating with the sports ticketing company, Elevate Collegiate Ticketing, LLC. In June 2025, the Board of Trustees voted to remove Fenchak from the Board, allegedly because of an inappropriate sexual comment that he made while attending a Board meeting. Following his removal, Fenchak brought this case against the University, former Board Chair Matthew Schuyler, and Board Vice Chair David Kleppinger alleging defamation, false light, breach of fiduciary duties, and violations of the United States and Pennsylvania Constitutions. (Doc. No. 1-3.) Defendants move to dismiss the Complaint in its entirety. (Doc. No. 6.) For the reasons discussed below, that motion is granted in part and denied in part.

## I. BACKGROUND[1]

The Board of Trustees is a nonprofit corporate body established by The Pennsylvania State University's Charter. (Doc. No. 1-3 at ¶ 18.) The Board is composed of 38 members, some of whom are elected by alumni and some of whom are appointed, and it is governed by the University's Amended and Restated Bylaws. (*Id.* at ¶¶ 19–20.) In 2022, Fenchak was elected by the University's alumni to serve a three-year term as a voting member on the Board, and he assumed his position on July 1, 2022. (*Id.* at ¶¶ 24–25.) Fenchak alleges that throughout his tenure, he "engaged in principled, civil, and respectful debate" with other trustees, "[c]onsistent with expectations of membership ... as a Board of Trustees member." (*Id.* at ¶ 34; *accord id.* at ¶¶ 33, 35–42.) In particular, there was significant debate between Fenchak and his fellow trustees about whether he should be given access to: (1) financial information related to administrative fees paid for management of the University's endowment and (2) the terms and conditions of the Elevate contract.

### A. Administrative Fees

The Board is tasked with, among other things, overseeing and managing the University's endowment, which is valued at around $5 billion. (*Id.* at ¶ 48.) As a new trustee, Fenchak sought to familiarize himself with the endowment by reviewing the University's IRS Form 990 filings for the 2008 to 2023 calendar years. (*Id.* at ¶ 50.) During that review, Fenchak noticed that "professional administrative fees paid to manage the ... endowment rose dramatically in 2017, more than tripling the rate within (3) three years." (*Id.* at ¶ 51.) Concerned, Fenchak spent his first two years as trustee repeatedly requesting "access to the specific data and items that totaled the aggregated figures listed on the IRS Form 990s" as "administrative fees reported to have been paid by the University to manage the endowment." (*Id.* at ¶ 53.) His requests, however, were repeatedly denied, first, by the Vice Chair of the Board's Finance Business and Capital Planning Committee and later, by other "controlling Board of Trustees members," including Defendants Schuyler and Kleppinger. (*Id.* at ¶¶ 54–64.)

***2** On July 16, 2024, Fenchak filed an action against the Board and Schuyler in the Pennsylvania Court of Common Pleas for Centre County, seeking an order compelling production of information related to the administrative fees. *See Fenchak v. Pa. State Univ. Bd. of Trs.*, No. 2024-CV-1843-CI (Centre Cnty. Ct. Comm. Pl.) ("*Fenchak I*").

### B. The Elevate Contract

A few months before filing *Fenchak I*, in the spring of 2024, Fenchak learned that the University was entertaining a 10-year expanded ticketing partnership with the sports ticketing company, Elevate, the goal of which would be to maximize revenue needed to support the University's ongoing $700 million renovation of Beaver Stadium, the University's football stadium. (Doc. No. 1-3 at ¶ 66; *see also id.* at ¶ 67 (alleging that the University and Elevate "entered into a Letter of Intent").) In April and May 2024, Fenchak "forwarded requests to various controlling Board of Trustees members for access to information related to the terms of and conditions of [the] contract under negotiation." (*Id.* at ¶ 69.) Defendants Schuyler and Kleppinger denied those requests on May 7, 2024, explaining that additional information about the Elevate contract "would be provided to all trustees in the ordinary course." (*Id.* at ¶ 71.)

Two weeks later, the Board convened a public meeting. (*Id.* at ¶ 73.) The purpose of the meeting was for "voting members of the Board of Trustees to consider and act upon a Resolution for project approval concerning Beaver Stadium renovations." (*Id.* at ¶¶ 80, 81.) The proposed resolution authorized certain trustees to "cause the University to award contracts on behalf of the University in furtherance of the ongoing Beaver Stadium Renovation Project, inclusive of [the Elevate contract]." (*Id.* at ¶ 82.) During that meeting, Fenchak disclosed that he had previously requested "access to information relating to the terms and conditions" of the Elevate contract but his requests had been denied. (*Id.* at ¶ 85.) He also publicly asked Defendant Schuyler when all the members of the Board would be given information about the Elevate contract and why that information was being kept secret. (*Id.* at ¶¶ 88–89.)

