**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CENTRE DAILY TIMES, | : | |
| SPOTLIGHT PA, and | : | |
| STATECOLLEGE.COM, | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 4:26-CV-01442 |
| | : | Chief Judge Matthew W. Brann |
| DAVID KLEPPINGER, | : | |
| DANIEL ONORATO, and | : | DEMAND FOR JURY TRIAL |
| RICHARD SOKOLOV, | : | |
| *in their official capacities*, | : | |
| Defendants. | : | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

ARGUMENT ....... 2

I. Plaintiffs Have Standing to Challenge the Gag Policy. ....... 2

A. Plaintiffs have shown an injury-in-fact above and beyond the prior restraint on emeriti trustees. ....... 3

B. Defendants cannot moot the Motion through voluntary cessation. ....... 6

II. Plaintiffs Are Likely to Succeed on the Merits Because the Gag Policy Violates the First Amendment. ....... 8

A. Even if trustees are akin to public employees, the Gag Policy violates the First Amendment. ....... 8

B. The Gag Policy's viewpoint discrimination also renders it unconstitutional. ....... 14

C. *Garcetti* does not apply because trustees are not public employees. ....... 15

III. Plaintiffs' Motion is Timely. ....... 19

CONCLUSION ....... 21

CERTIFICATE OF COMPLIANCE WITH L.R. 7.8 ....... 23

# TABLE OF AUTHORITIES

## Cases

*Abu-Jamal v. Price*,
154 F.3d 128 (3d Cir. 1998) .......... 20

*Alderman v. Phila. Hous. Auth.*,
496 F.2d 164 (3d Cir. 1974) .......... 6

*Am. Future Sys., Inc. v. Pa. State Univ.*,
752 F.2d 854 (3d Cir. 1984) .......... 17

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
39 F.4th 95 (3d Cir. 2022) .......... 13, 14, 15

*Blair v. Bethel Sch. Dist.*,
608 F.3d 540 (9th Cir. 2010) .......... 18

*Bond v. Floyd*,
385 U.S. 116 (1966) .......... 17, 19

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 14

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) .......... 15

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
78 F.3d 920 (5th Cir. 1996) .......... 5

*Decker Advert. Inc. v. Del. Cnty.*,
765 F. Supp. 3d 128 (N.D.N.Y. 2025) .......... 6

*DeCrane v. Eckart*,
12 F.4th 586 (6th Cir. 2021) .......... 10

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) .......... 20

*Democracy Rising PA v. Celluci*,
380 F. App'x 155 (3d Cir. 2010) .......... 6

*Dougherty v. Sch. Dist. of Phila.*,
772 F.3d 979 (3d Cir. 2014) ........................................................................10, 12

*Elrod v. Burns*,
427 U.S. 347 (1976).....................................................................................20, 21

*Fenchak v. Pa. State Univ.*,
2026 WL 2210062 (E.D. Pa. July 31, 2026),
*appeal docketed*, No. 26-3056 (3d Cir. Aug. 13, 2026) ..................................9, 17

*FOCUS v. Allegheny Cnty. Ct. of Common Pleas*,
75 F.3d 834 (3d Cir. 1996) ...........................................................................5, 6

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..............................................................................................2

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)...........................................................................*passim*

*Greenman v. City of Hackensack*,
486 F. Supp. 3d 811 (D.N.J. 2020)..................................................15, 17, 19

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) ..............................................................................10

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022).......................................................................................2, 19

*In re Dow Jones & Co.*,
842 F.2d 603 (2d Cir. 1988) ..............................................................................6

*Kos Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) ............................................................................20

*Lane v. Franks*,
573 U.S. 228 (2014)..................................................................................9, 10, 11

*Lutter v. JNESO*,
86 F.4th 111 (3d Cir. 2023) ...............................................................................7

*MacRae v. Mattos*,
145 S. Ct. 2617 (2025)......................................................................................15

*Near v. Minnesota ex rel. Olson*,
283 U.S. 697 (1931) .......... 14

*PennEnvironment v. PPG Indus., Inc.*,
2014 WL 6982461 (W.D. Pa. Dec. 10, 2014) .......... 20

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
391 U.S. 563 (1968) .......... 9, 12

