# Exhibit A

IN THE COURT OF COMMON PLEAS
OF CENTRE COUNTY, PENNSYLVANIA
CIVIL DIVISION

BARRY J. FENCHAK : NO. 2024-CV-1843-CI

VS. :

THE PENNSYLVANIA STATE
UNIVERSITY BOARD OF TRUSTEES :
And MATTHEW SCHUYLER in his
official capacity as chairman :

# TRANSCRIPT OF PROCEEDINGS
(Hearing on Plaintiff's Petition to Sanction Defendants)

BEFORE: Brian K. Marshall, Judge

DATE: June 30, 2026

PLACE: Centre County Courthouse
Annex Courtroom
106 East High Street
Bellefonte, PA 16823

APPEARANCES:

FOR THE PLAINTIFF:
Steven Marino, Esquire

FOR THE DEFENDANTS:
Andrew Stanton, Esquire
Susan Kessler, Esquire
Christopher Conrad, Esquire

NOTES BY: Shannon L. Gallagher, CVR
Official Court Reporter
Centre County Courthouse
102 South Allegheny Street
Bellefonte, PA 16823
814-355-6734 or 814-548-1158

INDEX TO WITNESSES


| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFF: | | | | |
| Anthony Lubrano | 29 | 56 | 57 | -- |
| Jay Paterno | 64 | -- | -- | -- |
| Barry Fenchak | 82 | 166 | 182 | -- |
| DEFENDANT: | | | | |
| [NONE] | | | | |


INDEX TO EXHIBITS


| | ADMITTED: |
|---|---|
| PLAINTIFF: | |
| Exhibit 1.1 - Complaint | 190 |
| Exhibit 1.2 - Entry of Appearance | 190 |
| Exhibit 1.3 - Entry of Appearance | 190 |
| Exhibit 1.4 - Preliminary Objections | 190 |
| Exhibit 1.5 - Amended Complaint | 190 |
| Exhibit 1.6 - Defendant’s POs | 190 |
| Exhibit 1.7 - Entry of Appearance | 190 |
| Exhibit 1.8 - Opinion and Order | 190 |
| Exhibit 1.9 - Plaintiff’s Response | 190 |
| Exhibit 1.10 - Praecipe to Withdraw POs | 190 |
| Exhibit 1.11 - Entry of Appearance | 190 |

Exhibit 1.14 - Defendant’s Answer and Affirmative Defenses 190
Exhibit 2.1 - Bylaws 190
Exhibit 4.1 - Amendment to Long-Term Investment 190
Exhibit 6.1 - Judicial Notice 190
Exhibit 7.1 - Docket Sheet 190

DEFENDANT:
Exhibit 1 - Amended Complaint 190
Exhibit 2 - Confidentiality Agreement 190

conclude your testimony. You may step down.
THE WITNESS: Can I leave the book?
THE COURT: Leave the binder there if you would.
Mr. Marino.
MR. MARINO: I understand that Mr. Jay Paterno has appeared. I would call him as our next witness.
And my offer of proof would be the same as that provided for Mr. Lubrano.
THE COURT: There's been no objection or motion made to this point, so.
All right. I need to swear you in. Please raise your right hand to be sworn.
Whereupon,
JOSEPH PATERNO, JR.
a witness herein, having been duly sworn, was examined and testified as follows:
THE COURT: All right. Thank you. Please be seated.
THE WITNESS: I apologize, Your Honor. On my way out the door, I forgot to put a tie on.
THE COURT: That's okay. You're better dressed than many people appear in court these days.
THE WITNESS: My father would kill me.

THE COURT: All right. Attorney Marino.

DIRECT EXAMINATION

BY MR. MARINO:

Q. Mr. Paterno, you were subpoenaed for this case?

A. Yes.

Q. The subpoena was quashed?

A. Yes.

Q. You come here not under command of a subpoena?

A. You mean did I come here because I -- on my own free will? Yeah.

Q. You come here voluntarily?

A. Yeah, voluntarily.

Q. You and I have not spoken?

A. No, we have not.

THE COURT: Hold on. Before you go forward, could you state your name for the record.

THE WITNESS: Well, my legal name is Joseph Vincent Paterno, Jr. I go by Jay.

THE COURT: All right. I'm sure just about everyone in the room knows who you are but just for purposes of creating the court record.

THE WITNESS: I'm not sure that's a good thing.

