2026 WL 2210062
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

# BARRY J. FENCHAK, Plaintiffs,
v.
PENNSYLVANIA STATE UNIVERSITY, et al., Defendants.

CIVIL ACTION NO. 25-6313-KSM
|
Filed 07/31/2026

**Attorneys and Law Firms**

Steven F. Marino, Marino Associates, Philadelphia, PA, for Plaintiff.

Susan E. Kessler, Andy Stanton, Jones Day, Pittsburgh, PA, for Defendants.

## MEMORANDUM

Marston, J.

***1** Plaintiff Barry J. Fenchak is a former member of the Board of Trustees of The Pennsylvania State University ("PSU" or "the University"). During his tenure, Fenchak repeatedly (and at times, publicly) sought financial information about administrative fees paid for managing the University's endowment and about the terms and conditions of a contract that the University was negotiating with the sports ticketing company, Elevate Collegiate Ticketing, LLC. The Board of Trustees ultimately voted to prematurely remove Fenchak from the Board in the summer of 2025, allegedly because of an inappropriate sexual comment that he made while attending a Board meeting. Following his removal, Fenchak sued the University, former Board Chair Matthew Schuyler, and Board Vice Chair David Kleppinger. (Doc. No. 1-3.) The Court has dismissed all of Fenchak's claims except for his claims for First Amendment retaliation. (*See* Doc. Nos. 12, 13.) Defendants now move for judgment on the pleadings as to those claims. (Doc. No. 19.) For the reasons discussed below, that motion is granted.

## I. BACKGROUND

The Board of Trustees is a corporate body established by PSU's Charter and governed by the University's Amended and Restated Bylaws. (Doc. No. 1-3 at ¶¶ 18–20.) The Board consists of 38 total trustees: 36 voting members and 2 non-voting members. Bylaws for Bd. of Tr'ees § 2.01(a), https://trustees.psu.edu/files/2025/12/Bylaw-Elections-Appendix-2025-November.pdf (last visited July 30, 2026). The bylaws dictate that trustees, alumni, and former students choose nine members of the Board; the Governor of Pennsylvania chooses six; Pennsylvania agricultural societies and associations also choose six; and the Board of Trustees itself chooses eleven. (*Id.*) The remaining six positions are held by state officials, the President of the University, and the immediate past president of the PSU Alumni Association. (*Id.*)

In 2022, PSU alumni elected Fenchak to serve a three-year term as a voting member on the Board. (Doc. No. 1-3 at ¶ 24.) This election process included a solicitation of nominations from electors, who are "all graduates who have received a 'first or bachelor's degree or an advanced degree from the University' and former students who have passed one semester's or two terms' work." Corporate Charter of The Pennsylvania State University, at C-3, https://bpb-us-e2.wpmucdn.com/elements.psu.edu/dist/2/51/files/2025/12/Charter-November-2017-1.pdf (last visited July 6, 2026). Fenchak assumed his position on July 1, 2022 (Doc. No. 1-3 at ¶ 25), and he claims that throughout his tenure, he "engaged in principled, civil, and respectful debate" with other trustees, "[c]onsistent with expectations of membership ... as a Board of Trustees member" (*id.* at ¶ 34; *accord id.* at ¶¶ 33, 35–42). In particular, there was significant debate between Fenchak and his fellow trustees about whether he should be given access to: (1) financial information related to administrative fees paid for management of the University's endowment, and (2) the terms and conditions of the Elevate contract. This debate eventually led (1) to an investigation into and the eventual removal of Fenchak from the Board and the instant action.

### A. Administrative Fees

***2** The Board is tasked with, among other things, overseeing and managing the University's endowment, which is valued at around $5 billion. (*Id.* at ¶ 48.) As a new trustee, Fenchak sought to familiarize himself with the endowment by reviewing the University's IRS Form 990 filings for the 2008 to 2023 calendar years. (*Id.* at ¶ 50.) During that review, Fenchak noticed that "professional administrative fees paid to manage the ... endowment rose dramatically in 2017,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

more than tripling the rate within (3) three years." (*Id.* at ¶ 51.) Concerned, Fenchak spent his first two years as trustee repeatedly requesting "access to the specific data and items that totaled the aggregated figures listed on the IRS Form 990s" as "administrative fees reported to have been paid by the University to manage the endowment." (*Id.* at ¶ 53.) His requests, however, were denied, first, by the Vice Chair of the Board's Finance Business and Capital Planning Committee and later, by other "controlling Board of Trustees members," including Defendants Schuyler and Kleppinger. (*Id.* at ¶¶ 54–64.)