On August 16, 2024, Fenchak renewed his request for a copy of the Elevate contract. (*Id.* at ¶ 107.) Defendants Schuyler and Kleppinger once again denied the request, this time by letter dated August 20, 2024:

> We write in response to your August 16, 2024 request for the University's agreement with Elevate.
>
> On multiple occasions, including April 18, 2024 and May 2, 2024, all trustees were provided with detailed information about the confidential financial guarantees and revenue share provision in the proposed arrangement with Elevate. Questions were posed by trustees and answered by University administrators regarding this information, as well as related to the reference checks conducted to confirm Elevate *bona fides.* As you know, the Board has received and will continue to receive regular updates on the Beaver Stadium renovation project, including information on ticket/seat sales.
>
> While we welcome all trustees' efforts to prepare for and meaningfully participate in Board proceedings and fulfill their oversight obligations to the University, your request for this document is unreasonable, beyond that which is objectively necessary for you to discharge your duties as a trustee, and seeks information the University is not able to share due to legal obligations it has with Elevate. Furthermore, your repeated violations of your confidentiality obligations have created risks for the University that inform our decision not to provide the contract to you.
>
> ***3** Under the terms of the University's agreement with Elevate, disclosure of the Agreement within the University is contractually restricted to those individuals who have a need to know such information in connection with the University's duties and obligations under the Agreement. In other words, disclosure of the Agreement within the University is limited to those persons tasked with carrying out the obligations in the Agreement including Penn State Finance operations that support those obligations.
>
> Additionally, and despite your mischaracterization that such claims of confidentiality are "specious," the Elevate Agreement and the framework of the Agreement itself, contains commercially sensitive information that Elevate has sought to protect. Your prior confidentiality breach related to Elevate—your disclosure of the existence of a confidential letter of intent between the University and Elevate in a public meeting of the Board in May 2024 —was raised by Elevate as a significant concern. Further sharing of confidential information by you could damage the University's relationship with Elevate.
>
> We are available to discuss further should you wish to do so.

(*Id.* at ¶ 108; *id.* at 68.)

One week later, on August 27, 2024, Fenchak amended his complaint in *Fenchak I* to also seek an order compelling production of "information informing upon the terms and conditions" of the Elevate contract. (*Id.* at ¶ 100.) The amended complaint quoted the August 20 letter verbatim and, except for the salutation, in its entirety. (*See* Doc. No. 6-3 at ¶ 103.) Defendants answered the amended complaint in *Fenchak I* by filing preliminary objections, which included a

copy of the August 20 letter attached as an exhibit. (Doc. No. 1-3 at ¶ 109.)

### C. Fenchak's Investigation and Removal from the Board

On July 19, 2024—just a few days after he filed *Fenchak I*—Fenchak attended a Board meeting at the University's Altoona campus. (Doc. No. 1-3 at ¶ 91.) While there, he spoke to three IT employees, and during the conversation, commented that "his wife says he cannot wear baseball hats because it makes him look like 'a penis with a hat on.' " (*Id.* at ¶¶92–93.) A sexual harassment investigation was launched against Fenchak in connection with this comment, and it was ultimately recommended that Fenchak be removed from the Board for violating the Trustee Code of Conduct. (*Id.* at ¶ 97.) A meeting was scheduled for October 2024 to rule on this recommendation. (*Id.*)

Meanwhile, on July 30, 2024, the Board amended the University's bylaws in two crucial ways. First, the amended bylaws empowered "the Chair of the Board to restrict a member Trustee's access to University information." (*Id.* at ¶ 105(f).) Second, the amended bylaws "vested the Chair of the Board and the Chair of the Governance Committee with ultimate power to sanction and remove member Trustees from their position on the Board." (*Id.* at ¶ 105(g).) After learning of the amended bylaws, Fenchak brought a second lawsuit, challenging the amendments as facially unconstitutional under the Pennsylvania Constitution and state law. *See Fenchak v. The Pa. State Univ. Bd. of Trs.*, No. 2025-CV-0882-CI (Centre Cnty. Ct. Comm. Pl.) ("*Fenchak II*"). The court rejected these arguments and dismissed the action on the pleadings. (Doc. No. 6-2.)