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .......... 14

*Rankin v. McPherson*,
483 U.S. 378 (1987) .......... 15

*Rd.-Con, Inc. v. City of Philadelphia*,
120 F.4th 346 (3d Cir. 2024) .......... 7, 8

*Times Mirror Mags., Inc. v. Las Vegas Sports News, LLC*,
212 F.3d 157 (3d Cir. 2000) .......... 20

*Tripathy v. Lockwood*,
2022 WL 17751273 (2d Cir. Dec. 19, 2022) .......... 20

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) .......... 10

*United States v. Gov't of Virgin Islands*,
363 F.3d 276 (3d Cir. 2004) .......... 3, 7

*United States v. Milchin*,
128 F.4th 199 (3d Cir. 2025) .......... 11

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) .......... 8, 13

*Werkheiser v. Pocono Twp.*,
780 F.3d 172 (3d Cir. 2015) .......... 16, 19

*Wood v. Georgia*,
370 U.S. 375 (1962) .......... 19

**Other Authorities**

2026 Alumni Trustee Election Final Results Report (May 9, 2026), https://perma.cc/U8PB-BVB6 ....................18

Jay Paterno, StateCollege.com, https://www.statecollege.com/articles/author/jay-paterno/. ....................5

*QuickFacts: Centre County,* Pennsylvania, U.S. Census Bureau (July 1, 2025), https://www.census.gov/quickfacts/fact/table/centrecountypennsylvania/PST045225 ....................18

The Board's last-minute amendment to the Bylaws,[1] made in direct response to Plaintiffs' submission of a declaration from Emerita Trustee Dr. Alice Pope, is a transparent attempt to evade review of the Board's unconstitutional policy. The Court should reject it.

The amendment does not address the fatal constitutional defects of the Gag Policy that Plaintiffs identified, namely that it (1) suppresses speech based on viewpoint, and (2) operates as a prior restraint. The amendment instead merely removes the language that stated emeriti trustees must adhere to the Code of Conduct and inserts language purporting to limit restraints to "official" speech. Neither revision moves the needle.

Plaintiffs retain Article III standing to challenge the Gag Policy for multiple reasons. Pope's speech continues to be restrained and, in any event, Plaintiffs' injury arises from the restraint on the speech of *every* trustee. That only Pope swore to the chilling effect of the policy at the time of filing does not limit the scope of Plaintiffs' relief to her speech alone. The Gag Policy continues to cause ongoing harm to Plaintiffs through its restriction on trustees, including not only Pope but others such as Jay Paterno. Defendants also cannot moot the Motion by suddenly purporting to exempt emeriti trustees from the Gag Policy, because "a defendant's voluntary

---

[1] Capitalized terms bear the same definitions set forth in Plaintiffs' opening Brief, ECF No. 15.

cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

On the merits, Defendants' only argument to save the Gag Policy is that trustee speech gets no First Amendment protection whatsoever under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). But *Garcetti* simply does not apply, because (1) the Gag Policy prohibits speech well beyond statements made in a trustee's "official capacity," and (2) trustees are not public employees—they retain their "right to speak freely on questions of government policy," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) (holding that community college trustee's speech was protected by First Amendment). Finally, even if *Garcetti* applies, the Gag Policy's viewpoint discrimination remains impermissible. The Gag Policy thus violates the First Amendment under any applicable test, and should be enjoined to avert further harm to Plaintiffs and the public.

## ARGUMENT

### I. Plaintiffs Have Standing to Challenge the Gag Policy.

The Board's July 17, 2026 Amendments to the Bylaws, Harvey Ex. 2 ("July 2026 Amendments"), did not meaningfully change the state of play. The Gag Policy continues to prohibit trustees from speaking freely to Plaintiffs, and while Pope is one of the trustees for whom that is true, she is not the only one. Plaintiffs have

demonstrated an injury-in-fact traceable to muzzling of other willing speakers as well. The Motion is also not moot because the timing of the change—two business days before Defendants' opposition brief was due—"strongly suggests that the impending litigation was the cause," and Defendants have not met their "'formidable' burden of persuading the court that the challenged conduct cannot reasonably be expected to resume." *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004).

**A. Plaintiffs have shown an injury-in-fact above and beyond the prior restraint on emeriti trustees.**

Putting aside the timing and motive of the July 2026 Amendments, their substance does not undermine Plaintiffs' Article III standing.