THE COURT: Well, that's what happens, I

guess, when you're as well-known as your family is.
Go ahead, Mr. Marino.
BY MR. MARINO:
Q. Mr. Paterno, tell us about your education background?
A. Oh, geez. I'm getting old. I graduated Penn State in 1991, sumo cum underachiever.
And then I went to grad school at the University of Virginia from 1991 through ’92, and then I became -- I was there as a graduate assistant football coach and then started coaching, so I did not finish my master's there.
Q. That's fine. Did you have an opportunity to serve as a board of trustee member for the University of Pennsylvania -- for Penn State University?
A. Yes.
Q. Are you still serving?
A. Yes.
Q. And how many terms have you served?
A. Today's the end of my third term. I was just reelected to a fourth term. So nine years total.
Q. Are you -- tell me how you became a board member?
A. I ran as an alumni elected trustee in 20 -- what year would it have been? 2017.

Q. Okay. And you served continuously since then?
A. Yes.
Q. Do you understand that the Board of Trustees operates with committees?
A. Yes.
Q. Do you know who's responsible for committee appointments during the course of your service?
A. It has been the chair -- I believe it's the chair, with the advice and consent of the vice chair. And then, you know, we're asked if there are certain committees we'd like to be on, but they ultimately make that decision.
Q. And when you say they, who are you referring to?
A. The chair of the Board. Currently David Kleppinger. Before that it was Matt Schuyler. Before that it was Mark Dambly, I believe. I think that covers them all.
Q. Does the -- your appointment -- do you understand, if at all, whether appointment to a committee impacts upon the fiduciary duties of a trustee?
A. You mean in terms of how they pick them? Sorry.
Q. That's a bad question.

Does a board of trustee member have duties?

A. Have duties? Yes.

Q. Are the committee assignments task oriented?

A. Yes.

Q. Okay. Does the -- when a board of trustee is elected, does he have a fiduciary responsibility?

A. Yes.

Q. Does the commitment to -- does the assignment to a committee impact in any way the fiduciary responsibility that is imposed upon a board of trustee member?

A. No.

Q. So despite the appointment, committee appointment, the fiduciary responsibility is the same for all members of the Board?

MS. KESSLER: Objection, Your Honor. This testimony is not relevant to any issue that's properly before the Court. It's also duplicative. We've heard all of this from Mr. Lubrano already.

MR. MARINO: Well, you have to make a credibility call.

They're gonna accuse Mr. Fenchak of having a perception of the duties that is unreasonable that's why it's relevant, unless they don't want to make the accusation. But that's what's gonna happen

and I anticipate that because that's what they forecasted they would do. They're gonna claim he's unreasonable.

These people, the trustees that you're gonna hear from, are gonna establish that he's reasonable and he's professional, and this fiduciary responsibility applies to everyone at the same level.

That's what he's gonna say. That's why it's relevant.

THE COURT: Additional argument?

MS. KESSLER: Your Honor, the Court has ample discretion to manage the efficient running of proceedings like this, and it's well within your discretion to limit duplicative testimony.

It also is not relevant to any of the conduct that occurred during the pendency of the matter.

THE COURT: Objection overruled.

Do you need the question again?

THE WITNESS: Yeah, I do.

BY MR. MARINO:

Q. We were talking about the fiduciary duty. And my question was, is that fiduciary duty the same for every member?

A. Yes, that's my understanding. Yes.

Q. So the chairperson, chairman, whoever he is, and the vice chair, whoever he may be, has the same duty as Mr. Fenchak?
A. That would be my understanding, yes.
Q. Same duty as you?
A. Yes.
Q. Same duty as Mr. Lubrano?
A. Again, that's my understanding.
Q. So the task orientation of how the duties of the task responsibilities of the Board has nothing to do, based on your understanding, with the fiduciary responsibility that's crucial to a trustee?
A. Based on my understanding, that's correct.
Q. You know Barry Fenchak?
A. Yes.
Q. How did you come to know him?
A. Oh, geez. Years ago, when I was still coaching, Barry was not a fan of my coaching and emailed me on occasion back and forth, so that's how we started.
Yeah, that's how I got to know him. And I asked him to go to lunch one time to explain how we viewed performance and football as related, and have been, you know, running into each other from various time to time.

I did get my revenge. He had to coach my son in youth soccer.
But by and large, I can't remember how many years ago that was. It's gotta be 20, but it's been a while.
Q. Have you served as a trustee with him?
A. Yes. And I don't know how many years it would have been, but you probably have the record of how many years he was on the Board.
Q. Multiple.
A. Okay.
Q. During the course of his service, did you have an opportunity to interact with him?
A. Yes.
Q. Did you -- during the course of your service, did you have an opportunity to see him interact with other people?
A. Yes.
Q. Do you recognize Mr. Fenchak as having any specialized knowledge in the disciplines of financial investment or financial analysis?
A. Certainly more than mine based on his professional experience.
Q. What is your understanding of his professional experience?

A. He is -- even going back to when I was coaching, he's a numbers guy.

He goes into numbers, digs into numbers, and comes up with his own analysis of things. And while I didn't agree with him in the coaching standpoint, he certainly knows more about the finances and the inner workings of balance sheets and those things than I do.