On July 16, 2024, Fenchak filed an action against the Board and Schuyler in the Pennsylvania Court of Common Pleas for Centre County, seeking an order compelling production of information related to the administrative fees. *See Fenchak v. Pa. State Univ. Bd. of Trs.*, No. 2024-CV-1843-CI (Centre Cnty. Ct. Comm. Pl.) ("*Fenchak I*").

### B. The Elevate Contract

A few months before filing *Fenchak I*, in the spring of 2024, Fenchak learned that the University was entertaining a 10-year expanded ticketing partnership with Elevate, the goal of which would be to maximize revenue needed to support the University's ongoing $700 million renovation of Beaver Stadium, PSU's football stadium. (Doc. No. 1-3 at ¶ 66; *see also id.* at ¶ 67 (alleging that the University and Elevate "entered into a Letter of Intent").) In April and May of 2024, Fenchak "forwarded requests to various controlling Board of Trustees members for access to information related to the terms of and conditions of [the] contract under negotiation." (*Id.* at ¶ 69.) Defendants Schuyler and Kleppinger denied those requests on May 7, 2024, explaining that additional information about the Elevate contract "would be provided to all trustees in the ordinary course." (*Id.* at ¶ 71.)

Two weeks later, the Board convened a public meeting. (*Id.* at ¶ 73.) The purpose of the meeting was for "voting members of the Board of Trustees to consider and act upon a Resolution for project approval concerning Beaver Stadium renovations." (*Id.* at ¶¶ 80, 81.) The proposed resolution authorized certain trustees to "cause the University to award contracts on behalf of the University in furtherance of the ongoing Beaver Stadium Renovation Project, inclusive of [the Elevate contract]." (*Id.* at ¶ 82.) During that meeting, Fenchak disclosed that he had previously requested "access to information relating to the terms and conditions" of the Elevate contract but his requests had been denied. (*Id.* at ¶ 85.) He also publicly asked Schuyler when all the members of the Board would be given information about the Elevate contract and why that information was being kept secret. (*Id.* at ¶¶ 88–89.)

On August 16, 2024, Fenchak renewed his request for a copy of the Elevate contract. (*Id.* at ¶ 107.) Defendants Schuyler and Kleppinger once again denied the request. (*Id.* at ¶ 108; *id.* at p. 68.) One week later, on August 27, 2024, Fenchak amended his complaint in *Fenchak I* to also seek an order compelling production of "information informing upon the terms and conditions" of the Elevate contract. (*Id.* at ¶ 100.)

### C. Fenchak's Investigation and Removal from the Board

On July 19, 2024—just a few days after he filed *Fenchak I*—Fenchak attended a Board meeting at PSU's Altoona campus. (Doc. No. 1-3 at ¶ 91.) While there, he spoke to three IT employees, and during the conversation, commented that "his wife says he cannot wear baseball hats because it makes him look like 'a penis with a hat on.' " (*Id.* at ¶¶ 92–93.) A sexual harassment investigation was launched against Fenchak in connection with this comment, and it was ultimately recommended that Fenchak be removed from the Board for violating the Trustee Code of Conduct. (*Id.* at ¶ 97.) A meeting was scheduled for October 2024 to rule on this recommendation. (*Id.*)

***3** Meanwhile, on July 30, 2024, the Board amended the University's bylaws in two crucial ways. First, the amended bylaws empowered "the Chair of the Board to restrict a member Trustee's access to University information." (*Id.* at ¶ 105(f).) Second, the amended bylaws "vested the Chair of the Board and the Chair of the Governance Committee with ultimate power to sanction and remove member Trustees from their position on the Board." (*Id.* at ¶ 105(g).) Fenchak was ultimately removed as a trustee by a vote of 30 to 4 in the summer of 2025. (*Id.* at ¶ 112.)[1] He was also voted ineligible to be listed on the ballot in the 2025 alumni trustee election. (*Id.* at ¶ 113.)