Fenchak was ultimately removed as a trustee by a vote of 30 to 4 on June 16, 2025. (*Id.* at ¶ 112.)[2] He was also voted ineligible to be listed on the ballot in the 2025 alumni trustee election. (*Id.* at ¶ 113.)

### D. Procedural History

***4** On October 30, 2025, Fenchak filed this action in the Court of Common Pleas of Philadelphia County. (Doc. No. 1 at ¶ 1.) He brings claims for defamation, false light, breach of fiduciary duties, and violations of the United States and Pennsylvania Constitutions against the University, Schuyler, and Kleppinger. (Doc. No. 1-3.) Defendants removed the matter to this Court on November 6, 2025. (*See generally* Doc. No. 1.) And two weeks later, they moved to dismiss the Complaint in its entirety. (Doc. No. 6.) Fenchak opposes that motion. (Doc. No. 9.)

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quotation marks omitted). In reviewing a motion to dismiss, the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations. *Id.* However, the court is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted). And "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint ... and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *accord Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011).

## III. DISCUSSION

Fenchak brings three types of claims: (1) invasion of privacy (defamation and false light), (2) breach of fiduciary duties, and (3) constitutional violations under the United States and Pennsylvania Constitutions. All claims are asserted against all Defendants. Defendants have moved under Rule 12(b)(6) to dismiss the Complaint in its entirety. (Doc. No. 9.) The Court considers Fenchak's invasion of privacy claims (Counts I and II), his fiduciary claims (Count III), and his constitutional claims (Counts IV through IX) in turn.

### A. Invasion of Privacy Claims

In Counts I and II, Fenchak brings state law claims for defamation and false light, both of which are premised on Defendants' publication of the August 20, 2024 letter from Schuyler and Kleppinger to Fenchak on the public docket in

*Fenchak I.* (*See* Doc. No. 1-3 at ¶ 159 ("Defendants published or otherwise disseminated the defamatory communication contained in the correspondence dated August 20, 2024, to the public at large September 17, 2024 at 3:16 p.m., by filing the correspondence of public record in the Office of the Centre County Prothonotary ...."); *id.* at ¶ 176 ("The correspondence dated August 20, 2024, contains statements which placed the plaintiff in a false light.").) Defendants argue that these claims must be dismissed because they are entitled to immunity under Pennsylvania's doctrine of judicial privilege. (Doc. No. 6-1 at 10–13.) The Court agrees.

In Pennsylvania, "[a]ll communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege which cannot be destroyed by abuse." *Binder v. Triangle Pubs., Inc.*, 275 A.2d 53, 56 (Pa. 1971); *see also* *Post v. Mendel*, 507 A.2d 351, 354–55 (Pa. 1986) ("[T]here has long been recognized a realm of protected communications in judicial proceedings. In this Commonwealth, protection for such communications is firmly established."). Under this doctrine, "statements by a party, a witness, counsel, or a judge cannot be the basis of a [tort] action whether they occur in the pleadings or in open court," *Binder*, 275 A.2d at 56, so long as the communication is "issued in the regular course of judicial proceedings" and is "pertinent and material to the redress or relief sought," *Post*, 507 A.2d at 355 (emphases omitted). Both conditions are satisfied here.