As an initial matter, the July 2026 Amendments do not remove the restraint on Pope's speech. She continues to feel chilled by the Gag Policy, Pope Suppl. Decl. ¶ 7, including because the change apparently targeted her directly, *id.* ¶ 6, and she was never informed that the Board made changes to purportedly address restrictions on her speech, *id.* ¶ 3.

And critically, Pope has considered running for the Board again and has three years of eligibility left. *Id.* ¶ 8. But she believes the Gag Policy "effectively foreclose[s] [her] from running," *id.* ¶ 9, because the Bylaws require that all candidates subject themselves to a review of their "social media and online presence" for speech that violates the Gag Policy and "any warnings, reprimands, or

letters of censure." Harvey Ex. 1 ("Bylaws"), Elections App'x § 2(2)(b), (3)(a). That would include Defendants' prior reprimand to Pope for speaking out, Pope Ex. A. Further, as a prerequisite to running, Pope would have to agree to "adhere to the Code of Conduct"—including the Gag Policy. Bylaws, Elections App'x § 2(2)(c). This restriction would make it "exceedingly difficult for [her] to run an honest campaign" by preventing her from "explain[ing] [her] voting history to alumni and express[ing] any dissenting views," Pope Suppl. Decl. ¶ 10. Because the Gag Policy continues to restrain Pope's speech, the July 2026 Amendments do not mitigate the chilling effects on otherwise-willing speakers, and do not eliminate Plaintiffs' standing to assert their rights to receive information from such speakers.

Regardless, Plaintiffs' injury-in-fact is not merely the inability to hear from Pope, but the inability to hear from *any* trustee. *See* Opening Br. at 6 ("In the wake of the Gag Policy's enactment, Plaintiffs have been unable to obtain vital information from trustees about Board decisions impacting thousands of Pennsylvanians."). Plaintiffs demonstrated that injury with declarations attesting to reporters' lack of information from *any* trustee and the resulting difficulties in covering Penn State. *See* Rafacz Decl. ¶¶ 7–9; McAllister Decl. ¶¶ 8–9; Rushton Decl. ¶¶ 8–11. Defendants do not address, much less dispute, that evidence.

And because Plaintiffs' injury is not cabined to Pope, additional willing speakers remain relevant. Anthony Lubrano is one. Defendants try to brush him off

because his trustee term ended six weeks ago, Opp'n at 6 n.1, but the Gag Policy's chill on his speech injured Plaintiffs, and is evidence that other alumni-elected trustees would also be willing speakers but for the Gag Policy.

Another alumni-elected trustee who qualifies as a willing speaker is Jay Paterno. *See* Pope Suppl. Decl. ¶ 12. He spoke at the same May 2025 press conference as Pope and Lubrano and was purportedly admonished for it, Rushton Ex. E. Additionally, Paterno is a regular columnist for StateCollege.com,[2] though the Gag Policy limits what he can write in those columns. Paterno also recently testified "voluntarily" in state court about Board-related matters. Ex. A, Hr'g Tr. (Centre Cnty. C.P. June 30, 2026) at 64:4–13. Paterno's public statements about matters related to Penn State—including some dissenting from the Board's majority view—indicate that he, too, would be inclined to speak freely with Plaintiffs but for the Gag Policy. *See FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 839 (3d Cir. 1996) (standing shown where speakers were willing to speak before enactment of restraint, but not after); *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 927 (5th Cir. 1996) (same). Relief from the Court—via an injunction prohibiting enforcement of the Gag Policy against *any* trustee—is still "meaningful"

---

[2] *See* Jay Paterno, StateCollege.com, https://www.statecollege.com/articles/author/jay-paterno/.

to Plaintiffs, *see Democracy Rising PA v. Celluci*, 380 F. App'x 155, 159 (3d Cir. 2010), as the restraint on trustee speech is ongoing.