Q. Do you know other people in the community that know him?

A. Pardon?

Q. Do you know other people in the community who know him?

A. Oh, gee. I'm sure I do, but off the top of my head I probably can't -- I don't know many people.

Q. Has his character trait of being an honest and truthful person, and concern about others, ever been a subject of conversation that you may have had with other people?

A. No. You know people disagree among things, but in terms of his honesty, I've never had an issue with that. I've never heard anybody has an issue with that.

Q. Do you know what his reputation in the community is for being truthful and honest?

A. As far from what I understand, he's been

truthful and honest.

Q. Okay. Do you know a person by the name of Mary Lee Schneider?

A. Yes.

Q. How do you -- how did you come to know a person by the name of Mary Lee Schneider?

A. I was elected to the Board and got to know her after I was on the Board. I did not know her prior to that.

Q. And when you say the Board, the Board of Trustees?

A. Yes, Board of Trustees.

Q. Is she a co-member of yours?

A. Yes.

Q. Do you know how long she was serving on the Board?

A. I believe 11 years, because she was on the Board before I was, and I think her term -- her 12 years is up next year, I think, but you have to check on that.

Q. What is your understanding of Ms. Mary Lee Schneider's position with the Board of Trustees?

A. In terms of her position? How she got on the Board?

I'm not sure what you're asking.

Q. Fair question. Does she have any special committee appointments?
A. She's chaired a number of committees, yes.
Q. Chair to the what?
A. Chaired a number of committees. I think she's chaired finance. I think she's chaired what was HR, which I think is now -- we've changed some of the acronyms for some of the committees -- and she's been on the executive committee for a number of years.
Q. Who would be responsible for appointing her to these chair positions?
A. The chair of the Board.
Q. So Matt Schuyler would?
A. Yeah, when he was chair he would've been. Yes.
Q. So he selected her to lead various committees?
A. Yes. That would be my understanding is as how the process works.
Q. You understand -- you have an understanding that she is the chair of the financial business, capital and planning committee?
A. I don't think she is currently, but she has been.
Q. Would she had been appointed to serve as the chair of the financial business capital and planning

committee by Matt Schuyler?
A. If he was the chair at that time, it would have been Matt Schuyler, yes.
Again, you're asking me to think back, and I haven't really sat and reviewed all this, so I think that is to the best of my knowledge.
Q. That's how they hierarchy worked? Mr. Schuyler would appoint people, the chairs, to these committees?
A. Correct.
Q. Do you know her based on your experience with the Board -- let me back up.
Did you ever see her, Mary Lee Schneider, interact with Mr. Fenchak?
A. Yeah, at times. Yeah.
Q. Do you have a perception that there's personal animosity that exists between Mary Lee Schneider and Mr. Fenchak?
A. Personal animosity, I'm not sure, but there's not a lot of love there.
Q. What's that mean not a lot of love?
A. Well, I mean, there's differences of opinion, and I think sometimes, on the Board, difference of opinions become personal, and I don't think that's necessarily healthy.

But I can't speak to her feelings to him -- for him and vice versa, other than just what I've seen.

Q. I'm not asking you to speak about her feelings. I'm just talking about your perception.

A. Correct.

Q. If you have that perception, that's fine. If you don't, that's fine as well.

A. My perception is they disagree on a lot of things.

Q. Do you know if Mary Lee Schneider has any special relationship with Matt Schuyler or David Kleppinger?

A. I think she has a good personal relationship with them, and that there's a lot of things on the Board that there's a handful of people that are consulted on certain things, and I think she's one of them.

Q. When you say there's a handful of people consulted on certain things, do you mean Mr. Schuyler consults with Mary Lee Schneider to make decisions?

A. Not necessarily to make decisions, but to -- there's informational flow that sometimes goes on the executive committee and things like that, and she's been on that executive committee.

Q. Okay. Do you have perceptions that she influences, or may influence, the decision of Mr. Schuyler or Mr. Kleppinger?

A. I think she tries to. I don't think -- but again, a lot us do, but she has -- she has a little bit of voice than some of the other ones, other trustees.

Q. Do you have an understanding that the fiduciary duty of a trustee contemplates that a trustee has to oversee the University's endowment?

A. Yeah, that's my understanding. Yes.

Q. Is that rooted in the bylaws?

A. I believe so, yes. You're not gonna make me read are you?

Q. I'm sorry?

A. You're not gonna make me read too much are you?

THE COURT: I'm not gonna let him make you read it. I've heard it.

THE WITNESS: Okay. Good. Thank you. Thank you, Your Honor.