### D. Procedural History

On October 30, 2025, Fenchak filed this action in the Court of Common Pleas of Philadelphia County. (Doc. No. 1 at ¶ 1.) Defendants removed the matter to this Court on November 6, 2025. (*See generally* Doc. No. 1.) And two weeks later, they moved to dismiss the Complaint in its entirety. (Doc. No. 6.) On April 17, 2026, the Court granted in part and denied in part Defendants' motion. (*See generally* Doc. No. 12.) Fenchak's

claims for defamation, false light, breach of fiduciary duties, and unlawful retaliation in violation of Article I, Section 7 of the Pennsylvania Constitution were dismissed with prejudice. (*Id.*) However, the Court declined to dismiss Fenchak's First Amendment claims for unlawful retaliation, emphasizing that no party had properly analyzed which standard governed those claims. (*Id.*) On May 1, 2026, Defendants answered the extant portions of the Complaint. (Doc, No. 15.) And on May 29, 2026, they moved for judgment on the pleadings as to Fenchak's First Amendment claims, arguing that Fenchak and his fellow Board members are appropriately considered employees of PSU, who can be punished for speech taken in the course of their official duties. (Doc. No. 19.) Fenchak opposes that motion. (*See* Doc. No. 20-2.) As the matter is fully briefed, it is ripe for resolution.

## II. LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings may be granted when the moving party demonstrates that there are no material issues of facts remaining and that they are entitled to judgment as a matter of law. *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). The standard for reviewing a motion for judgment on the pleadings is similar to the standard for deciding a Rule 12(b)(6) motion to dismiss. *Zion v. Nassan*, 283 F.R.D. 247, 254 (W.D. Pa. 2012). In both instances, the "court must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (quotations omitted). When conducting this analysis, "a court may only consider the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Id.* (quotations omitted).

## III. DISCUSSION

The only remaining claims in this litigation are for unlawful retaliation under the First Amendment of the United States Constitution (Counts IV through VI), which are brought pursuant to 42 U.S.C. § 1983.[2] Fenchak contends that Schuyler and Kleppinger violated his First Amendment rights when they "deliberately retaliated against" him for his "exercise of speech" (Doc. No. 1-3 at ¶¶ 233, 244)[3] and that the University is vicariously liable for their actions (*id.* at ¶¶ 208–27). "[T]o plead a claim for First Amendment retaliation, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Willson v. Yerke*, 604 F. App'x 149, 151 (3d Cir. 2015) (quotation marks omitted); *see also Houston Comm'ty Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (explaining that a plaintiff pursuing a claim for First Amendment retaliation "must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.' " (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019))). Here, the parties' disagreement turns on the first element—whether Fenchak engaged in constitutionally protected speech—and the standard that governs that analysis. As the Court explained in our prior Memorandum, the answer to those questions depends on whether Fenchak is properly characterized as a public employee or an elected official. (*See* Doc. No. 12 at 13–17.)

***4** Although "public employees do not surrender all their First Amendment rights by reason of their employment," there are limits to employees' First Amendment protections. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Specifically, statements made by public employees in the course of their official duties are not protected speech under the First Amendment; employers may discipline employees for such communications. *Id.* at 421. However, if a public employee is addressing matters of public concern as a *citizen*, the First Amendment safeguards their right to do so. *Id.* at 417 (collecting cases); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (explaining that a public employees' speech is protected if "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern; and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other members of the general public' as a result of the statement he made" (quoting *Garcetti*, 547 U.S. at 418)).

By contrast, if the plaintiff is not a public employee, but instead, serves as an elected public official, *Garcetti* likely does not apply (*see* Doc. No. 12 at 15–17), and the elected body may not materially inhibit the official's ability to speak freely when performing their official duties, *see, e.g., Ruttle v. Brady*, No. 22cv3000, 2023 WL 5554648, at *3 (3d Cir. 2023) ("This case ... involves a censure of one member of an

elected body by other members of the same body, and because it does not involve expulsion, exclusion, or any other form of punishment, we ... conclude that it cannot support a viable First Amendment claim." (cleaned up)); *Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 826 (D.N.J. 2020) ("In short, the *Garcetti* categories do not read very readily onto the situation of an elected councilwoman, like Ms. Greenman. True, she may suffer consequences for political speech—but not because she is in some subordinate role, subject to the authority of her public employe....r Plaintiff spoke as elected official. (As I have held, *Garcetti* does not apply as such. Speech is protected, but 'retaliation,' to be impermissible, must rise to the level of interfering with plaintiff's functioning as an elected official)."); *cf. Houston Comm'ty Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) ("The First Amendment surely promises an elected representative like Mr. Wilson the right to speak freely on questions of government policy. But just as surely, it cannot be used as a weapon to silence other representatives seeking to do the same.").