***5** First, Defendants published the August 20, 2024 letter as an exhibit to their preliminary objections in *Fenchak I*, so the communication was made "in the regular course of judicial proceedings." *Post*, 507 A.2d at 355. Fenchak disputes this conclusion on the grounds that Defendants "did not prepare" the August 20, 2024 letter "for purpose of initiating a judicial proceedings [sic], nor did the defendants prepare the ... letter in the regular course of judicial proceedings." (Doc. No. 9-1 at 18 (referring to the letter as "an extra-judicial act").) But that fact is immaterial to the analysis here. It is true that an extra-judicial communication is not protected merely because it is filed in a judicial proceeding. *See* *Post*, 507 A.2d at 355–56 (holding privilege did not extend to "extra-judicial communications" like the defendant's letter because although the letter "made reference to matters which occurred in an ongoing trial, the letter was not directly relevant to the court proceedings .... The letter was clearly not a part of the judicial proceedings to which it made reference, and merely forwarding a copy of the letter to the court did not make it a part of those proceedings"); *Barto v. Felix*, 378 A.2d 927, 930 (Pa. Super. Ct. 1977) ("[J]udicial immunity does not protect the public defender in this case, for the remarks made by him at the press conference were not made at a judicial proceeding. They did not fall within the sphere of activities which judicial privilege was designed to protect."). But here, Fenchak is challenging the fact that the August 20, 2024 letter was *published on the docket* in *Fenchak I.* (*See, e.g.*, Doc. No. 1 at ¶ 159 ("Defendants published or otherwise disseminated the defamatory communication contained in the correspondence dated August 20, 2024, *to the public at large* September 17, 2024 ... by *filing the correspondence of public record* in the Office of the Centre County Prothonotary ...." (emphases added))). Accordingly, the Court finds the communication at issue was made "in the regular course of judicial proceedings." *Post*, 507 A.2d at 355; *see also* *Handy v. Del. River Surgical Suites, LLC*, No. 19cv1028, 2023 WL 11884784, at *7 (E.D. Pa. Jan. 19, 2023) (finding the judicial privilege applied because "[a]ttempting to admit evidence or attaching documents to pleadings is a communication with the court attempting to seek relief").[3]

Second, the letter's contents were also "pertinent and material" to the proceeding. *Post*, 507 A.2d at 355. *Fenchak I* was about whether the Board wrongfully denied Fenchak access to financial information about administrative fees and the Elevate contract. *See generally Fenchak I*, Doc. No. 9 (Aug. 27, 2024). Defendants filed preliminary objections seeking dismissal of the complaint and argued in part that Fenchak was not entitled to information related to the Elevate contract under Pennsylvania law because—as explained to him in the August 20, 2024 letter—his request sought "information the University is not able to share due to legal obligations it has to Elevate" and his repeated violations of confidentiality had "created risks for the University" that inform Defendants' decision not to provide him with a copy of the proposed contract. *Id.*, Doc. No. 10 at ¶ 47 (Sept. 16, 2024); *see also id.* at ¶ 54 (arguing that the complaint should be dismissed at least in part because Fenchak did not "allege that he has not violated his confidentiality obligations as a trustee"). Indeed, Fenchak can hardly dispute the letter's materiality given that his amended complaint in *Fenchak I*, which was filed on the public docket weeks before Defendants' preliminary objections, quoted the body of the letter *verbatim* and *in full. Id.*, Doc. No. 9 at ¶ 103.

Because the communication that serves as the basis for Fenchak's defamation and false light claims was "issued in the regular course of judicial proceedings" and is "pertinent and material to the redress or relief sought," *Post*, 507 A.2d at 355 (emphases omitted), Defendants are protected from suit

on Fenchak's defamation and false light claims by the judicial privilege, *see Handy*, 2023 WL 11884784, at *7 ("Although the judicial privilege had its origin in defamation actions, 'it has now been extended to include all tort actions based on statements made during judicial proceedings.' " (quoting *Panitz v. Behrend*, 632 A.2d 562, 564 (Pa. Super. Ct. 1993))).[4] Counts I and II are dismissed with prejudice.

**B. Fiduciary Duty Claims**

In Count III, Fenchak contends that Defendants "breached the duties of care owed" to Fenchak when they (1) "[p]ublish[ed] or otherwise disseminat[ed] the defamatory communication contained in the correspondence dated August 20, 2024 ... by filing the correspondence of public record in the Office of the Centre County Prothonotary" and (2) "[r]etaliat[ed] against [Fenchak] for voicing his opinions, beliefs, or disagreements that differ from the prevailing views maintained by defendants" and for otherwise engaging in "protected speech." (Doc. No. 1-3 at ¶ 198(a).) Defendants argue that Fenchak's claims fail because none of the Defendants owed a fiduciary duty to Fenchak. The Court agrees.[5]