More broadly, no caselaw supports Defendants' contention that plaintiffs can only seek relief as to willing speakers who submit a declaration, which, if adopted, would thwart the very purpose of this type of claim. The effect of any prior restraint is that otherwise-willing speakers are scared to come forward, and so never speak at all. That is why prior restraints are so invidious: "[they] seek[] absolutely to exclude the speech from 'the market place of ideas.'" *Alderman v. Phila. Hous. Auth.*, 496 F.2d 164, 170 (3d Cir. 1974). Pope's courage to go on the record about the Gag Policy's chilling effect is the exception, not the rule. A burden of proof that requires affirmative declarations from any potentially willing speaker ignores this fundamental problem. Courts have held that much less is required to show standing in such cases. *See FOCUS*, 75 F.3d at 839; *In re Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988); *Decker Advert. Inc. v. Del. Cnty.*, 765 F. Supp. 3d 128, 153 (N.D.N.Y. 2025).

**B. Defendants cannot moot the Motion through voluntary cessation.**

Even if the analysis were cabined to the restriction on Pope's speech, the amendment does not moot the Motion.[3] "[A] defendant's voluntary cessation of the

---

[3] Defendants sometimes suggest that "the case," not merely the Motion, is moot, *see* Opp'n at 1, but they did not move to dismiss the case. In any event, for the reasons described herein, the strategic changes to the Bylaws do not moot the

complained-of conduct does not moot claims for prospective relief unless that defendant meets the 'heavy' burden of establishing that 'there is no reasonable expectation that the wrong will be repeated,' and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Lutter v. JNESO*, 86 F.4th 111, 130–31 (3d Cir. 2023) (citations omitted).

Defendants have not met that burden here. Their assertion that the July 2026 Amendments were "a natural consequence of 2025 amendments that limited the role of emeriti trustees in general," Opp'n at 10, is conclusory and belied by the obvious inference that the change was made in response to this litigation. Plaintiffs filed the Complaint on May 27, 2026, and filed this Motion on June 11, 2026. ECF Nos. 1, 14. Just two business days before Defendants' Opposition deadline, the Board passed the July 2026 Amendments. "That course of conduct makes it more likely that litigation … prompted [the Board's] choice" to amend the Bylaws. *Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 357 (3d Cir. 2024); *see also Virgin Islands*, 363 F.3d at 285. Further, Defendants do not concede that the Gag Policy's restriction on Pope's speech was unconstitutional, instead claiming that the Board made the change coincidentally. But "[m]ere voluntary cessation … while still maintaining 'that its conduct was lawful all along' is insufficient." *Rd.-Con, Inc.*,

---

case as a whole either. Plaintiffs reserve the right to submit supplemental briefing on this issue if Defendants properly raise it at a later date.

120 F.4th at 357 (citation omitted). The general presumption that the government acts in good faith does not apply when the record plainly shows another motive for amendment: this litigation. The Motion is not moot.

## II. Plaintiffs Are Likely to Succeed on the Merits Because the Gag Policy Violates the First Amendment.

On the merits, Defendants rely exclusively on *Garcetti*, which held that the First Amendment does not "shield[] from discipline the expressions employees make pursuant to their professional duties." 547 U.S. at 426. But *Garcetti* is inapplicable here, for multiple reasons. First, even if trustees were government employees, public statements "pursuant to their professional duties" would only include speech where they act as spokespeople for the Board, and the Gag Policy plainly restricts much more than that. Thus, the Gag Policy is an unconstitutional prior restraint under *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 467 (1995). *Garcetti* also does not excuse the Gag Policy's unconstitutional viewpoint discrimination.

Second, trustees are *not* public employees, making *Garcetti* inapposite. Trustees retain First Amendment rights, and the Gag Policy infringes on them.

### A. Even if trustees are akin to public employees, the Gag Policy violates the First Amendment.

Public employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v.*

*Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Further, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Rather, the "critical question … is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

Defendants ignore this "critical question" and ask this Court to read *Garcetti* much more broadly, treating the "in a Trustee capacity" and "pursuant to official responsibilities" language in the July 2026 Amendments as magic words that remove all chill from protected trustee speech.[4] Not so. In particular, Defendants have not demonstrated that *dissenting* speech falls ordinarily within the scope of trustees' "official responsibilities," which they pointedly make no effort to define.