BY MR. MARINO:

Q. Do you have an understanding that Mr. Fenchak had requested information relating to the endowment when he was a trustee?

A. Yes.

Q. Do you have an understanding of what the nature of that information was?

A. I believe he emailed the trustees. Again, I'm recalling off the top of my head. I believe he emailed trustees and stated what things that he was looking for, and a lot of it had to do with -- I think it had to do with fee rates.

I might not be saying that correctly, but expense rates on trustee management -- or on enrollment management.

THE COURT: Endowment management?

THE WITNESS: Endowment. I'm sorry. Not enrollment. Yes.

BY MR. MARINO:

Q. Do you have an understanding or perception that his request for information was reasonably related to his duty to oversee the endowment?

A. Well, I think that any trustee that needs that information should be able to get it because it is part of our fiduciary responsibility.

Q. Did there come a time that you participated in a board meeting that addressed the Elevate contract?

A. I believe, yes. But when exactly it was, I don't recall.

Q. Would the date of May 21, 2024 refresh your recollection?
A. The exact date, I'm just trusting that you, you know, that that's the date, yeah.
Q. You don't have to know the date, that's fine.
Do you recall what happened -- do you recall that there was presenters at that meeting?
A. Yes.
Q. Do you recall a person by the name of Sara Thorndike presented?
A. Yes.
Q. Is Sara Thorndike a member of the Board of Trustees?
A. No.
Q. After she presented, did you come to the conclusion or draw the inference that she was privy to the Elevate contract?
A. Yes.
Q. And what's your understanding of what the Elevate contract -- bad question.
What is your understanding of the relationship between the Elevate contract and the renovation project of Beaver Stadium?
A. My understanding is that when we were presented information on that renovation, there was a

number of factors that were gonna go into helping pay for it, and part of that was that we were gonna see an increase in revenues from this contract that would help pay for the stadium.

Q. You mentioned it was your inference that Sara Thorndike was privy to that information?

A. Yes. She is the vice president of finance, and that would make sense.

Q. But not a board of trustee member?

A. Not a board of trustee member.

Q. Do you recall at this May 21, 2024, Board of Trustees meeting whether the president of the University presented?

A. Yes.

Q. Did you listen to her presentation?

A. Yes. The substance of it I would be hazy on now.

Q. Did you draw the inference after hearing her presentation of learning that she was privy to the Elevate contract?

A. I don't know if she ever said that per se, but certainly I would have assumed, given that contract had been executed by the University, that she was privy to it.

Q. Did Dr. Pat Kraft, the vice president of

athletic department, present at that May 21, 2024 board meeting?

A. Yes.

Q. As a result of his presentation, did he discuss the Elevate contract?

A. I believe so.

Q. Did you have an understanding based on listening to his -- his presentation that he was privy to the Elevate contract?

A. Yes.

Q. He's not a board of trustee member?

A. No.

Q. Do you understand that Mr. Fenchak had requested to see the Elevate contract?

A. I don't know if I understood he had requested it before the May meeting or after, but I know he had requested to see it.

Q. Do you maintain the perception that the Elevate contract was reasonably related to the duties of a board of trustee member?

A. Yes.

Q. And why is that?

A. Because the financial matter that involved a major construction project, as well as an extension of a business relationship between the athletic

department and outside entity.

MR. MARINO: No further questions. Pass the witness.

THE COURT: Cross.

MS. KESSLER: None, Your Honor.

THE COURT: All right. That will conclude your testimony. You may step down.

THE WITNESS: Oh, excellent. Thank you.

THE COURT: All right. I presume you're gonna call Mr. Fenchak next.

MR. MARINO: Yes, sir.

THE COURT: All right. Let's take just a brief break, about five minutes, and then we'll resume.

(Whereupon a brief recess was taken.)

THE COURT: Attorney Marino, next witness.

MR. MARINO: I call Mr. Barry Fenchak.

THE COURT: All right. Mr. Fenchak, come on up to the witness stand.

Before you're seated, I need to swear you in. Please raise your right hand to be sworn.

Whereupon,

BARRY FENCHAK

a witness herein, having been duly sworn,

C E R T I F I C A T E

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me upon the hearing on the within matter, and that this copy is a correct transcript of the same.

I hereby certify that a copy of this transcript was made available to counsel and/or self-represented parties of record. Counsel and/or self-represented parties shall have five (5) days from receipt of transcript in which to file any written objections or exceptions to the same. That time period having elapsed without recording of objections or exceptions, the transcript is therefore lodged with the Court for further action.

_______________________________________________________

Date Shannon L. Gallagher, CVR
Official Court Reporter

APPROVAL OF COURT

The foregoing record of the proceedings held in the hearing in the within case is hereby approved and directed to be filed.

______________________________________________________
Date Brian K. Marshall, Judge