With these distinctions in mind, the Court considers first whether Fenchak is an elected official or public employee, before turning to whether he has shown his speech was constitutionally protected under the appropriate standard.

**A. Public Employee v. Elected Official**

Defendants argue that trustees on PSU's Board are not elected officials, but instead, constitute public employees subject to *Garcetti.* (Doc. No. 19-1 at 11.) Fenchak disagrees, arguing that PSU's trustees are elected officials and that Defendants materially interfered with his ability to function as such when they prematurely removed him from the Board. (Doc. No. 20-1 at 17–19.) The Court agrees with Defendants.

Fenchak relies almost exclusively on the United States Supreme Court's decision in *Houston Community College System v. Wilson* ("*HCCS*"). (*See generally* Doc. No. 20-2.) In *HCCS*, the plaintiff was elected to the Board of Trustees of the Houston Community College System. 595 U.S. 468, 471 (2022). Each HCCS board member, including the plaintiff, was elected for a six-year term by a single-member district in Houston. *Id.* As a member of the board, the plaintiff often dramatically clashed with other members about what he believed was in the best interest of HCCS. *Id.* He brought multiple lawsuits challenging the board's actions, arranged robocalls to the constituents of certain other trustees to publicize his views, and hired a private investigator to watch another trustee because he suspected that she was not residing in the district that elected her. *Id.* at 472. Ultimately, the plaintiff's conduct led the HCCS Board of Trustees to issue a public reprimand against him, adopt a resolution to censure him, and impose penalties that deemed him ineligible for officer positions. *Id.*

***5** The Supreme Court emphasized that the plaintiff "was an elected official," and as such, "[t]he First Amendment surely promises" him "the right to speak freely on questions of government policy." *Id.* at 478; *see also id.* at 480 (distinguishing the plaintiff's situation from that of "students, employees, or licensees," who might have stronger retaliation claims under similar circumstances). The Court qualified, however, that the First Amendment "just as surely ... cannot be used as a weapon to silence other representatives seeking to do the same." *Id.* Balancing these rights, the Court held that the board's censure, which "did not involve expulsion, exclusion, or any other form of punishment," and which was about the "conduct of official business," did not give rise to a viable First Amendment claim. *Id.* at 482–83.

Although not relied upon as heavily by Fenchak as *HCCS*, the Tenth Circuit Court of Appeals decision in *Phelan v. Laramie County Community College Board of Trustees* also treated elected trustees of public colleges and universities as elected officials, who fall outside the realm of *Garcetti.* In *Phelan*, the plaintiff served as a trustee on the board of trustees for the local county community college. 235 F.3d 1243, 1245 (10th Cir. 2000). She was elected to her position by members of the Laramie County District through a polling system that occurred during general election years. Wyo. Stat. § 22-22-102(a). The plaintiff had served as a member of the board since the college's founding. 235 F.3d at 1245. More than 30 years later, the board voted to fund campus repairs and renovations with a tax assessment, and the proposal was sent to the public for popular vote. *Id.* Despite being a member of the board that put forth the proposal, the plaintiff ran an advertisement in the local newspaper that asked the public to vote against the funding measure. *Id.* Afterward, the board voted to censure her for violating the board's ethics policy. *Id.* at 1245–46 (referencing the board's policy, which requires trustees "to abide by and uphold the final majority decision of the Board"). The plaintiff then sued the board of trustees and each board member under § 1983 for violations of her First Amendment rights. *Id.* at 1245. Like the Supreme Court in *HCCS*, the Tenth Circuit Court of Appeals started from the premise that the plaintiff "is not a governmental employee or contractor; indeed, the Board members and [the plaintiff] occupy the same positions as elected public officials." *Id.* at 1247. With that clarification, the court held that the board's

censure did not "infringe any of Ms. Phelan's free speech rights because it did not punish her for exercising these rights. Nor does it deter her future speech." *Id.* Indeed, the censure "carried no penalties; it did not prevent her from performing her official duties or restrict her opportunities to speak, such as her right to vote as a Board member, her ability to speak before the Board, or her ability to speak to the public." *Id.* at 1248.