***6** Directors of a nonprofit corporation owe a fiduciary duty *to the corporation*; they do not owe fiduciary duties to their fellow directors, nor are they owed fiduciary duties by the corporation. *See* 15 Pa. Stat. & Cons. Stat. § 5717 (stating that the fiduciary duty owed by individual directors is owed "*solely* to the nonprofit corporation and not to any member or creditor or any other person or group, and may be enforced directly by the corporation or may be enforced by an action in the right of the corporation, and may not be enforced directly by a member or creditor or by any other person or group" (emphasis added)); *Carlson v. Fawn Ridge Estates Homeowners' Ass'n, Inc.*, No. 1256 C.D. 2011, 2012 WL 1358573, at *3–5 (Pa. Commw. Ct. Apr. 17, 2012) (affirming grant of summary judgment in favor of nonprofit corporation and the corporation's director because § 5717 "permits members of the nonprofit corporation to bring an action for breach of fiduciary duty only as a derivative action on behalf of the nonprofit corporation" and not for "breach of fiduciary duty or damages ... against the corporation or against directors or officers on their own behalf").[6] Contrary to Fenchak's suggestion (*see* Doc. No. 9-1 at 23), nothing in the statute establishing the University and the Board of Trustees renders § 5717 inapplicable, authorizes trustees to bring suit on their own behalf as board members, or alters the fiduciary relationship between trustees and the University they represent. *See* 24 Pa. Stat. & Cons. Stat. § 2533 (establishing a board of trustees for what would become the University and mandating that "*said corporation* shall by the same name have power to sue and be sued" (emphasis added)).

Accordingly, Count III is also dismissed with prejudice.

**C. Constitutional Claims for Deprivation of Free Speech**

Last, Fenchak brings claims for unlawful retaliation in violation of the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. The state constitutional claims (Counts VII through IX) are quickly dismissed, however, as "[n]o Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011); *see also, e.g., Dooley v. City of Philadelphia*, 153 F. Supp. 2d 628, 663 (E.D. Pa. 2001) ("Courts of this circuit that have considered the question have concluded that Article I, Section 7 does not establish a private cause of action for damages.") (collecting cases).

That leaves Fenchak's claims for unlawful retaliation under the First Amendment of the United States Constitution (Counts IV through VI), which are brought pursuant to 42 U.S.C. § 1983.[7] Fenchak contends that Defendants Schuyler and Kleppinger violated his First Amendment rights when they "deliberately retaliated against [him] as a result of the [his] exercise of speech" (Doc. No. 1-3 at ¶¶ 233, 244)[8] and that the University is vicariously liable for their actions (*id.* at ¶¶ 208–27). "[T]o plead a claim for First Amendment retaliation, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Willson v. Yerke*, 604 F. App'x 149, 151 (3d Cir. 2015) (quotation marks omitted); *see also Houston Comm'ty Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (explaining that a plaintiff pursuing a claim for First Amendment retaliation "must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.' " (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019))).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***7** Here, Defendants, relying on the United States Supreme Court's opinion in *Garcetti v. Ceballos*, argue that Fenchak's retaliation claims fail on the first element, because at all relevant times, Fenchak was speaking in his capacity as a trustee, and never as a private citizen. (Doc. No. 6-1 at 14 (citing *Garcetti*, 547 U.S. 410, 421–22 (2006)). In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The problem with Defendants' reliance on this holding is that it assumes Fenchak was a public employee, but the allegations in the Complaint suggest he may be more appropriately considered an elected public official. (Doc. No. 1-3 at ¶ 24 (alleging that Fenchak was "elected by the alumni" of the University); *id.* at ¶¶ 209–10 (alleging that the University is a "state actor")); *see also Phelan v. Laramie Cnty. Comm'ty Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (finding "the Board [of Trustees] members and [the plaintiff, as a trustee,] occupy the same positions as elected officials"). If Fenchak is an elected official, then it is far from clear that *Garcetti* applies. *See Werkheiser v. Pocono Township*, 780 F.3d 172, 177 (3d Cir. 2015) ("We pause here to emphasize that we do not today decide whether *Garcetti* is applicable to elected officials' speech or not."); *Wilson v. Yerke*, 604 F. App'x 149, 152 (3d Cir. 2015) ("*Werkheiser* did not definitively answer the question whether *Garcetti* is applicable to elected officials' speech, but it did hold that the law was not clearly established on this issue."); *Croft v. Donegal Township*, No. 20cv1430, 2021 WL 1146285, at *5 (W.D. Pa. Mar. 25, 2021) ("[T]he scope of [the protection afforded an elected official's speech] —and importantly, the type or degree of retaliatory conduct sufficient to trigger a violation of the First Amendment—is not clear.").