*Garcetti* itself "reject[ed] … the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions" that would sweep all speech by those employees within their "professional duties." 547 U.S. at 424–25. The Third Circuit, too, has rejected the "nearly all-inclusive standard"

---

[4] The recent decision in *Fenchak v. Pennsylvania State University* concerned whether the Board could discipline the plaintiff for statements he did not dispute were made "in his role as a trustee" (requests for information about financial transactions), so the court did not directly address what speech the Gag Policy covers on its face. 2026 WL 2210062, at *7 (E.D. Pa. July 31, 2026), *appeal docketed*, No. 26-3056 (3d Cir. Aug. 13, 2026).

Defendants implicitly put forth here because it "would eviscerate citizen speech by public employees simply because they learned the information in the course of their employment," and "is at odds with the delicate balancing and policy rationales underlying *Garcetti*." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 989 (3d Cir. 2014). Instead, courts have found a wide range of public-employee speech to fall outside the *Garcetti* framework. *See, e.g.*, *Lane*, 573 U.S. at 238 (employee's testimony in judicial proceedings); *Heim v. Daniel*, 81 F.4th 212, 227–28 (2d Cir. 2023) ("professor's academic speech"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 376 (D.D.C. 2020) ("core editorial or journalistic functions of government-employed journalists"). Communications with the press are a paradigmatic example of protected citizen speech. The Supreme Court said as much in *Garcetti* itself, identifying "writing a letter to a local newspaper" as protected speech. *Garcetti*, 547 U.S. at 423. Likewise, in *Dougherty*, the Third Circuit held a school district employee's speech to a newspaper about alleged misconduct was "the archetype of speech deserving the highest rung of First Amendment protection." 772 F.3d at 991. Other courts agree. *See, e.g.*, *DeCrane v. Eckart*, 12 F.4th 586, 597–98 (6th Cir. 2021) ("making disclosures to the media without approval" was protected citizen speech).

In sum, even under *Garcetti* and its progeny, the Board cannot restrict trustees from speaking for themselves on matters of public concern, even if that speech

"concerns information acquired by virtue of" their positions, *Lane*, 573 U.S. at 240. The Gag Policy does just that, however, proscribing a vast swath of protected speech from trustees: "Negative or critical public statements made by Trustees pursuant to their official responsibilities about the Board, the University or its students, alumni, community, faculty, staff, and other stakeholders," Bylaws § 2.03(c), and "all media and press interactions done in a Trustee capacity relating to matters that have come before the Board," Bylaws § 2.04(c). That broad scope stands in sharp contrast to the Bylaws' separate provision—not challenged here—prohibiting trustees from speaking as "spokesperson[s] for the Board" unless "specifically authorized to do so by the Board or the Chair." Bylaws § 2.04(b). Based on both a plain reading of these provisions and the canon against surplusage, *see, e.g.*, *United States v. Milchin*, 128 F.4th 199, 202 (3d Cir. 2025), the Gag Policy prohibits speech by trustees beyond what is already banned by Section 2.04(b). In other words, the Gag Policy restricts trustees' speech made not as spokespeople for the Board but as citizens on matters of public concern.

Defendants' reading of *Garcetti* would mean that every public statement by any trustee "in connection with their service as a Trustee" is unprotected by the First Amendment, Opp'n at 13 (quoting Bylaws § 2.03(a)), which could allow Board leadership to block practically all Penn State-related speech ever made by a trustee. This extraordinary level of control over speech casts aside the "overarching

objectives" of the Supreme Court's employee-speech precedent, "*both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern* and to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 419–20 (emphasis added); *see also Dougherty*, 772 F.3d at 989.

The May 2025 press conference about campus closures proves the point. At that time, the July 2024 version of the Gag Policy was in effect, which included similar "in a Trustee capacity" language reintroduced in July 2026. *Compare* July 2026 Amendments § 2.04(c), *with* Compl. Ex. 2 (July 2024 Bylaws) § 2.04(c). In their letters admonishing alumni-elected trustees for speaking at that press conference, Defendants stated that the trustees had "failed to comply with the Code of Conduct section 2.04" press preclearance requirement, and may have also violated Section 2.03(c)'s prohibition on "[n]egative or critical public statements about the Board." Pope Ex. A; Rushton Ex. E, Attachment. The letters demonstrate that Defendants believed the trustees' respectful, but dissenting, statements about campus closures were made "pursuant to their official responsibilities," and thus punishable under the Gag Policy. But Pope and the others were not purporting to act as Board spokespeople; they were simply sharing their personal views on a matter of public concern. They did not "relinquish" their right to do so through their election to the Board, *see Pickering*, 391 U.S. at 568.