Although *HCCS* and *Phelan* suggest members of a college board of trustees are properly considered elected public officials, we find two important factual differences between the boards in those cases and PSU's Board here. First, unlike the plaintiffs in *HCCS* and *Phelan*, Fenchak and the other members of PSU's Board were not elected by a district at large or as part of a general election. Instead, Fenchak was chosen through the alumni trustee selection process, in which nomination ballots are mailed only to "alumni who have been active members of the alumni association or who have contributed to the University within the past two years or who specifically request a nomination ballot." *Benner v. Oswald*, 592 F.2d 174, 176 (3d Cir. 1974). Alumni then vote by mail, and whoever earns the top votes for that cycle—as Fenchak did in 2022—joins the board. *Id.* Voting for a PSU trustee is thus not the equivalent of voting in a "general government election[ ]." *Id.* at 183; *cf. Lee Publs., Inc. v. Dickinson Sch. of Law*, 848 A.2d 178, 185 (Pa. Cmwlth. Ct. 2004) ("Appellate courts in Pennsylvania have considered PSU to be analogous to a nonprofit corporation chartered for educational purposes.").

***6** Second, unlike the trustees in *HCCS* and *Phelan*, once elected to the Board, the PSU trustees have duties that are "not commensurate with the duties of elected public officials." *Id.* Indeed, the Third Circuit reached this very conclusion in *Benner.* In that case, PSU undergraduate students claimed that they had a right under the Fourteenth Amendment's Equal Protection Clause to participate in the election of certain members to PSU's board of trustees. *Benner*, 592 F.2d at 175. In analyzing their claims, the Third Circuit emphasized that the board has less governmental power than other local entities, such as school districts or county and state offices, and "controls no viable political sub-division." *Id.* The court also highlighted the University's limited general authority, stating that "it cannot acquire property by condemnation, levy or collect taxes, or pass on petitions to annex school districts." *Id. Contra. Phelan*, 235 F.3d at 1245 (board of trustees voted in favor of submitting a tax assessment to the public for general vote). Accordingly, the court concluded that the trustees' "duties do not approach the quantum of responsibilities of officials selected in a political democracy," nor do they "implicate decisions that are preservative of all rights." *Benner*, 592 F.2d at 183 (quotation marks omitted).

This Court finds *Benner* instructive. As the Third Circuit noted in that case, there are key differences between officials elected by the general public and trustees elected by a subset of PSU's population. *See generally id.* In addition to those differences, we also find it telling that 17 of the trustees are not elected by an portion of the PSU population, but instead are *appointed* by the Governor or elected by the Board itself. *See* Bylaws for Bd. of Tr'ees § 2.01(a). The Court is hard pressed to consider these 17 trustees similarly situated to elected public officials. And as Defendants note, if the Court were to treat some trustees as elected public officials and others as employees, it would render "governance of the Penn State Board of Trustees ... incoherent. The trustees appointed by the Board or the Pennsylvania Governor could face removal for improper speech made in their official capacities, while the nine trustees elected by alumni could disrupt the Board's work without consequence." (Doc. No. 19-1 at 17.)

Fenchak argues that none of PSU's trustees can be considered employees because the Board's Bylaws preclude a "person who is employed in any capacity by the University" from "serv[ing] as a member of the Board." (Doc. No. 20-2 at 7, 18 (referencing Bylaws for Bd. of Tr'ees § 2.02(a)).) But this provision merely forecloses individuals employed by the University in other capacities from simultaneously serving on the Board; it says nothing about whether a trustee, once elected (or appointed), is more appropriately considered an employee or an elected public official for First Amendment purposes. Moreover, other portions of the Bylaws show that once a trustee begins serving their term, they are subject to a rigorous code of conduct that outlines their responsibilities, limits their actions, and allows for their removal. *See* Bylaws for Bd. of Tr'ees § 2.03 (Trustee Code of Conduct); *id.* § 2.04 (Role and Responsibilities of Trustees); *id.* § 2.05 (Trustee Sanction or Removal). Those provisions, and the restrictions outlined within them, read far more like terms of employment than they do an oath of public office. *Cf. Jenevein v. Willing*, 493 F.3d 551, 557 (5th Cir. 2007) (finding a state court judge "is an elected official, about whom the public is obliged to inform itself, and the 'employer' is the public itself, at least in the practical sense, with the power to hire and fire. It is true that Judge Jenevein was an employee of the state. It is equally true that as an elected holder of state office, his

relationship with his employer differs from that of an ordinary state employee").