Although the Third Circuit in *Werkheiser* declined to address the issue, dicta in that case suggests the rationale underlying *Garcetti* does *not* apply in the case of an elected public official. *See* 780 F.3d at 178 ("Many of the reasons for restrictions on employee speech appear to apply with much less force in the context of elected officials. Werkheiser's speech as an elected official is not subject to prior review or approval. To use *Garcetti*'s language, his speech is neither 'controlled' nor 'created' in the same way that an employer controls the speech of a typical public employee.... [And], there is no truly comparable analog to 'managerial discipline' when discussing retaliation between elected officials." (quoting *Garcetti*, 547 U.S. at 424)); *see also Jenevein v. Willing*, 493 F.3d 551, 557–58 (5th Cir. 2007) ("[T]he preferable course ought not draw directly upon the *Pickering-Garcetti* line of cases for sorting the free speech rights of employees elected to state office."); *Phelan*, 235 F.3d at 1247 (finding, albeit before *Garcetti* was decided, that the *Pickering* line of cases did not apply to the plaintiff's First Amendment retaliation claim because she "is not a governmental employee or contractor," and instead, "occup[ies] the same position[ ] as [an] elected official[ ]").

And, consistent with *Werkheiser, Jenevein*, and *Phelan*, many recent district courts have declined to apply *Garcetti* in cases involving elected officials. *See, e.g., Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 826 (D.N.J. 2020) ("In short, the *Garcetti* categories do not read very readily onto the situation of an elected councilwoman, like Ms. Greenman. True, she may suffer consequences for political speech—but not because she is in some subordinate role, subject to the authority of her public employer.... Plaintiff spoke as elected official. (As I have held, *Garcetti* does not apply as such. Speech is protected, but 'retaliation,' to be impermissible, must rise to the level of interfering with plaintiff's functioning as an elected official)."); *Warren v. DeSantis*, 631 F. Supp. 3d 1188 (N.D. Fla. 2022) ("*Garcetti* deals with government supervisors, their subordinates, and managerial discipline. The decision includes not a word about the First Amendment rights of elected officials—the issue decided in *Bond*—and the decision's rationale simply does not apply to them.... [T]he weight of circuit authority supports this analysis." (collecting cases)). *But see, e.g., Hartman v. Register*, No. 06cv33, 2007 WL 915193, at *6 (S.D. Ohio Mar. 26, 2007) ("The distinction between the public employee in *Garcetti* and an elected official, in this case Plaintiff, is inconsequential.").

***8** Considering the unsettled nature of the case law and outstanding questions as to whether trustees, like Fenchak, are more appropriately considered public employees or elected officials—issues which no party meaningfully addresses[9]—the Court declines to dismiss Fenchak's federal constitutional claims at this juncture. Defendants may raise this argument again at summary judgment if appropriate.[10]

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is granted in part and denied in part. It is denied as to Fenchak's First Amendment claims (Counts IV through VI). It is granted as to Fenchak's remaining claims, all of which are dismissed with prejudice. An appropriate order follows.

**All Citations**

Slip Copy, 2026 WL 1045065

Footnotes

1 The following facts are taken from the Complaint, and are assumed true for purposes of the instant motion. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) ("The District Court, in deciding a motion under Federal Rule of Civil Procedure 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].").

2 Although not specified in the Complaint, Defendants note in their motion to dismiss that the removal vote initially scheduled for October 9, 2024 was delayed because Fenchak obtained a preliminary injunction in *Fenchak I.* (*See* Doc. No. 6-1 at 9.) The injunction was dissolved on May 16, 2025, and Fenchak was then removed from the Board one month later. (*Id.* at 9–10.)

3 The Court strongly disagrees with Fenchak's contention that the "holding of *Handy* is burdened with infirmities, misconstrues the concept of judicial [privilege], and troubling to understand." (Doc. No. 9-1 at 20.)

4 Because the Court dismisses Counts I and II on this basis, we need not consider Defendants' argument that Fenchak consented to the August 20, 2024 letter's filing on the docket.

5 Defendants also argue, and the Court concludes, that Fenchak's first contention likewise fails for the reasons discussed in Part III.A.—Defendants' publication of the August 20, 2024 letter is covered by the judicial privilege. *See Handy*, 2023 WL 11884784, at *7 (recognizing that the judicial privilege has "been extended to include *all tort actions* based on statements made during judicial proceedings" (quoting *Panitz*, 632 A.2d at 564) (emphasis added)); *see also Panitz*, 632 A.2d at 564 ("Regardless of the tort contained in the complaint, if the communication was made in connection with a judicial proceeding and was material and relevant to it, the privilege applies. The privilege is equally applicable where the cause of action is stated in terms of misrepresentation or a contractual requirement to exercise due care." (citations and quotation marks omitted)).