The Gag Policy thus covers speech beyond what is strictly pursuant to official responsibilities and is an unconstitutional prior restraint. On its face, the Gag Policy prohibits trustees from making certain "negative" statements and imposes preclearance requirements for interactions with the press. Such regulations that "chill[] potential speech before it happens" are governed not by *Garcetti* but by *NTEU*. *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 104 (3d Cir. 2022). *NTEU* imposes a "heavy" burden on Defendants to justify the prior restraint by "show[ing] that the interests of [the] potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." 513 U.S. at 467–68. Defendants have not made any effort to pass this test, nor could they.

Defendants' position that the Gag Policy is not a prior restraint strains credulity. They argue that the policy "requires coordination, not pre-approval" for press interactions and only imposes "after-the-fact consequences for improper speech." Opp'n at 15. But it is not just coordination: the Gag Policy mandates that trustees "*shall respect guidance*" from the Board Office about media interactions. Bylaws § 2.04(c) (emphasis added). And the Gag Policy defines improper speech and the corresponding consequences *in advance*—a textbook prior restraint. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 714–15 (1931). Even assuming that

trustees could be considered public employees, Plaintiffs are likely to succeed on the merits of their First Amendment claim under *NTEU*.

**B. The Gag Policy's viewpoint discrimination also renders it unconstitutional.**

The Gag Policy is independently unconstitutional, even under *Garcetti*, because it discriminates based on content and viewpoint. Defendants do not dispute that the Gag Policy so discriminates; they simply argue they have free rein to do so under *Garcetti*. Opp'n at 15. This does not square with Supreme Court or Third Circuit precedent.

As the Supreme Court just recognized in *Chiles v. Salazar*, even within the "few and narrowly drawn" categories of historically unprotected speech, the Court has "sometimes still applied strict scrutiny when governments have sought to regulate speech based on viewpoint." 146 S. Ct. 1010, 1021 (2026) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392, 395–96 (1992) (invalidating ordinance that barred fighting words based on viewpoint)). In the public-employee context specifically, the Third Circuit has rejected Defendants' implicit position that "there is nothing in *NTEU, Pickering*, or any other precedential case from the Supreme Court or Third Circuit that forbids content or viewpoint-based discipline in the context of public employment." *Amalgamated Transit Union*, 39 F.4th at 108. To the contrary, "[c]oncern over viewpoint discrimination is the very reason *Pickering* rejected the older rule that the First Amendment does not protect government-

employee speech." *Id.*; *see also MacRae v. Mattos*, 145 S. Ct. 2617, 2620 (2025) (Thomas, J., respecting denial of certiorari) ("[T]he core First Amendment principle of viewpoint neutrality applies in the *Pickering-Garcetti* context as elsewhere."); *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse … simply because superiors disagree with the content of employees' speech."). The Board is not free to discriminate against trustees' views with impunity, even under *Garcetti*. The Gag Policy should be enjoined for doing so.

### C. *Garcetti* does not apply because trustees are not public employees.

Independent of the above, "*Garcetti* simply doesn't fit" this scenario, *Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 825 (D.N.J. 2020), because trustees are not public employees. Plaintiffs respectfully disagree with the Eastern District of Pennsylvania's decision on this question in *Fenchak* and ask this Court to hold otherwise if it reaches the issue, for several reasons.[5]

---

[5] Defendants' footnoted suggestion that the purportedly "legitimate" sweep of the policy outnumbers its unconstitutional applications, Opp'n at 18 n.4, is not sufficient to raise this argument, but regardless, the Gag Policy's unconstitutional applications outweigh its "legitimate" sweep, for the same reasons it fails the *NTEU* test. *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (noting that prior restraint's "evils engender identifiable risks to free expression that can be effectively alleviated only through a facial challenge"). Additionally, more than the nine alumni-elected trustees are chosen through an election, *see* Bylaws § 2.01(a)(v)–(viii), and even unelected trustees differ from typical public employees as described below.