In short, given PSU's limited sovereign power, the multifaceted selection process for trustees on PSU's Board, and the nature of the trustees' duties, this Court finds that trustees, like Fenchak, are not elected public officials for First Amendment purposes.[4] Instead, they are properly viewed as University employees, whose speech may be restricted when necessary for the University to "operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

### B. The *Garcetti* Test

***7** As discussed above, when a public employee claims retaliation for protected speech, *Garcetti* provides the applicable standard. Specifically, statements made by public employees in the course of their official duties are not protected speech under the First Amendment; employers may discipline employees for such communications. *Garcetti*, 547 U.S. at 417. However, if a public employee is addressing matters of public concern as a *citizen*, the First Amendment safeguards their right to do so. *Id.* (collecting cases). Thus, the question now is whether Fenchak has alleged that he was speaking pursuant to his official duties or as a private citizen. *See Hill*, 455 F.3d at 241–42 (explaining that a public employees' speech is protected only if "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern; and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other members of the general public' as a result of the statement he made" (quoting *Garcetti*, 547 U.S. at 418)).

Here, Fenchak claims that Defendants retaliated against him for "[1] repeatedly, and at times, publicly, requesting ... financial information concerning administrative fees paid by the University to professionals retained to manage the University's endowment; [2] request[ing] ... information informing upon the terms and conditions of a contract the University was negotiating with Elevate Collegiate Ticketing, LLC, a sports ticketing company; and [3] filing an action in the Centre County Court of Common Pleas against Pennsylvania State University Board of Trustees and defendant Matthew Schuyler to compel production of information plaintiff had requested." (Doc. No. 20-2 at 17–18.) Fenchak has never contested that in each instance he was speaking in his role as a trustee and not as a private citizen. And his pleadings in this case and in *Fenchak I* confirm that in all three instances, he was speaking pursuant to his official duties—and specifically, pursuant to the fiduciary duties that he owed the University as a trustee. *See* Bylaws for Bd. of Tr'ees § 2.03(a) ("Trustees have crucial fiduciary responsibilities towards the University under these Bylaws ...."); *see also Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009) (explaining that a "claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job").

Beginning with Fenchak's requests for information about the University's endowment, Fenchak alleges that he "requested access to certain information relating to defendant Pennsylvania State University's endowment IRS 990 filings ... which he reasonably believed necessary to ... faithfully *discharge his duty as trustee* to protect the interests of the University." (Doc. No. 1-3 at ¶ 52 (emphasis added); *see also id.* at ¶ 33 (alleging that "[*c*]*onsistent with expectations of membership*, from time to time, *as a Board of Trustees member*, plaintiff spoke openly, freely, and candidly about what he believed to serve the greater good of the University and its student body" (emphases added)). As for the Elevate contract, Fenchak similarly alleges that "*consistent with his fiduciary responsibilities* plaintiff owed to the University ... plaintiff forwarded requests ... for access to information relating to the terms and conditions of a contract ... with Elevate Sports Ventures." (*Id.* at ¶ 69; *see also id.* at ¶ 23 (alleging that "at all times material to his service as a Board of Trustees member, plaintiff stood in a fiduciary relationship to the University").) And for both the endowment and the Elevate contract, Fenchak's requests were penned to other trustees and voiced during trustee meetings, avenues that were open to Fenchak because he was a trustee. (*Id.* at ¶¶ 53–58, 62, 69, 85–89); *cf. Santiago v. N.Y. & N.J. Port Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012) (finding an "internal report that went up the chain of command" was not citizen speech).