6 Although Fenchak alleges that the relevant duties of care arose, at least in part, out of the University's bylaws (*see* Doc. No. 1-3 at ¶¶ 191–97), those allegations do not save Count III. Fenchak has not alleged that the bylaws state that the duties of care run from one trustee to another or from the University to a trustee. And the Court's independent review of the bylaws revealed that they state only that "[t]rustees have crucial fiduciary responsibilities *towards the University* under these Bylaws." Bylaws for Bd. of Tr'ees § 2.03(a), https://trustees.psu.edu/files/2025/12/Bylaw-Elections-Appendix-2025-November.pdf (last visited Apr. 16, 2026) (emphasis added). Even if the Court were to ignore this clear language, we still would not be inclined to read the bylaws in the manner Fenchak proposes, because to do so would impermissibly render them at odds with § 5717. *See* 15 Pa. Stat. & Cons. Stat. § 5504(a) ("The bylaws may contain any provisions for managing the business and regulating the affairs of the corporation *not inconsistent with law* or the articles [of incorporation]." (emphasis added)); *see also Fenchak v. The Pa. State Univ. Bd. of Trs.*, No. 25cv0882, 2025 WL 1643951, at *4 (Centre Cnty. Ct. Comm. Pl. Apr. 14, 2025) ("The Board [of Trustees for the University] is further empowered by the Pennsylvania Nonprofit Corporation Law to pass 'any provisions for managing the business and regulating the affairs of the corporation *not inconsistent with laws* or the articles.' " (quoting 15 Pa. Stat. & Cons. Stat. § 5504(a)) (emphasis added)).

7 That section provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

8 The Complaint does not specify *how* Defendants Schuyler and Kleppinger allegedly retaliated against Fenchak. (*See* Doc. No. 1-3 at ¶¶ 233, 244.) But based on Fenchak's allegations against the University, the Court infers that he views the entire course of events leading to his removal—i.e., the sexual harassment investigation, the recommendation of removal, and Fenchak's ultimate removal from the Board of Trustees pursuant to the amended bylaws—as retaliatory. (*See id.* at ¶¶ 208–27.)

9 Fenchak argues that *Garcetti* is inapplicable, but, confusingly, not on the grounds that Fenchak is an elected official. Instead, Fenchak argues that the University is a *private* entity for First Amendment purposes, and thus, Fenchak could not have been speaking as a public employee under *Garcetti.* (*See* Doc. No. 9-1 at 24–25 ("Discovery will reveal in this case plaintiff did not provide services to a government or an instrumentality of the government. Although the University is recognized as a state actor for purposes a [sic] Section 1983 liability, it is not identified as a government or an agency of the Commonwealth by the Pennsylvania Supreme Court. To the contrary, Penn State University is a private corporate identity, not government .... The doctrine which limits the constitutional protections guaranteed by the First Amendment to public employee speech in the context of employment with the government does not apply here." (footnotes omitted))). But Fenchak simultaneously contends that the University *is* a state actor subject to liability under § 1983. (*Id.*) He cannot have it both ways. If the University is a state actor under § 1983, then it is also a public employer for purposes of the First Amendment. Nothing in the cases cited by Fenchak alters that conclusion. Indeed, although the Pennsylvania Supreme Court has found the "board of trustees of PSU is not governmental in nature" for tax purposes, *see Pa. State Univ. v. Derry Twp. Sch. Dist.*, 731 A.2d 1272, 1275 (Pa. 1999), the Third Circuit and district courts in this Circuit have consistently recognized the University's public nature when it comes to § 1983 *and* claims for retaliation under the First Amendment, *see, e.g., Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 n.24 (3d Cir. 1984) ("Of course, the [F]irst [A]mendment would not even be implicated if Penn State were not a 'state actor' for purposes of the [F]irst [A]mendment."); *Nelatury v. Pa. State. Univ.*, 633 F. Supp. 3d 716, 729 (W.D. Pa. Oct. 3, 2022) (finding university professor "works at PSU, so he is a public employee" and applying *Garcetti*). The issue here is whether Fenchak, who was elected by University alumni to serve on the Board, is more appropriately considered an employee or an elected official of the University, which again, is a public entity for purposes of this lawsuit. This is the issue that the parties have yet to meaningfully brief.

10 Any future motion should address the cases discussed by the Court in this Memorandum.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.