First, the "public employee vs. elected official" question creates a false dichotomy. One need not be a full-fledged elected official to avoid *Garcetti*, which spoke only to clear-cut public employees and laid out a specific rationale for treating them differently: "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." 547 U.S. at 418. That reasoning is directed to employees running the day-to-day operations of the government in a hierarchical structure, not trustees empowered to make final decisions on Penn State governance, about which reasonable trustees might disagree. Whether elected by alumni, agricultural organizations, faculty, or even the Board, trustees need to be able to tell the Penn State community what they think is good (or bad) for Penn State. *See* Pope Decl. ¶¶ 4–6. A trustee's vote is her own to cast, based on her own good-faith judgment, not the judgment of the Board's majority. Likewise, a trustee's speech is her own to make. The First Amendment prohibits the Board from controlling it, because "debate and diversity of opinion" is not a hindrance—it is essential. *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 178 (3d Cir. 2015).

The May 2025 press conference is, again, a concrete example showing that "the rationales for limiting public employee speech are not very relevant to" trustee speech, *Greenman*, 486 F. Supp. 3d at 825. There, four current and former alumni-

elected trustees spoke out against the Board's plans to close seven campuses. Pope Decl. ¶ 16; Rushton Ex. E. Defendants said their speech violated the version of the Gag Policy then in place. *See* Pope Ex. A; Rushton Ex. E, Attachment. But this press conference was a quintessential example of "free debate about governmental operations" protected by the First Amendment. *Bond v. Floyd*, 385 U.S. 116, 136 (1966). Those trustees were entitled to make their views known on these "controversial political questions so that their constituents can be fully informed by them," *id.*

Second, Defendants posit that trustees are not "true" elected officials because they do not "exercise sovereign power," "owe their loyalty" to Penn State rather than the public, and are not chosen through a "general public election." Opp'n at 18–19 (citations omitted); *see Fenchak*, 2026 WL 2210062, at *6. These are distinctions without a difference, at least for the purpose of *Garcetti*. Penn State is a "state actor" because of its "close relationship with the state government," *Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 n.24 (3d Cir. 1984), and trustees are charged with managing all its affairs, Bylaws § 2.01. The concept of "sovereignty" appears nowhere in *Garcetti*, and a Penn State trustee has at least as much power, as, say, a school board member. *See, e.g.*, *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 542 (9th Cir. 2010). Further, trustees' duties to the "entire University, not just a particular constituency," Bylaws § 8.07, do not distinguish them from elected officials, who

are chosen by some percentage of voters but, once in office, serve the whole nation (or state, or county, or school district).

Finally, the differences between public employees and trustees are much greater than the differences between elected officials and trustees. Trustees are not managed by the Board Office. They are not paid by the University.[6] They did not sign an employment contract; they are bound by the Bylaws, but get to vote on what those Bylaws say. And to the extent alumni-elected trustees report to anyone, it is to the community of alumni eligible to vote for them—nearly 770,000 people, more than the entire population of Centre County.[7]

Because trustees are not public employees, their best analogue in the caselaw remains elected officials, to whom *Garcetti* does not apply. The Supreme Court has squarely held that the First Amendment protects the right of elected officials—specifically community college trustees—"to speak freely on questions of government policy." *Houston Cmty. Coll. Sys.*, 595 U.S. at 478; *accord Bond*, 385

---

6 Defendants cite a handful of cases where unpaid volunteers were treated as public employees under *Garcetti*, Opp'n at 19–20, but Plaintiffs' argument does not rest on the fact that trustees are unpaid. In any event, these cases are distinguishable, as they involve either volunteer firefighters who are otherwise typical employees with minimal policymaking authority (unlike trustees) or an appointed commissioner who served at the pleasure of the town council.

7 *See* 2026 Alumni Trustee Election Final Results Report (May 9, 2026), https://perma.cc/U8PB-BVB6; *QuickFacts: Centre County,* Pennsylvania, U.S. Census Bureau (July 1, 2025), https://www.census.gov/quickfacts/fact/table/centrecountypennsylvania/PST045225.