***8** By contrast, the Pennsylvania Court of Common Pleas where Fenchak filed *Fenchak I* is open to the public and statements made in the course of judicial proceedings are often considered citizen speech. *See, e.g., Falco v. Zimmer*, 767 F. App'x 288, 307 (3d Cir. 2019) ("[W]e can reasonably infer that Falco's filing this [First Amendment retaliation] action was not within his ordinary job responsibilities ...."). *But cf. Conte v. Bergeson*, 764 F. App'x 25, 28 (2d Cir. 2019) (finding the plaintiff's reports to an outside regulatory body were not citizen speech because "Conte's duties as a supervising pharmacist included ensuring that the pharmacy was in 'compliance with the laws and regulations of federal

and state agencies governing pharmacies.' While it may not have been explicitly within Conte's job description to file her grievance about the pharmacy's lack of compliance with an outside body, and the Board invites and receives complaints from the general public, those facts do not render her speech that of a private citizen”). However, Fenchak's pleadings in *Fenchak I* show that the filing of that case was merely an extension of Fenchak's efforts to gain information about the University's endowment and the Elevate contract: “[s]ince his election to the Board, Trustee Fenchak has sought information from the Board that he believes are *necessary to fulfill his fiduciary duties as a Board member*,” “[p]laintiff's requests are ... *strictly fiduciary in nature*,” and “[p]laintiff cannot *fulfill his fiduciary role* without this information.” *Fenchak I*, No. 2024-CV-1843-CI at 8–12 (emphases added); (*see also* Doc. No. 1-3 at ¶ 24 (“*Consistent with the fiduciary responsibilities owed to the University*, on July 16, 2024, plaintiff filed an action in the Centre County Court of Common Pleas ... to compel production of information relating to administrative fees paid by the University to manage the University's $5 billion endowment.” (emphasis added)); *id.* at ¶ 100 (“*Consistent with the fiduciary responsibilities plaintiff owed to the University*, on August 27, 2024, plaintiff amended the Complaint [in *Fenchak I*] to compel production of information informing upon the terms of the contract entered into between Pennsylvania State University [and] Elevate Sports Ventures.” (emphasis added)); Doc. No. 20-2 at 18 (asserting that one basis for his First Amendment claim is *Fenchak I*, which was filed “to compel production of information plaintiff had requested”).) And, as noted above, those efforts were taken pursuant to Fenchak's official duties as trustee, including the fiduciary responsibilities he owed the University.

Because Fenchak was at all times speaking in this fiduciary capacity, the Court finds that he was speaking pursuant to his official duties as a trustee and not as a private citizen. *See Houston*, 559 F. App'x at 142 (“Houston's role as ‘the person responsible for training’ the RIT included the ‘duty to correct errors and deviations in RIT procedures.' Thus, Houston's complaints regarding RVFD's training and dispatch protocols for its RIT were made ‘pursuant to his official duties’ and receive no First Amendment protection.” (cleaned up)). Accordingly, his speech is not protected under the First Amendment, and his retaliation claims fail. *See id.*

## IV. CONCLUSION

Defendants' motion for judgment on the pleadings is granted. Because Fenchak is not able to cure the deficiencies in his First Amendment retaliation claims, those claims are dismissed with prejudice. An appropriate order follows.

## All Citations

Slip Copy, 2026 WL 2210062

Footnotes

1 Although not specified in the Complaint, Defendants noted in their motion to dismiss that the removal vote initially scheduled for October 9, 2024 was delayed because Fenchak obtained a preliminary injunction in *Fenchak I.* (*See* Doc. No. 6-1 at 9.) The injunction was dissolved on May 16, 2025, and Fenchak was removed from the Board on June 16, 2025. (*Id.* at 9–10.)

2 That section provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. “To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.” *West v. Atkins*, 487 U.S. 42, 48 (1988).

3 The Complaint does not specify *how* Schuyler and Kleppinger allegedly retaliated against Fenchak. (*See* Doc. No. 1-3 at ¶¶ 233, 244.) But based on Fenchak's allegations against the University, the Court infers that he views the entire course of events leading to his removal—i.e., the sexual harassment investigation, the recommendation of removal, and Fenchak's ultimate removal from the Board of Trustees pursuant to the amended bylaws—as retaliatory. (*See id.* at ¶¶ 208–27.)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

4 Fenchak's suggestion that *Garcetti* does not apply because he was a volunteer as opposed to a paid employee is directly at odds with Third Circuit precedent. *See, e.g., Houston v. Township of Randolph*, 559 F. App'x 139, 142 (3d Cir. 2014) (applying *Garcetti* to First Amendment claim brought by volunteer firefighter).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.