U.S. at 136–37; *Wood v. Georgia*, 370 U.S. 375, 395 (1962). In *Werkheiser*, the Third Circuit recited approvingly the "sound reasons to assert that *Garcetti* does not apply to elected officials' speech." 780 F.3d at 179; *see also Greenman*, 486 F. Supp. 3d at 825 ("The Third Circuit's discussion of *Garcetti* strongly implies that the rationales for limiting public employee speech are not very relevant to elected officials[.]"). The Supreme Court reinforced the matter in *Houston Community College System* (a case Defendants do not acknowledge), where it did not apply *Garcetti*, and reiterated that elected officials' speech was entitled to First Amendment protection. 595 U.S. at 478.

Because *Garcetti* does not apply, trustees' speech is protected by the First Amendment. Defendants do not dispute that the Gag Policy fails strict (or any) scrutiny. Plaintiffs are therefore likely to succeed on the merits.

## III. Plaintiffs' Motion is Timely.

Defendants also seek to avoid review by arguing that Plaintiffs filed their Motion "almost two years" after the Gag Policy was enacted, Opp'n at 21, but that timeline is both inaccurate and inapposite. Plaintiffs' challenge was based in substantial part on changes made in November 2025 (approximately six months before filing), *see* Compl. ¶¶ 43–46, and evidence of a chilling effect among trustees following the May 2025 press conference.

More importantly, courts "presume that First Amendment harms are irreparable," *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024)—which is true "for even minimal periods of time," *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Abu-Jamal v. Price*, 154 F.3d 128, 136 (3d Cir. 1998). An irreparable harm such as the loss of First Amendment rights does "not become reparable (or 'less immediate') because of Plaintiffs' delay in filing for a preliminary injunction, whatever the reason." *PennEnvironment v. PPG Indus., Inc.*, 2014 WL 6982461, at *15 (W.D. Pa. Dec. 10, 2014). "Rule 65 sets no time limit on filing for a preliminary injunction," and Plaintiffs' filing in June 2026 was reasonable in light of the circumstances. *Id.* (two-year delay did not preclude preliminary injunction); *see also Tripathy v. Lockwood*, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022) (29-month delay was not "by itself sufficient to deny" preliminary injunction in First Amendment case).[8]

Here, the Gag Policy's injury to Plaintiffs' First Amendment rights was occurring when Plaintiffs filed their Motion and continues today. The July 2026 Amendments did not change that, as the policy still infringes on the freedom of Pope and other trustees to speak, *see supra* Part I. The First Amendment harm is thus

[8] Even outside the First Amendment context, "[t]he claim that [a 13-month] delay bars preliminary relief is not consistent with the law of this Circuit." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726–27 (3d Cir. 2004); *see also Times Mirror Mags., Inc. v. Las Vegas Sports News, LLC*, 212 F.3d 157, 169 (3d Cir. 2000) (15-month delay did not preclude injunctive relief).

"unquestionably" irreparable and ongoing, *Elrod*, 427 U.S. at 373. Plaintiffs' Motion is timely.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion and enjoin Defendants from enforcing Sections 2.03(c) and 2.04(c) of the Penn State Bylaws.

Dated: August 14, 2026

Respectfully submitted,

*/s/Paula Knudsen Burke*
Paula Knudsen Burke
PA Bar No. 87607
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
4000 Crums Mill Rd., Ste. 101
Harrisburg, PA 17112
Tel: (717) 370-6884
Fax: (202) 795-9310
pknudsen@rcfp.org

Renee M. Griffin*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 800-3247
rgriffin@rcfp.org

Heather E. Murray*
Kyle S. Clauss**
CORNELL LAW SCHOOL

FIRST AMENDMENT CLINIC[9]
Myron Taylor Hall
Ithaca, NY 14853
(607) 255-8518
hem58@cornell.edu
ksc227@cornell.edu

*admitted *pro hac vice*
***pro hac vice* appl. forthcoming

*Counsel for Plaintiffs*

[9] The Cornell Clinic is housed within Cornell Law School and Cornell University. Nothing in this brief should be construed to represent the view of these institutions, if any.

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.8**

I hereby certify that the foregoing Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction (not counting the table of contents or table of authorities) contains 4,986 words, as calculated by the word-count feature of Microsoft Word, in compliance with the limits of Local Rule 7.8(b)(2).

Date: August 14, 2026

*/s/ Paula Knudsen Burke*

Paula Knudsen Burke
PA Bar No. 87607
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS